1              UNITED STATES DISTRICT COURT

 2                       FOR THE

 3              MIDDLE DISTRICT OF GEORGIA

 4

 5    CASE NUMBER:  4:12-CV-43-CDL

 6

 7    SHAWNA BATES aka SHAWNA SMITH,

 8            Plaintiff,

 9            vs.

10    JP MORGAN CHASE BANK, N.A.,

11            Defendant.

12

13            S T I P U L A T I O N

14            IT IS STIPULATED AND AGREED by and

15    between the parties through their respective

16    counsel, that the video deposition of Jeffrey

17    G. Smith may be taken before Sara Nunnelly,

18    CCR, at the offices of Freedom Court

19    Reporting, at 188 North Foster Street, Suite

20    106, Dothan, Alabama 36303, on the 6th day of

21    June, 2013.

22

23            DEPOSITION OF JEFFREY G. SMITH

24

25

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                    **Pages 2..5**

**Page 2**

```
 1         IT IS FURTHER STIPULATED AND AGREED
 2  that the signature to and the reading of the
 3  deposition by the witness is waived, the
 4  deposition to have the same force and effect
 5  as if full compliance had been had with all
 6  laws and rules of Court relating to the taking
 7  of depositions.
 8         IT IS FURTHER STIPULATED AND AGREED
 9  that it shall not be necessary for any
10  objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties
13  may make objections and assign grounds at the
14  time of the trial, or at the time said
15  deposition is offered in evidence, or prior
16  thereto.
17         IT IS FURTHER STIPULATED AND AGREED
18  that the notice of filing of the deposition by
19  the Commissioner is waived.
20
21         * * * * * * * * * * * * *
22
23
24
25
```

**Page 3**

```
 1              I N D E X
 2           EXAMINATION
 3                                    PAGE
 4  By Mr. Englert ...................... 6
 5
 6         DEFENDANT'S EXHIBITS
 7                                    PAGE
 8  Ex. 1 - Mr. Smith's original
 9         Deposition Subpoena ........ 22
10  Ex. 2 - Mr. Smith's 2nd Deposition
11         Subpoena .................. 29
12  Ex. 3 - Map of 145 Culpepper Drive
13         property .................. 36
14  Ex. 4 - Loan refinance app for 145
15         Culpepper property ........ 104
16  Ex. 5 - Mr. Smith's signature
17         affidavit ................ 105
18  Ex. 6 - Copy of 2006 Income Tax
19         Return ................... 110
20
21
22     (Original Exhibits Were Retained By
23            Mr. Englert.)
24
25         * * * * * * * * * * * * *
```

**Page 4**

```
 1         UNITED STATES DISTRICT COURT
 2              FOR THE
 3         MIDDLE DISTRICT OF GEORGIA
 4
 5  CASE NUMBER:  4:12-CV-43-CDL
 6  SHAWNA BATES aka SHAWNA SMITH,
 7         Plaintiff,
 8         vs.
 9  JP MORGAN CHASE BANK, N.A.,
10         Defendant.
11  BEFORE:
12         Sara Nunnelly, Commissioner.
13  APPEARANCES:
14         DAVID T. ROHWEDDER, ESQUIRE, 1425
15  Wynnton Road, Columbus, Georgia 31906,
16  appearing on behalf of the Plaintiff.
17         JOE ENGLERT, ESQUIRE, of WARGO &
18  FRENCH, 999 Peachtree Street Northeast, 26th
19  Floor, Atlanta, Georgia 30309, appearing on
20  behalf of the Defendant.
21         JESSICA C. CASEY, ESQUIRE, of WARGO
22  & FRENCH, 999 Peachtree Street Northeast, 26th
23  Floor, Atlanta, Georgia 30309, appearing by
24  telephone on behalf of the Defendant.
25         ALSO PRESENT:  TED YOST
```

**Page 5**

```
 1         I, Sara Nunnelly, CCR, a Court
 2  Reporter of Pike Road, Alabama, acting as
 3  Commissioner, certify that on this date, as
 4  provided by the Alabama Rules of Civil
 5  Procedure and the foregoing stipulation of
 6  counsel, there came before me at the offices
 7  of Freedom Court Reporting, 188 North Foster
 8  Street, Suite 106, Dothan, Alabama 36303,
 9  beginning at 9:23 a.m., Jeffrey G. Smith,
10  witness in the above cause, for oral
11  examination, whereupon the following
12  proceedings were had:
13         VIDEOGRAPHER:  This begins
14  videotape number one in the deposition of
15  Jeffrey G. Smith in the matter of Shawna Bates
16  versus JPMorgan Chase Bank, case number
17  412CV-43-CDL in the United States District
18  Court for the Middle District of Georgia.
19         We are on the Record at 9:23
20  a.m., on Thursday, June 6th, 2013.  This
21  deposition is taking place at Dothan, Alabama.
22         My name is Ted Yost,
23  representing Huseby, Incorporated.  The Court
24  Reporter is Sara Nunnelly.
25         Would Counsel identify yourself
```

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                    Pages 6..9

Page 6

1  and state whom you represent.
2              MR. ROHWEDDER:  David Rohwedder,
3  for Shawna Bates.
4              MR. ENGLERT:  Joe Englert, for
5  JPMorgan Chase Bank.
6              VIDEOGRAPHER:  Will the
7  Reporter --
8              MS. CASEY:  Jessica Casey, for
9  JPMorgan Chase Bank.
10             VIDEOGRAPHER:  Will the Reporter
11 please swear in the witness.
12             JEFFREY G. SMITH,
13 being first duly sworn, was examined and
14 testified as follows:
15             COURT REPORTER:  Usual
16 stipulations?
17             MR. ENGLERT:  Yeah, that's fine.
18             MR. ROHWEDDER:  Yeah.
19             EXAMINATION
20 BY MR. ENGLERT:
21       Q.    Now, Mr. Smith, my name is Joe
22 Englert.
23       A.    Uh-huh.
24       Q.    I represent JPMorgan Chase Bank,
25 and I'll be representing them in connection

Page 7

1  with the -- the lawsuit filed by Mrs. Bates.
2       A.    Yes, sir.
3       Q.    Ms. Bates.
4       A.    Yeah.
5       Q.    Against JPMorgan Chase in the
6  United States District Court for the Middle
7  District of Georgia.
8       A.    Yeah.
9       Q.    And this deposition today is in
10 connection with that lawsuit.
11      A.    Okay.
12      Q.    I'm going to go ahead now and
13 explain a few general ground rules, and we'll
14 kind of go from there and I'll start asking
15 some questions.
16      A.    Okay.
17      Q.    Basically, the way this works,
18 I'm going to ask you questions, you're going
19 to respond to those questions.  When I've
20 completed with my questions, David here may
21 have a few questions for you as well.  And at
22 any point while we're asking these questions,
23 you need a break; you need some water, you
24 need to go to the bathroom, just let us
25 know --

Page 8

1       A.    Okay.
2       Q.    -- and we'll accommodate you.
3  The only thing that I will ask is, that if I
4  have asked you a question and you need to take
5  a break, if you would please finish the
6  question first --
7       A.    Sure.
8       Q.    -- or answering the question
9  first, and then you can go ahead and take a
10 break.
11      A.    Sure.
12      Q.    Okay.  Have you ever been
13 deposed before?
14      A.    Been where?
15      Q.    Have you ever been deposed
16 before?
17      A.    No.  No.
18      Q.    Taken -- No.  Okay.  Well,
19 Ms. Nunnelly here, she's -- she's making a
20 Record of our conversation, so my questions
21 and your answers.
22      A.    Okay.
23      Q.    And it's important when I ask
24 the questions in order to have a clean Record,
25 that you respond verbally; so yes or no.

Page 9

1       A.    Sure.
2       Q.    No head shakes or nods, that's
3  not going to be able to be recorded.
4  Although, you're also going to be videotaped
5  here today; but please do answer verbally,
6  respond verbally.
7       A.    Okay.
8       Q.    And no huh-uhs or uh-huhs, just
9  respond yes or no, or however is appropriate
10 based on the question.
11             Also, I ask for, so that we have
12 a clean Record, that you let me finish my
13 question first before responding; and I'll do
14 the same, I'll let you finish your answer.
15 The only time I may stop you is just if you
16 start veering far off course and start
17 becoming nonresponsive to the original
18 question, I may cut you off and try to
19 rephrase or ask another question to help get
20 you back on track.
21      A.    Okay.
22      Q.    If you don't understand a
23 question that I've asked, please do let me
24 know.
25      A.    Okay.

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                    Pages 10..13

Page 10

1      Q.      And I will try to rephrase it so
2  that you can comprehend it and answer.  And --
3  But if you go ahead and answer, I'm going to
4  assume that you understand the question.
5      A.      All right.
6      Q.      One other thing is, from time to
7  time, I doubt we'll do it very often, but one,
8  either David or I, may interject with an
9  objection about one of the questions that he
10 or I am going to ask.  Simply because we've
11 stated an objection doesn't mean that you
12 should not answer that question.  Just let us
13 finish -- state the objection and then you can
14 go ahead and respond --
15     A.      Okay.
16     Q.      -- as you deem appropriate.
17     A.      Okay.
18     Q.      Let's see.  Okay.  So I'm going
19 to just go through a few things here and make
20 sure that -- Are you on any medications
21 today --
22     A.      No.
23     Q.      -- Mr. Smith?
24     A.      No medications.
25     Q.      Are you -- Have you had any

Page 11

1  alcohol today?
2      A.      No.  No.
3      Q.      Okay.  Is there any other issues
4  that we should be aware about that would make
5  you --
6      A.      No, sir.
7      Q.      -- unable to testify competently
8  today?
9      A.      No, sir.
10     Q.      Okay.  I already asked if you've
11 been -- ever been deposed before.  Have you
12 ever been in a lawsuit, been involved in a
13 lawsuit?
14     A.      No, sir.
15     Q.      Have you ever been a party to a
16 lawsuit?
17     A.      No, sir.
18     Q.      Never been asked to testify as a
19 witness at trial?
20     A.      No, sir.
21     Q.      In a lawsuit?
22     A.      No, sir.
23     Q.      Okay.  One other thing I'm going
24 to backtrack on, one more ground rule.  I
25 wanted to explain quick before we get going

Page 12

1  about the oath.  So you just swore an oath
2  before we started this with Ms. Nunnelly.
3  That oath is, you know, you were sworn to
4  answer truthfully to questions that David and
5  I are going to ask you today.  And it's the
6  same oath that you would swear as if you were
7  in a court.  So it's important that you answer
8  completely and truthfully to the questions
9  that are asked today.
10     A.      Okay.
11     Q.      Okay.  Have you -- Have you --
12 Have you spoken with anybody regarding --
13 after you received the deposition subpoena
14 about the testimony that you're going to give
15 today?
16     A.      I talked with Shawna.  I called
17 her and let her know I had a paper delivered
18 to me.
19     Q.      When was that?
20     A.      And I talked with David.  That
21 was last week, maybe Thursday.  I'm not sure,
22 maybe Wednesday.  I'm not good with dates.
23     Q.      And that was when you spoke with
24 Shawna?
25     A.      Shawna.

Page 13

1      Q.      What was the content of that
2  conversation?
3      A.      Just letting her know I had
4  gotten a subpoena to -- to come do this,
5  basically.
6      Q.      Did she advise you about how you
7  should respond to the questions today?
8      A.      No.  No, no.  I just talked with
9  her and, you know, then I talked with David,
10 so no advisement on how to respond, no.
11     Q.      Okay.  And you contacted Shawna?
12     A.      I did.
13     Q.      Okay.  And then you also
14 mentioned that you spoke with David?
15     A.      I did.
16     Q.      When was that?
17     A.      The -- Maybe the same day or the
18 next day after the paper.  I'm very bad with
19 dates and time frames.  I get -- You know, but
20 it was last week, maybe Thursday.
21     Q.      Okay.  That actually reminds me,
22 too.  Let me instruct you in -- if I ask a
23 question and you don't know the answer, go
24 ahead and say:  I don't know.
25     A.      Okay.

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                      **Pages 14..17**

Page 14

1      Q.    Now, if you don't know -- Now,
2  if you know approximately or you have an
3  estimate about how to answer that question,
4  that's fine, and that was an appropriate
5  response.
6      A.    Okay.
7      Q.    If you don't know the exact
8  date, you can go:  I don't know.  I don't want
9  you to guess or to speculate.
10     A.    Right.
11     Q.    So, you know --
12     A.    Well, that's what I -- That's
13  approximate right there.
14     Q.    Okay.  Very good.  What was the
15  content of your conversation with David?
16     A.    Basically, just asking him about
17  what was going to happen here, you know, what
18  was going to go on.  And he said y'all were
19  going to ask me questions.  Basically, that
20  was it.  And he said -- you know, that's
21  really -- I've -- I've never been to nothing
22  like this, and I was just wanting to know what
23  I could expect.
24     Q.    Did David -- Did David advise
25  you as to what kind of questions might be

Page 15

1  asked?
2      A.    He talked to me about what
3  might -- you know, some questions that might
4  be asked.
5      Q.    Did he advise you of how you
6  might respond to those questions?
7      A.    No.  No.  He just -- He just
8  kind of went over a few questions with me, you
9  know, about what might be asked.
10     Q.    Did he provide any information
11  on the status of the lawsuit?
12     A.    No, sir.
13     Q.    Okay.  Have you spoken with --
14  with Ms. Bates at any point recently, other
15  than this occasion after you got served with
16  the deposition subpoena?
17     A.    I spoke with her Monday, this
18  past Monday, she called and asked about some
19  child support.  And I also spoke with my
20  children, you know, at the same time.  So
21  that's the last time.
22     Q.    Is this -- Was this last week,
23  last Wednesday when you discussed the -- the
24  deposition today, was this the first time that
25  you discussed the lawsuit --

Page 16

1      A.    Yes, sir.
2      Q.    -- with her?  Okay.  How often
3  do you speak with Ms. Bates?
4      A.    Not -- Not often at all.  You
5  know, I speak with the boys but not with her.
6      Q.    Okay.  When -- Other than you
7  said last Wednesday, that was the last time
8  you spoke with Ms. Bates?
9      A.    Right.
10     Q.    Is that correct?
11     A.    I spoke with her Monday.
12     Q.    Okay.
13     A.    She had asked me about child
14  support.  And also, like I say, while --
15  while I was on call with her I spoke with my
16  boys.
17     Q.    So this was Monday.  When you
18  say Monday, that was just Monday of this week?
19     A.    This week.
20     Q.    Okay.  And then the previous
21  Wednesday?
22     A.    I think it was Wednesday.
23     Q.    Wednesday of last -- that
24  following week or previous week, you spoke
25  with her and that was when you discussed

Page 17

1  your --
2      A.    Told her about --
3      Q.    -- subpoena and the deposition
4  today?
5      A.    Exactly.
6      Q.    Okay.  Do you recall when the
7  last time before that, the last two times when
8  you spoke with her?
9      A.    I'm sure it was about child
10  support, which would -- Probably a couple of
11  weeks before that.
12     Q.    Okay.
13     A.    You know.  And when I say I
14  spoke with her, you know, she calls me about
15  child support.  I get behind a little bit, and
16  basically that's -- you know, that's what we
17  talk about.  And I ask her about the boys, you
18  know, or either talk with them, so . . .
19     Q.    And you stated that she calls
20  you.  So would it be fair to say that she is
21  able to contact you?
22     A.    Yes.
23     Q.    She knows how to get ahold of
24  you?
25     A.    Yes, sir.

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                    Pages 18..21

Page 18

1    Q.    Does she know where you
2  currently reside?
3    A.    Yes, sir.  If I ain't out of
4  town working, she basically knows where I'm --
5  I'm there in Andalusia.
6    Q.    Okay.
7    A.    She knows Andalusia, basically,
8  is about all she knows.
9    Q.    Does she have a -- contact
10 information for you, in terms -- phone number?
11   A.    A phone number, yes, sir.
12   Q.    Is that a cell phone?
13   A.    Yes, sir.
14   Q.    What's that cell phone number?
15   A.    770-318-1551.
16   Q.    And she contacts you -- And she
17 has contacted you on this number in the past?
18   A.    Uh-huh.
19   Q.    How long have you had this cell
20 phone number?
21   A.    Many years.  Shoot, I'd say --
22 Man, I've had it a while, you know.  You know,
23 maybe ten years.
24   Q.    Ten.  Is it fair to say this was
25 the cell phone number that you had when you

Page 19

1  were together with Ms. Bates?
2    A.    Yes, sir.
3    Q.    Okay.  And she's always been
4  able to reach you at this number?
5    A.    Yes, sir.
6    Q.    There's been no interruption of
7  service of a significant amount of time?
8    A.    I have had interruption of
9  service, yes, sir.  I have.
10   Q.    Do you remember the last time
11 that your cell phone was disconnected,
12 approximately?
13   A.    The last time it was interrupted
14 was probably three weeks ago.
15   Q.    Okay.
16   A.    Two weeks ago.  Yeah, about two
17 weeks ago.
18   Q.    For how long?
19   A.    Probably a week and a half.
20   Q.    Okay.
21   A.    Yeah.
22   Q.    Is that -- How often does that
23 occur?
24   A.    Well, that happened.  And then a
25 previous time it was off for about a month,

Page 20

1  which was -- the distance in there I don't
2  know.
3    Q.    Okay.
4    A.    But I have had it off about a
5  month before.  And -- And I'm going to say
6  that's been a couple of months back.
7    Q.    Okay.
8    A.    That's close as I can get,
9  really.
10   Q.    Okay.  But generally this number
11 has --
12   A.    Yes.
13   Q.    -- been active and available and
14 Ms. Bates has been -- been able to contact you
15 at this number?
16   A.    Yes, sir.
17   Q.    Okay.  So, other than David and
18 Ms. Bates, is it your testimony that you have
19 not sought the advice or spoken with any other
20 individual --
21   A.    No.
22   Q.    -- about your deposition here
23 today?
24   A.    No.
25   Q.    Okay.  Have you relied on any

Page 21

1  documents, reviewed any documents in
2  preparation?
3    A.    No.
4    Q.    Okay.  Did you bring any
5  documents with you today?
6    A.    Just what I received on the
7  subpoena.
8    Q.    Okay.  Did you do anything else
9  to prepare for this deposition?
10   A.    No.
11   Q.    All right.  And you're not
12 represented by counsel?
13   A.    No.
14   Q.    Okay.  Just to clarify, it was
15 your testimony that the first time that you
16 spoke with -- with David here or any other of
17 his associates or partners was this past week
18 when you were served the deposition?
19   A.    Yes.
20   Q.    In no -- In no other time in the
21 past have you spoken with Charlie Gower?
22   A.    No.
23   Q.    Okay.  How about -- And the same
24 goes for David?
25   A.    Sure.  I mean, this last week

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013                    Pages 22..25

Page 22

1  was the first time.
2       Q.    Okay.   Okay.  At this time, I'm
3  going to introduce -- I'll mark this Exhibit
4  1, if you don't mind.
5              (Whereupon, Defendant's
6              Exhibit No. 1 was marked
7              for identification
8              purposes.)
9              MR. ROHWEDDER:  What is it?
10             MR. ENGLERT:  It's the original
11 subpoena.
12             MR. ROHWEDDER:  Thank you.
13      Q.    (Mr. Englert) Mr. Smith, do you
14 recognize this document that's been labeled
15 Deposition Exhibit 1?
16      A.     I do.  It looks similar to what
17 I have here.
18      Q.    Okay.  Is this the subpoena that
19 you received in connection with this lawsuit?
20      A.     Yes, sir.
21      Q.    Okay.  Can you turn to the first
22 page?
23      A.     (Witness complies.) Uh-huh.
24      Q.     It says testimony has a
25 checkmark there?

Page 23

1       A.     Uh-huh.
2       Q.    Can you read that paragraph to
3  me and let me know when you're done?
4       A.     (Witness complies.) Uh-huh.
5  Okay.
6       Q.    Okay.  Did you -- And have you
7  read this before coming to testify today, this
8  subpoena?
9       A.     I glimpsed at it.
10      Q.    Okay.
11      A.     You know, I mean, I really
12 haven't had time to really get into it too
13 much.
14      Q.    Okay.
15      A.     I tried to read over it a little
16 bit, you know, but I -- I glimpsed at it.  But
17 this is kind of high-tech looking stuff, so I
18 just glimpsed and went on with it.
19      Q.    Can you turn to -- It would be
20 page -- the second-to-the-last page -- or
21 third-to-the-last page, starting under
22 requests.
23      A.     (Witness complies.) Requests.
24 Okay.
25      Q.    Have you reviewed this?

Page 24

1       A.     I glimpsed at it, again.
2       Q.    Okay.  Did you understand when
3  you glimpsed through it or read it?
4       A.     I did.  Now that I'm looking at
5  it, I remember reading this, yes, sir, about
6  the letters, Facebook or other social media
7  networks, messages or text messages.  Yeah, I
8  just -- I glimpsed at it.  I just read a
9  little bit over it, yeah.
10      Q.    Did you understand when you read
11 through it that -- that you were required to
12 bring those documents today to this
13 deposition?
14      A.     Well, I mean, I don't -- I
15 don't -- I don't really -- I don't have a
16 computer.  I don't have a -- The Facebook
17 thing, I don't do, you know, so . . .
18      Q.    So, would -- Have you taken any
19 efforts -- Or what efforts have you taken
20 to -- to try to identify or obtain these
21 documents?
22      A.     Well, just looking over it, I
23 mean, I don't have no computer as far as
24 emails.  Facebook, I don't do.  Text messages,
25 I mean, I -- just didn't -- you know, I . . .

Page 25

1       Q.    Okay.
2       A.     I mean, I don't have none, I
3  mean.
4       Q.    With respect to number two,
5  request number two, go to number two.
6       A.     (Witness complies.) Number two.
7       Q.    For documents relating to -- Are
8  you reading the second request there?
9       A.     I don't understand.  What is it
10 saying, I mean?
11      Q.    Was that --
12      A.     I don't have no documents.
13      Q.    The request is seeking documents
14 related to the loan for --
15      A.     Oh.
16      Q.    -- for 145 Culpepper Drive?
17      A.     Right.
18      Q.    Are you not in possession of any
19 documents --
20      A.     No.
21      Q.    -- related to that loan?
22      A.     I don't have nothing.
23      Q.    Okay.  The third request under
24 number three?
25      A.     I do not have nothing.

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013                                    Pages 26..29

Page 26

1       Q.      Number four?
2       A.      I do not have nothing on that.
3       Q.      Is it your testimony you were
4  not -- Were you served with any documents
5  related to the foreclosure on that property?
6       A.      No.  No.  No, sir.
7       Q.      Okay.  Number five?
8       A.      I don't have nothing -- I really
9  don't understand that, what it's asking.
10      Q.      Number five is asking for
11 documents evidencing, referring to or
12 otherwise relating to any purported trespass
13 at the Culpepper property.
14      A.      I don't have nothing.
15      Q.      Are you aware of any documents
16 related to any allegation of trespass on the
17 property?
18      A.      My boys mentioned something to
19 me about some -- you know, somebody coming on
20 the property one time, but -- but I don't have
21 nothing.
22      Q.      Okay.  All right.  Number six?
23      A.      I don't have nothing on that
24 either.  I don't have none of this.
25      Q.      So you have -- Is it your

Page 27

1  testimony that you are not in possession of
2  any emails?
3       A.      I do not.
4       Q.      With respect to Mrs. Bates or
5  your interaction with -- with Chase, JPMorgan
6  Chase Bank?
7       A.      I don't have nothing.
8       Q.      You don't have any letters from
9  Chase Bank?
10      A.      I do not.  Like I say, I don't
11 even have a computer.
12      Q.      Okay.
13      A.      I mean, I know I don't mean, you
14 know, to say I don't have no email, I mean, or
15 nothing like that, but I don't -- I don't -- I
16 ain't had a computer in -- in, shoot, a year,
17 you know.  Mine -- I broke mine.  I just ain't
18 had no need to go online, really, you know.
19      Q.      Okay.  Number seven?
20      A.      I don't have nothing, nothing on
21 that.
22      Q.      Is it -- Is it your testimony
23 that you are not in possession of any
24 documents that evidence referred to or
25 otherwise related to communications with

Page 28

1  Ms. Bates, including emails, letters, Facebook
2  messages, social media, text messages about
3  the Culpepper property, about Chase Bank or
4  Mrs. Bates' emotional state?
5       A.      I don't have nothing -- I mean,
6  there's been no communication, you know what
7  I'm saying, or no documents from -- I don't
8  have no documents.
9       Q.      Okay.  Does Ms. Bates
10 communicate -- communicate with you via text
11 message?
12      A.      Every now and then about child
13 support, you know, just asking me when can I
14 pay child support.
15      Q.      Has she ever sent you a text
16 message that relates to Chase Bank --
17      A.      No.
18      Q.      -- or her problems with the
19 loan?
20      A.      No.
21      Q.      How about her emotional state?
22      A.      No.  Not at -- Nothing on text
23 message on that, no.  But I -- I mean, I just
24 know, I mean -- That's enough.  Okay.
25      Q.      Okay.  Thank you, Mr. Smith.

Page 29

1       A.      Uh-huh.
2               MR. ENGLERT:  Can you mark that
3  Exhibit 2?
4                       (Whereupon, Defendant's
5                       Exhibit No. 2 was marked
6                       for identification
7                       purposes.)
8       Q.      (Mr. Englert) Mr. Smith, are you
9  familiar with the document that's been labeled
10 Deposition Exhibit 2?
11      A.      Yes.
12      Q.      Is this the second subpoena that
13 you were served with?
14      A.      Yes, sir.
15      Q.      Okay.  Do you recall reading
16 this document?
17      A.      I glimpsed over it.  Again, I
18 just got it a couple of days ago.  Yes, a
19 couple days back I got it.
20      Q.      As with the previous subpoena,
21 did you understand when you read through it
22 that you were required to produce documents?
23      A.      Yes.
24      Q.      Is it your testimony, then, that
25 you do not have any documents --

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                    Pages 30..33

Page 30

```
 1        A.    No, I haven't.
 2        Q.    -- that are responsive to these
 3 requests in your possession?
 4        A.    I do not have any documents, no.
 5        Q.    If you turn to that, let's see,
 6 it's going to be -- I don't have a page number
 7 here.  It's going to be, it looks like the
 8 third from the back again.
 9        A.    (Witness complies.)
10              MR. ROHWEDDER:  The page before
11 it?
12              MR. ENGLERT:  No.  Back one.
13              MR. ROHWEDDER:  There you go.
14        Q.    So that request number two is
15 asking for a copy of all tax returns filed
16 jointly with Shawna Bates or individually from
17 2006 to 2010.  Is it your testimony that you
18 do not have records of your tax returns from
19 that period?
20        A.    I do not, no.
21        Q.    Request number three is seeking
22 any and all documents evidencing, requesting
23 or leading to your income from 2006 to 2010.
24 Including paychecks, bank statements and other
25 documents requesting your income.  Is it your
```

Page 31

```
 1 testimony that you do not have any documents
 2 responsive to this request?
 3        A.    Yes, sir.  No documents.
 4        Q.    No paychecks dating back between
 5 2006 and 2010?
 6        A.    No, sir.
 7        Q.    Okay.  Okay.  Mr. Smith, have
 8 you spoken with anyone from Chase or
 9 Washington Mutual since you've been notified
10 about the deposition today?
11        A.    No.
12        Q.    Did you speak with any of the
13 attorneys from my office, which is the offices
14 of Wargo and French?
15        A.    No.
16        Q.    Okay.  How old are you,
17 Mr. Smith?
18        A.    Thirty-seven.
19        Q.    And what is your exact date of
20 birth?
21        A.    8/21/65.
22        Q.    And what is your full legal
23 name, for the Record?
24        A.    Jeffrey Glenn Smith.
25        Q.    Have you gone by any other names
```

Page 32

```
 1 in the past?
 2        A.    No, sir.
 3        Q.    What's your current address?
 4        A.    I would -- I would say right
 5 now, this -- this 207 -- 20770 Peek Lane,
 6 Andalusia, Alabama is where I -- right now.  I
 7 pretty much work on the road, construction, so
 8 work -- Yeah.  I live out of my camper.
 9        Q.    And where is that currently
10 located?
11        A.    Andalusia, Alabama.
12        Q.    Okay.  How long have you lived
13 in Andalusia, in your camper?
14        A.    I've been there now, roughly,
15 eight months.
16        Q.    Prior to that time, where
17 would -- where did you live?
18        A.    Like I say, I'm on the road.  So
19 I was in Mississippi.  I was in Mississippi
20 for probably about three months.
21        Q.    Also in your camper?
22        A.    Yes, sir.
23        Q.    Can you give me more -- Can you
24 give me a city where you were?
25        A.    Pascagoula.  Pascagoula.
```

Page 33

```
 1 Pascagoula.  About three months there.
 2        Q.    And then prior to that?
 3        A.    Prior to that, I was back in
 4 Andalusia for several months.  I can't
 5 remember no exact time frame on that,
 6 but . . .
 7        Q.    Do you know how many months,
 8 approximately?
 9        A.    Pretty much since I've left
10 Georgia.  I can't remember.  I don't remember.
11 Bad on time frames.
12        Q.    Was it less than a year?
13        A.    I've been gone from Columbus
14 probably a year and a half, a year and so many
15 months.  So I -- You know, I'd just have to
16 put all that time together there.
17              I was in Andalusia -- I first
18 went to Andalusia.  Then I went to Mississippi
19 for -- for several months.  I'm going to say
20 three or four months.  And now I'm back in
21 Andalusia with my camper.
22        Q.    Previous to that, so you were in
23 Andalusia, then you were at Pascagoula, if I'm
24 pronouncing that correctly?
25        A.    Pascagoula, yes, sir.
```

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                    **Pages 34..37**

Page 34

1      Q.      Okay.  For three months.  And
2  then for the past eight months, you've been
3  back in Andalusia?
4      A.      Yes, sir.
5      Q.      And all times you were living in
6  your camper?
7      A.      Yes, sir.
8      Q.      Okay.  Previous to that, where
9  did you live?  Where did you reside?
10      A.      Before I moved to Alabama, I
11  resided on the property.
12      Q.      And what was that?  Okay.
13      A.      That would be Cataula, Georgia.
14      Q.      And that's -- The address is 145
15  Culpepper?
16      A.      Well, it's actually 216
17  Culpepper Drive.  There's two -- There's a
18  couple different properties right there.  So I
19  was on the back -- I was on the back
20  properties.
21      Q.      Did you own that property, that
22  back property?
23      A.      At one time I did, yes, sir.
24      Q.      Did you own that property
25  jointly with Ms. Bates?

Page 35

1      A.      You know, I don't remember if
2  that was just in my name or both of our names;
3  I can't remember how we set that up.
4      Q.      But the 216 Culpepper property,
5  was it a distinct and separate property?
6      A.      It is.  It is.
7      Q.      From the 145 Culpepper?
8      A.      It is.
9      Q.      Is it adjacent?
10      A.      Yes, sir.
11      Q.      The 216 Culpepper property, is
12  that adjacent to the 145 Culpepper property?
13      A.      Yes, sir,  Yes, sir.
14      Q.      Are you able to see from 216
15  Culpepper, view the house at 145 Culpepper?
16      A.      If you get at the right angle,
17  you could probably look -- you know, I was
18  kind of behind -- behind a shop.  We have a --
19  We had a shop on the property, on that 216,
20  so, really, I couldn't see unless I stepped
21  around to the side of the shop and looked,
22  because I was pretty much in the back of the
23  property over there.  So behind the shop we
24  had -- there's a big shop setting on the
25  property, so I was kind of behind it.

Page 36

1      Q.      So, how long did you reside at
2  216 Culpepper?
3      A.      I don't know.  Again, I'm
4  working construction, I'm on the road a lot,
5  and I'd -- I'd be there with my camper and
6  then -- you know, and on jobs.  It's according
7  to how far out of town I'd be working.
8              (Whereupon, Defendant's
9              Exhibit No. 3 was marked
10              for identification
11              purposes.)
12      MR. ENGLERT:  Can you mark this?
13      Q.      Mr. Smith, this purports -- this
14  is a map from above --
15      A.      Uh-huh.
16      Q.      -- of the 145 Culpepper
17  property.
18      A.      Uh-huh.
19      Q.      Does this look familiar to you?
20      A.      It does.
21      Q.      Can you confirm that this is
22  a -- a map or a picture of an overview of the
23  145 Culpepper, to the best of your knowledge?
24      A.      It is.
25      Q.      Can you identify with -- Here,

Page 37

1  I'll give you a pen.  You can just mark on
2  there, indicate to me where on this map the
3  216 Culpepper property was -- where your
4  camper was located on that property?
5      A.      Okay.  Just mark a little spot
6  here?
7      Q.      Yeah.
8      A.      Like, right in here
9  (indicating), under them trees back in there
10  kind of.
11      Q.      Okay.  Okay.  Do you think --
12      A.      I don't know if you can see
13  that -- I don't know if you can see that very
14  well, but . . .
15      MR. ENGLERT:  Do you think you
16  might have a red pen?
17      MR. ROHWEDDER:  Yeah, I don't.
18      MR. ENGLERT:  You don't?  Okay.
19      Q.      (MR. ENGLERT) And just to
20  confirm then, when you were residing in the
21  216 Culpepper property, you were residing in
22  your camper?
23      A.      Yeah.  Exactly.
24      Q.      Okay.  And prior to that time,
25  you resided in -- it's your testimony that you

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                    Pages 38..41

Page 38

```
 1  resided at 145 Culpepper?
 2       A.    I'm sorry?
 3       Q.    All right.  You -- Prior to
 4  residing at the 216 Culpepper address, you
 5  resided at 145 Culpepper?
 6       A.    Yes, sir.
 7       Q.    And you lived in the -- the
 8  house, or the home located on that property?
 9       A.    Yes, sir, when we was together.
10       Q.    Okay.  And when was -- When did
11  you move out of 145 Culpepper home?
12       A.    I don't know.  I don't know.
13  I -- I can't remember a time.  I'm bad on time
14  frames.  And -- Gosh.  Because we'd -- We'd
15  been separated a good while, you know.  I'm
16  just no good with time on time frames.  So,
17  you know, I'm sorry about that, but I just --
18  it's hard for me to back up and go, then tell
19  you exactly, you know, when that was.
20       Q.    Was it in 2009?
21       A.    No.  It was before that, I'm
22  sure.
23       Q.    Before 2009?
24       A.    I'm sure.
25       Q.    Okay.  But it was after May of
```

Page 39

```
 1  2008?
 2       A.    I can't remember.  I really
 3  can't tell you a good answer on that, because
 4  I don't -- I don't remember -- you know, I
 5  don't remember exactly when it was.
 6       Q.    Sure.  Do you recall when you
 7  first moved into the 145 Culpepper address?
 8       A.    The date?
 9       Q.    Approximately.
10       A.    No, I don't.
11       Q.    Do you recall what year,
12  approximately?
13       A.    Okay.  Let me see.  Maybe 2002.
14       Q.    Okay.
15       A.    Maybe.
16       Q.    Okay.  Now, at any point after
17  you moved out of the 215(sic) Culpepper
18  address --
19       A.    Uh-huh.
20       Q.    -- did Ms. Bates ever visit you
21  at any of those -- in either Andalusia or
22  Pascagoula?
23       A.    Oh, no, sir.
24       Q.    Any of her friends visit you?
25       A.    No, sir.
```

Page 40

```
 1       Q.    Family members?
 2       A.    No, sir.
 3       Q.    Okay.  When you moved from the
 4  216 Culpepper address --
 5       A.    Uh-huh.
 6       Q.    -- did you change your address?
 7       A.    I did not.
 8       Q.    Okay.
 9       A.    I mean, I've -- I've had no need
10  to -- I did not change it, no.
11       Q.    Did you change your address when
12  you moved from the 145 Culpepper address to
13  the 216 Culpepper address?
14       A.    No, sir.
15       Q.    So you -- You were still
16  receiving mail at the 145 Culpepper address?
17       A.    Yes, sir.
18       Q.    Even after you moved out of the
19  home?
20       A.    Yes, sir.
21       Q.    How would you get that mail?
22       A.    Shawna would either give it to
23  me.  When I was on the property, she would --
24  she would call me and tell me I had mail.  And
25  I would either meet her, you know, just walk
```

Page 41

```
 1  across the property and get it from her.
 2       Q.    Did you ever contact Chase to
 3  tell them about the change in the address?
 4       A.    No, sir.
 5       Q.    Okay.  Do you recall the -- the
 6  physical structure of the door at the 145
 7  Culpepper address?
 8       A.    The physical structure of the
 9  front door?
10       Q.    I mean, let me -- Let me
11  rephrase that.  It's a -- Do you recall anyone
12  ever slipping papers, mail, packages
13  underneath the door at the 145 Culpepper
14  address?
15       A.    No, sir.
16       Q.    Do you recall -- You would --
17  Someone would have been able to slip a piece
18  of paper underneath the door?
19       A.    I don't think so.  I mean, not
20  on the big door.  And we had -- And there's
21  this glass door was on there.  I don't know
22  what's on there now, but before there was like
23  a storm door on there, and it would lock, and
24  I don't -- I don't see how you could get
25  anything in there.
```

**Page 42**

```
1        Q.      Okay.  Are -- Are you currently
2  married?
3        A.      No, sir.
4        Q.      Have you ever been married?
5        A.      One time, yes, sir.
6        Q.      When was that?
7        A.      Gosh.  Let me think about that,
8  now.  Here we go with time again.
9        Q.      Take your time.  Just
10 approximate.  I mean, this doesn't have to be
11 the exact date that you were married.
12       A.      1989.
13       Q.      And how long --
14       A.      That's approximate.  I'm not
15 sure.
16       Q.      And how long were you married?
17       A.      Maybe a couple of years.
18       Q.      Okay.  And what was the name of
19 the person you were married to?
20       A.      Melody.
21       Q.      Do you recall her --
22       A.      I don't recall her.
23       Q.      -- maiden name?
24       A.      It's been so long ago.  Gosh.  I
25 don't remember.  I don't remember.  I don't
```

**Page 43**

```
1  remember right now.
2        Q.      Okay.
3        A.      It's been so long since I've
4  thought about that, I don't -- I don't
5  remember.
6        Q.      That's okay.  If it comes to you
7  later during the deposition --
8        A.      Okay.  No problem.
9        Q.      -- just let me know.  Did you
10 have any children from that marriage?
11       A.      We did.
12       Q.      What were their names?
13       A.      He's a Jeffrey Smith, Junior.
14       Q.      How old is Jeff Smith, Junior?
15       A.      He is twenty-two.
16       Q.      Is this to Melody, this is the
17 only time you've ever been married?
18       A.      That's correct.
19       Q.      You were not married to
20 Ms. Bates?
21       A.      No, sir, we weren't married.
22       Q.      Do you have any other children
23 other than Jeff Smith, Junior?
24       A.      Yes.
25       Q.      And what are their names?
```

**Page 44**

```
1        A.      [REDACTED] and [REDACTED].
2        Q.      And what's [REDACTED] age?
3        A.      Fifteen.
4        Q.      And [REDACTED] age?
5        A.      [REDACTED] is eleven.
6        Q.      Okay.
7        A.      Approximate.
8        Q.      And [REDACTED] and [REDACTED]
9  [REDACTED], their mother is Ms. Bates?
10       A.      That's correct.
11       Q.      Do you have a custody order in
12 place with respect to [REDACTED] and [REDACTED]
13       A.      No, sir.  Custody order?
14       Q.      Let me rephrase.
15       A.      Uh-huh.
16       Q.      What is the custody arrangement
17 with [REDACTED] and [REDACTED]?
18       A.      We really don't have no actual
19 writing or nothing, but, you know, she has
20 custody of the children.  And I visit when I
21 can, you know.  And she -- She let's me come
22 visit whenever I can, which it's been a little
23 while now, but . . .
24       Q.      Do the children ever come and
25 visit you?
```

**Page 45**

```
1        A.      No, sir.
2        Q.      Do you pay child support to
3  Ms. Bates?
4        A.      I do.
5        Q.      Have you ever been ordered by a
6  court to pay child support?
7        A.      No, sir.
8        Q.      Has Ms. Bates ever taken you to
9  court regarding custody or child support?
10       A.      No, sir.
11       Q.      So, when did you first meet the
12 Plaintiff here, Ms. Bates?
13       A.      I don't remember what year it
14 was, sorry.
15       Q.      Can you give me an approximate,
16 a decade?
17       A.      Oh, sure, yeah.  Maybe '96.
18       Q.      How did you meet Ms. Bates?
19       A.      Ms. Bates was a -- She was a
20 tenant of my mom's.  My mom had some duplexes
21 and she was a tenant, and I met her that way.
22       Q.      When did you become romantically
23 involved with Ms. Bates?
24       A.      Maybe -- Are you asking me a
25 year or like -- I mean, you know, a couple
```

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                    Pages 46..49

Page 46

1  months after we met.  I mean, we --
2       Q.    So you previously testified that
3  you met Mrs. Bates -- Ms. Bates, excuse me,
4  approximately 1996?
5       A.    Roughly.  I'm not -- I'm not
6  exact on these dates, so . . .
7       Q.    Okay.  But you started a
8  romantic relationship with her soon after you
9  met her?
10      A.    Sure.
11      Q.    Okay.  When did you split up?
12      A.    Wow.  You know, I can't -- I'm
13  trying to remember.  I don't know.  It's been
14  many years back, now.  I can't give you a
15  date -- I don't remember.  I mean, we was on
16  and off a little bit there, and then I -- and
17  I don't remember actually what year it was
18  when we separated.  I don't -- You know, I
19  don't remember what year.
20      Q.    Was it prior to 2009?
21      A.    Yes.
22      Q.    Was it prior to 2008?
23      A.    Yes, I think so.  Somewhere in
24  that time, I'm not exact -- I -- I don't know.
25      Q.    Okay.  Why did you split up, do

Page 47

1  you recall?
2       A.    Just wasn't getting along.
3       Q.    And it was after you split up
4  that you moved to the 216 Culpepper address?
5       A.    Yes.
6       Q.    So, it's your testimony that you
7  were never married to Ms. Bates; correct?
8       A.    That's correct.
9       Q.    Did she ever -- Did Ms. Bates
10  ever legally change her name to Shawna Smith?
11      A.    Not that I know of.
12      Q.    At some point, did she start
13  using the name Shawna Smith?
14      A.    Not that I know of, I mean.
15      Q.    Were you aware that she had a
16  driver's license in the name of Shawna Smith?
17      A.    No, I wasn't.  No.  I didn't
18  know that.
19      Q.    In the last five years, how
20  often have you seen Ms. Bates in person?
21      A.    In the last five years.  Gosh,
22  that's hard to say.  The only time I did
23  see -- have seen her any in the past is when I
24  do go see my boys.  And here lately, and I've
25  been -- that's been a -- since December, is

Page 48

1  when I seen the boys, and I know it's
2  terrible, but that's about the last time I've
3  been up there.  And -- But I don't know how
4  many times.  I don't know.  You say how many
5  times I saw her since we separated?
6       Q.    Yeah.  Approximately, just --
7       A.    I don't know.
8       Q.    -- is it maybe twice a year; is
9  that fair?
10      A.    Probably a little more than
11  that, since, you know -- when I -- When I was
12  living on the property I'd see her more, you
13  know.
14      Q.    Uh-huh.
15      A.    I'd get my mail or whatever I'd
16  get from her, you know.  And I would borrow --
17  You know, I'd wash my clothes at the house.
18  You know, she'd let me go over there and use
19  the laundry.  And I can't say how many times I
20  saw her.  I don't -- I can't -- I don't know.
21      Q.    So since you moved from the 216
22  Culpepper property, approximately how often do
23  you see Ms. Bates?
24      A.    Oh, Lord.  I've probably seen
25  her four times, five times.

Page 49

1       Q.    Total?
2       A.    Yes.
3       Q.    Okay.  When you see Ms. Bates,
4  you meet with her, did you discuss at -- at
5  any point the issues with the mortgage?
6       A.    No, sir.
7       Q.    Did she ever discuss her
8  interactions with Chase Bank?
9       A.    No, sir.
10      Q.    And when was the last time you
11  saw Ms. Bates in person?
12      A.    I don't remember what -- It
13  would be last year.  I went -- I went to see
14  my boys at Christmas.  I didn't see her then,
15  and it was the time before I went and visited
16  them.  I'm not sure what the date is.  It was
17  maybe October, maybe November of last year,
18  maybe.
19            I mean, in that -- I'm
20  estimating that.  I'm not sure.  It'd be --
21  It'd be one of the times I picked the boys up.
22  The last time I picked them up, I picked them
23  up at their grandmas.  So before that I saw
24  Ms. Bates, which would probably be October or
25  November, something like that.

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013                        Pages 50..53

Page 50

1      Q.      Now, how -- How often do you
2  speak with Ms. Bates on the phone?
3      A.      Not often at all.  Only child
4  support time.  And if I get behind is mainly
5  when I talk to her, otherwise, I just -- you
6  know, I'll just pay my child support.  And as
7  long as that's getting paid and then I ain't
8  seen my boys lately, so I don't, you know,
9  have too much communication.
10     Q.      So in the last five years, how
11  often did you -- have you spoken with
12  Ms. Bates?
13     A.      Gosh, I can't say.  I don't know
14  how many.  I don't know.  I don't know.
15     Q.      Okay.  Are there any major
16  disagreements that you recall in the
17  conversations you've had with Ms. Bates in the
18  last five years?
19     A.      Major disagreements?
20     Q.      Arguments.
21     A.      Not really.  No arguments, no.
22  It's just, if anything, you know, she'd -- I'd
23  get behind on child support mainly, and she'd,
24  you know, be wanting her money, wanting money.
25  So it ain't really a disagreement there, you

Page 51

1  know.  It's just that would be it.
2      Q.      When you spoke with Ms. Bates,
3  did you have any indication that she was
4  having emotional issues, was depressed?
5      A.      Not that I could tell, I mean, I
6  didn't know.  I don't know.  I mean, I don't
7  know nothing.  I just -- You know, we don't
8  talk very much.  I know I keep saying that,
9  but we didn't talk -- we haven't talked that
10  much since I've been gone, so . . .
11     Q.      And she never mentioned in the
12  times, the few times that you did speak, any
13  problems she was having, either health-wise or
14  emotionally?
15     A.      Well, before I left from the
16  properties, you know, I know she was having
17  emotional problems with -- with everything
18  about the house and all because, you know, at
19  one time I was still there on the properties.
20  And, you know, that's basically all I know.  I
21  mean . . .
22     Q.      What -- What did she tell you
23  specifically about the problems she was having
24  with the mortgage?
25     A.      She didn't really tell me

Page 52

1  nothing.  I could just tell by her attitude,
2  you know, her actions, that she was stressed.
3  You know, that's basically all I seen.  And,
4  you know, I know Shawna pretty good, and, you
5  know, from being with her, so . . .
6      Q.      Okay.  So, while you were living
7  with Ms. Bates, were you aware of any
8  treatment that she undertook for mental health
9  conditions?
10     A.      Not that I know of, no.
11     Q.      You prev -- You previously
12  testified that you became aware that she was
13  stressed at some point.  This was after you'd
14  split up?
15     A.      After I'd(sic) split up, but I
16  was still on the properties.
17     Q.      Okay.  Did she comm -- You
18  said -- Did she communicate to you the source
19  of that stress?
20     A.      Well, I did know about -- You
21  know, I did understand about the house.  I
22  knew a few things about what was going on with
23  the house, and -- and I was worried, too.
24  But, you know, that's mainly what she -- you
25  know what I'm saying, when she was stressed.

Page 53

1  But, who wouldn't be though, so . . .
2      Q.      What was your understanding of
3  what was happening with the house?
4      A.      Before I had left the
5  properties, she had told me about some
6  payments we had made on the house that wasn't
7  credited to our account, and, you know, we
8  just discussed that.  And, you know, I'm like:
9  Well, what happened to the money?  And just
10  stuff like that.  And she was very upset about
11  all that, you know.  And she was just having a
12  hard time with it, which -- which we had
13  separated.  I mean, I still had concerns, you
14  know, about all that, and I worry about all
15  that, you know, for my children and all, but
16  basically, that's all I know . . .
17     Q.      Would you say that she was
18  depressed during this time?
19     A.      I don't know about depressed,
20  but she was, you know, emotional over what was
21  happening.  She was worried about a place to
22  live and all, you know, and all of that.  And,
23  you know, anybody would be stressed over that.
24     Q.      Did she ever cry in front of you
25  about the mortgage issues?

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                    **Pages 54..57**

Page 54

1    A.    Sure.
2    Q.    How often was that?
3    A.    I mean, really, I didn't really
4  get into it too much with her on that.  I
5  mean, except for a few times, you know, right
6  before I left the -- the property, and just a
7  couple times I talked with her.
8    Q.    Do you know whether Ms. Bates
9  was suffering for -- from or being treated for
10 any physical health problems?
11    A.    No, sir, not that I really know
12 of.  I can't recall that.
13    Q.    At this time -- I'm sorry.  Let
14 me -- Let me start over with that question.
15          Do you know whether Mrs. Bates
16 was suffering from any physical problems when
17 she -- during this time when she first
18 discussed the issues with the mortgage with
19 you?
20    A.    Say that one more time now.
21    MR. ENGLERT:  Would you read
22 that back.
23    A.    I'm sorry.
24    Q.    That's okay.
25          (Requested portion of the

Page 55

1          Record was read by the
2          Reporter.)
3    A.    No, sir.  Not that I recall.  I
4  don't -- I don't.
5    Q.    Do you know if Ms. Bates has
6  ever suffered from any health conditions?
7    A.    Not that I know of.
8    Q.    Were you aware of -- of any
9  issues, thyroid issues, health issues?
10    A.    Not really.  Maybe I -- Maybe I
11 remember her mentioning maybe thyroids, I
12 don't --I don't know.
13    Q.    Did she ever mention that she
14 got a thyroidectomy?
15    A.    No.
16    Q.    Did she ever mention anything
17 about thyroid replacement therapy?
18    A.    No.  Very little communication
19 with me and her.
20    Q.    Was that after you split up that
21 you -- that there was very little
22 communication, or while you were together?
23    A.    After we split up, and -- and a
24 little bit before we split up, you know, we
25 was -- we was slipping there on the

Page 56

1  communication.
2    Q.    So, you were together in 2004;
3  correct?
4    A.    Sure.
5    Q.    Do you recall at this time
6  whether or not Ms. Bates was communicating
7  with you regularly?
8    A.    Pretty much, I reckon.  2004, I
9  reckon, yes.
10    Q.    You were aware at this time
11 whether or not she was -- 2004; that is,
12 whether or not she was taking any medication
13 for depression?
14    A.    I don't recall no medication.
15    Q.    Do you recall at this time in
16 2004 whether she had expressed any feelings of
17 depression to you?
18    A.    No, sir.
19    Q.    While you were together, was
20 Mrs. Bates -- Ms. Bates ever experiencing
21 excessive weight gain?
22    A.    She did put on a few pounds
23 right there towards the end of our --
24    Q.    And what time frame would that
25 have been?

Page 57

1    A.    Gosh, I don't know.
2    Q.    Prior to 2000 --
3    A.    Well, before I was -- Probably
4  before I left the property, I noticed she was
5  putting on a few pounds.
6    Q.    And that was around 2008, 2009?
7    A.    Yeah.  Before -- I left the
8  properties over a year ago, you know, so . . .
9    Q.    How about anxiety, do you recall
10 at this time prior to you moving out while you
11 were together with Ms. Bates, do you recall
12 whether she was anxious, suffering from --
13    A.    No, sir.
14    Q.    And it is your testimony that
15 also during this time, while you were together
16 prior to you moving out, that Ms. Bates was
17 not suffering from depression?
18    A.    Prior to me moving out of?
19    Q.    Of 145 Culpepper.
20    A.    No.  No.
21    Q.    How about insomnia?
22    A.    Insomnia.  What is that?
23    Q.    Trouble sleeping.
24    MR. ROHWEDDER:  Object to the
25 form of the question.

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**          Pages 58..61

Page 58

1           MR. ENGLERT:  Withdrawn.
2      Q.     Let me rephrase it.
3           Do you recall during your
4  relationship with Ms. Bates, prior to you
5  moving out from the premises --
6      A.     Uh-huh.
7      Q.      -- of 145 Culpepper, do you
8  recall Ms. Bates having any issues with -- any
9  trouble sleeping or any issues with insomnia?
10     A.     No, sir.
11     Q.     All right.  Do you recall during
12 the time while you were together with
13 Ms. Bates prior to you moving out from 145
14 Culpepper whether or not Ms. Bates suffered
15 from nausea, vomiting, diarrhea or general --
16     A.     No, sir.
17     Q.      -- stomach upset?
18     A.     No, sir, I don't recall none of
19 that.
20     Q.     Do you know whether Ms. Bates is
21 currently suffering from any mental health
22 conditions?
23     A.     Well, I know she's had some kind
24 of conditions going on.  You know, when I went
25 and seen my boys, I know she was sickly, and

Page 59

1  that's, like I say, one of the reasons I
2  didn't even see her, I reckon.
3      Q.     Well, when you say sickly --
4      A.     Yes, sir.
5      Q.      -- can you provide a further
6  explanation?
7      A.     I cannot.  I really -- I really
8  don't know what her problems are.  I really
9  don't.
10     Q.     Did your -- What did your
11 children tell you specifically?
12     A.     They said that she had a
13 operation, maybe at this time, which was
14 around December, you know, of this past year.
15 And really, they didn't -- They couldn't
16 really tell me, you know, what was going on.
17 And I don't even know if they did know, you
18 know.  I don't -- I don't know.  I mean, I
19 don't know what is wrong, you know what I'm
20 saying.  So I'm just telling you the truth.  I
21 don't know what problems are, you know.
22     Q.     Do you know whether Ms. Bates is
23 currently seeking the services of a therapist
24 or mental health professional?
25     A.     I don't -- I don't know.  I

Page 60

1  don't know.
2      Q.     Okay.  Do you know if Mrs. Bates
3  has ever sought the services of a therapist or
4  other mental health professional?
5      A.     Not that I know of.
6      Q.     To your knowledge, has Ms. Bates
7  ever been married?
8      A.     She has -- She has a -- She has
9  been married.
10     Q.     Do you recall when that marriage
11 was?
12     A.     No, sir.
13     Q.     She's currently divorced?
14     A.     Well, I think she's remarried
15 now, I think.  I don't get a lot of info from
16 nobody, so.  But she was -- I thought you
17 meant prior to her and I being together.
18     Q.     That's correct.
19     A.     And I do know she was married, I
20 think, at one time.  I think she was married.
21 I'm pretty sure she was married.  I shouldn't
22 be thinking nothing.  But I'm -- I'm sure she
23 was married.
24     Q.     Okay.  So you and Ms. Bates got
25 together around 1996, about?

Page 61

1      A.     About.
2      Q.     And you were together for
3  several years?
4      A.     Several years.
5      Q.     Until 2008?
6      A.     Somewhere around in that area.
7      Q.     Okay.  And how -- When did you
8  first start experiencing problems in that
9  relationship?
10     A.     You know, I work out of town a
11 lot, and I don't -- I don't recall when we had
12 the problems and all; which, you know, that
13 creates problems working out of town like I
14 did, and -- and we just kind of grew apart.  I
15 don't -- I don't know -- I can't remember when
16 we first started having problems.  I don't
17 know what year it was.  I don't -- I don't
18 know.
19     Q.     Okay.  Would you say it was
20 several years prior to the -- the time before
21 you split up?
22     A.     I'm sure.  I'm sure we started
23 having problems, you know, several years
24 prior.  You know, everybody has a little
25 trouble.  But, yes, we -- You know, like I

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                    Pages 62..65

Page 62

1 say, I worked out of town and all.  I'm not
2 sure how many -- how many years prior, you
3 know, but.  It's tough working like that.
4        Q.      Would you have arguments?
5        A.      Sure.  Every -- We'd have
6 arguments.
7        Q.      After these arguments, would
8 you -- was Ms. Bates upset?
9        A.      I mean, you know, just normal --
10 normal upset, you know, over little fussings,
11 you know.
12        Q.      After you began having problems
13 in your relationship, did you observe that
14 Mrs. Bates was suffering or was more stressed
15 than she normally was?
16        A.      Not really.  I mean, I'm just
17 speaking of like just little fussing, you
18 know, between couples, no.  You know.  Not
19 really.
20        Q.      During the past ten years since
21 you've known Ms. Bates, has she been
22 unemployed at any time?
23        A.      I'm sure she's been unemployed
24 before.  I mean.
25        Q.      Do you recall?

Page 63

1        A.      I mean, there's times we've had
2 our children and all, so I know she -- there's
3 times when she wasn't working, so . . .
4        Q.      Do you recall when the last time
5 she was unemployed?
6        A.      I do not.
7        Q.      Was she unemployed at the time
8 when you split up?
9        A.      I don't remember.  I don't
10 remember if she was unemployed at that time or
11 not.
12        Q.      Was she unemployed during the
13 period after you moved out of the 145
14 Culpepper address?
15        A.      I don't know.
16        Q.      Before you moved out of the 216
17 Culpepper address?
18        A.      Say that again.  Was she
19 unemployed?
20        Q.      The time frame between after you
21 moved out of the 145 Culpepper house and
22 before you moved out from the 216 Culpepper
23 address, do you recall whether or not she was
24 unemployed during that time?
25        A.      I -- I really don't -- I can't

Page 64

1 recall.  I really don't -- I know she worked.
2 I don't know if she was unemployed, you know,
3 during that time or not.  I'm not sure.
4        Q.      During that time, again, that
5 time being --
6        A.      Between.
7        Q.      -- between when you moved from
8 the 145 Culpepper, between when you moved from
9 the 216 Culpepper --
10        A.      Uh-huh.
11        Q.      -- do you recall if she ever
12 discussed finances with you, her finances?
13        A.      Just from one -- the time I
14 moved out of 145 until I left the 216, sure we
15 discussed money, you know.  Sure.
16        Q.      Did she express any stress
17 related to finances during this time?
18        A.      Naturally there's a little
19 stress, but, I mean, that's all I could say,
20 you know, a little stress, but over finances,
21 you know, so . . .
22        Q.      Specifically, what was she
23 stressed about financially?
24        A.      I don't -- I mean, just -- I
25 mean, it -- it had become a bad time there,

Page 65

1 you know, after -- you know the economy went
2 down and all that.  And just a lot of -- I
3 really don't know what to say, but besides,
4 being, you know, just trying to make
5 everything -- make ends meet everywhere, you
6 know.  So that's basically it.
7        Q.      During the periods where she's
8 been unemployed, did she pay her bills during
9 this period?
10        MR. ROHWEDDER:  Object to the
11 form of the question.  You can answer it if
12 you can.
13        A.      Okay.  Say that again.
14        Q.      You previously testified that
15 there were periods in the last ten years where
16 Ms. Bates was unemployed.
17        MR. ROHWEDDER:  I think his
18 testimony was that he doesn't recall that.
19        A.      I don't recall when she was, you
20 know -- when she was not -- when she was not
21 employed, or I don't remember how many times.
22 And really, as far as her paying her bills,
23 you know, when her and I were together, you
24 know, we -- the monies was -- my money was her
25 money, you know what I'm saying.  I don't know

Case 4:12-cv-00043-CDL   Document 67   Filed 06/11/13   Page 18 of 86

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013                    Pages 66..69

Page 66

1 if I got that right or not, but . . .
2        Q.     Let me -- Let me start over or
3 rephrase the question.
4        A.     Okay.
5        Q.     We'll back up.
6        A.     Okay.
7        Q.     In the last ten years --
8        A.     Uh-huh.
9        Q.     -- do you recall whether
10 Ms. Bates has been unemployed during -- any
11 period during that time?
12        A.     I'm sure she was unemployed.  I
13 don't know how many times.  I'm sure, like I
14 say, she -- we've had our children and all,
15 yes, she's been unemployed.
16        Q.     During those periods where
17 she's -- a period or periods --
18        A.     Uh-huh.
19        Q.     -- where she's been unemployed?
20        A.     Uh-huh.
21        Q.     Has Ms. Bates had trouble paying
22 her bills?
23        A.     No, sir.  We wouldn't have had
24 no trouble.  I mean, no more than -- nothing
25 major.  Just, you know, I would -- whatever I

Page 67

1 would make, she'd -- we'd pay our bills or her
2 bills.
3        Q.     So, during those periods where
4 she was unemployed --
5        A.     Uh-huh.
6        Q.     -- were you paying her bills?
7        A.     Sure.
8        Q.     During the last ten years, has
9 Ms. Bates ever expressed frustration --
10 frustration with having difficulty obtaining
11 employment?
12        A.     Not really.  Not really.  Not
13 that I know of, no.
14        Q.     In the past ten years, has there
15 ever been, to your knowledge, any significant
16 deaths in -- of her friends or family?
17        A.     Oh, sure,
18        Q.     Ms. Bates' friends or family?
19        A.     I know her dad passed away.  I
20 don't remember what year.  Basically, I'm sure
21 there's a few more family members, you know,
22 along, maybe a aunt or something.  I don't
23 remember exactly.  I just remember maybe some
24 of them from Macon.  You know, I'm not sure
25 where all them people were from.  But I just

Page 68

1 remember, I mean, I didn't go to the funeral
2 or nothing, but I remember some other family
3 members maybe dying.  But -- But her dad
4 passed away, I don't remember what year.
5        Q.     Was that within the last ten
6 years --
7        A.     Yes, sir.
8        Q.     -- that her dad passed?
9        A.     Yes, sir.  Yes, sir.  It's been
10 about a minute because, you know, time flies,
11 you know, but . . .
12        Q.     Was it within the last five
13 years that her father passed away, to your
14 recollection?
15        A.     No.  Maybe -- Maybe it's been a
16 little bit longer than five years, I'm not --
17 I can't remember.
18        Q.     Okay.  Do you recall whether in
19 the past ten years, whether any of Mrs. Bates
20 friends or family had fallen severely ill?
21        A.     In the past ten years?
22        Q.     Uh-huh.
23        A.     Her dad got ill.
24        Q.     How long was her father ill
25 before he passed?  Was it a long period of

Page 69

1 time?
2        A.     Right there at the end, he was
3 probably ill for a couple months, maybe, I'm
4 not sure, you know, when he went through his
5 worst time.  I'm -- I'm not even sure what was
6 wrong with him, but I remember him, you know,
7 having hospice, and all come in and help him.
8        Q.     Was Ms. Bates upset during this
9 time?
10        A.     Sure.
11        Q.     Was this -- When this time when
12 her father was ill and when he passed, was
13 this while you were together?
14        A.     Yes.
15        Q.     Okay.
16        A.     Yes.  I don't remember what year
17 that was.  Gosh.  Time flies.
18        Q.     Okay.  You testified previously
19 that you were informed by your children that
20 Ms. Bates had undergone a, or might have
21 undergone a surgery; is that correct?
22        A.     They said she was in the
23 hospital.
24        Q.     Do you recall, other than -- any
25 other instance where you've been aware where

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**       **Pages 70..73**

Page 70

1 Ms. Bates had a surgery?
2      A.     Prior to that one, I don't know.
3      Q.     Okay. Do you recall any
4 instances of issues with creditors other than
5 Chase?
6      A.     Not that I know of. I don't
7 know. As far as her's -- her business, I
8 don't know.
9      Q.     No issues with a credit card?
10     A.     I don't know. I'm not sure
11 about her personal, you know. I don't know.
12     Q.     Okay.
13           THE WITNESS: May I take a
14 bathroom break?
15           MR. ENGLERT: This is actually a
16 good time. That would be fine.
17           VIDEOGRAPHER: Going off the
18 Record at 10:34 a.m.
19           (Recess taken.)
20           VIDEOGRAPHER: Going back on the
21 Record at 10:48 a.m.
22     Q.     (MR. ENGLERT) Mr. Smith, can you
23 take a look again at Deposition Exhibit Number
24 2? It's that letter, the subpoena, dated June
25 23rd, 2013.

Page 71

1      A.     Uh-huh.
2      Q.     If you turn to that
3 third-to-the-last page. This is a request for
4 transcript of tax returns.
5      A.     Yes, sir.
6      Q.     Do you see that?
7      A.     I do.
8      Q.     Could you sign this document.
9 This is -- document is requesting permission
10 for Chase to pull your tax returns from 2006
11 and 2007.
12     A.     And I don't see why -- I mean, I
13 don't -- I don't -- I don't think I ought to
14 sign that.
15     Q.     Okay. If you go back one more
16 page in that Deposition Number 2?
17     A.     Uh-huh.
18     Q.     Read that request number 1.
19     A.     Uh-huh.
20     Q.     Can you read that aloud?
21     A.     A signed tax form 4506-T
22 enclosed.
23     Q.     So, that request is made
24 pursuant to this subpoena, with the -- the
25 power of the Courts of the United States

Page 72

1 District Court of the Middle District of
2 Georgia. And it's seeking this information,
3 which would otherwise be in your control,
4 which to release these documents, these tax
5 returns, we're seeking this information
6 pursuant to this case.
7           So, we may seek, if you do not
8 consent to sign it today, we may seek a court
9 order seeking your signature on this document?
10     A.     Okay.
11     Q.     I just want to advise you of
12 that.
13     A.     Okay.
14     Q.     Do you still wish to --
15     A.     I -- I -- I don't -- I ain't
16 going to sign that.
17     Q.     Okay. Before we went to break,
18 we were talking about your relationship with
19 Ms. Bates?
20     A.     (Witness nods head in the
21 affirmative.)
22     Q.     I wanted to follow back up
23 with -- with you regarding -- You had
24 testified previously that you had had a
25 conversation, or you were aware from your

Page 73

1 communications or interaction with Ms. Bates
2 that she was stressed about the mortgage?
3      A.     Yes, sir.
4      Q.     Is that correct?
5      A.     That is correct.
6      Q.     How did you -- How was this
7 communicated to you, specifically?
8      A.     I don't remember how it was
9 really communicated to me. I mean, we were
10 talking and she was concerned about where she
11 was going to live, you know, and what she was
12 going to do with all her stuff if she got put
13 out of the house or whatever, basically.
14     Q.     Did she tell you that she was
15 stressed?
16     A.     No. But I could tell she was --
17 you know, she was crying and all about the
18 situation, so I know she was stressed.
19     Q.     Did she say specifically why she
20 was crying?
21     A.     Well, we were talking about the
22 problem with the house, so I'm assuming she
23 was, you know, I'm assuming it was about that,
24 you know. I mean, I was stressed, too, you
25 know. So, I understand. That's a bad

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                    **Pages 74..77**

Page 74

1  situation, you know.  I don't care who it is,
2  you know, to be -- to have to get out of a
3  house, so, you know.  I mean, naturally.
4        Q.      What did she say specifically
5  about the actions of Chase?
6        A.      She didn't really tell me
7  exactly the actions of Chase.  I don't really
8  know.  I -- I don't know the legal -- you
9  know, what had legally went on or nothing.
10 But it -- you know, well, like I said, while I
11 was still on the properties, I remember about
12 the payments had got lost or whatever, and
13 then I don't really know.  I really don't
14 know.
15       Q.      Did she -- During this
16 conversation that you was -- where she started
17 crying, she had expressed stress about the
18 mortgage?
19       A.      Uh-huh.
20       Q.      Did she express stress that she
21 was -- would lose the house?
22       A.      Yes.
23       Q.      Did she express specifically
24 stress related to the payments that she had
25 made to Chase?

Page 75

1              MR. ROHWEDDER:  Object to the
2  form.  Object to the form of the question.
3        Q.      Well, let me rephrase that.
4        A.      Okay.
5        Q.      You just testified that you were
6  aware or Ms. Bates had communicated to you
7  that there was issues with some payments?
8        A.      Right.
9        Q.      At the time when she expressed
10 this stress to you as she started crying,
11 which you --
12       A.      Uh-huh.
13       Q.      -- did she mention the payments
14 at that time?
15       A.      No.  No.
16       Q.      So, is it -- is it fair -- is it
17 correct to say that when she expressed this
18 stress and when she started crying, this was
19 generally related to the fact that she was
20 behind in her mortgage?
21             MR. ROHWEDDER:  Object to the
22 form of the question.
23       Q.      Let me rephrase.
24             Did Mrs. Bates ever express --
25 specifically express to you that she was upset

Page 76

1  about any payments made to Chase?
2        A.      She -- We discussed some
3  payments that had gotten lost, just like I
4  said before, and then said they couldn't be
5  found or whatever.  That's basically all I
6  know.
7        Q.      In the context of those
8  conversations?
9        A.      Uh-huh.
10       Q.      Those conversations about the
11 payments to Chase, did she ever express to you
12 or communicate to you that she was feeling
13 anxious or stressed about those payments?
14       A.      Naturally a little stress,
15 maybe.  She didn't really -- You know, I could
16 just tell by her -- her speaking to me that
17 she was, you know, worried about it.
18 That's -- That's all I can say.
19       Q.      But she -- did she ever
20 specifically express to you that she was
21 stressed about those missed payments?
22             MR. ROHWEDDER:  Object to the
23 form of the question.
24       Q.      Did she ever specifically
25 express to you that she was stressed about

Page 77

1  the -- the payments to Chase?
2        A.      She didn't specifically tell me
3  she was stressed.
4        Q.      So, it is correct that -- that
5  you implied, simply implied from her conduct
6  that she was stressed about the payments?
7        A.      Yes, sir.  I'm going by her
8  actions, yes, sir.  I mean . . .
9        Q.      Okay.  Do you have any training
10 in mental health?
11       A.      No, I don't.
12       Q.      Diagnosis?
13       A.      No, sir, I don't.
14       Q.      So it's fair to say that you
15 are --
16       A.      I'm not.
17       Q.      -- not competent to assess the
18 mental health of a -- an individual?
19       A.      You could say that, I reckon.
20       Q.      Okay.
21       A.      I just know her, you know.
22 That's all I can say.
23       Q.      Okay.  Previously, you had
24 testified that you -- since you were served
25 with the subpoena?

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                    **Pages 78..81**

Page 78

1      A.      Yes, sir.
2      Q.      You had two conversations
3  regarding the subpoena; is that correct?
4      A.      That is correct.
5      Q.      The first conversation that you
6  had was with Ms. Bates; is that correct?
7      A.      That's correct.
8      Q.      How long was that conversation?
9      A.      Just two minutes.
10      Q.      Two minutes?
11      A.      Two -- Two minutes.
12      Q.      What did you discuss in that
13  conversation?
14      A.      Just told her I had got a piece
15  of paper to go to a subpoena.  Go to a
16  deposition.  Is that what you call this?  Yes,
17  sir.
18      Q.      And what did Mrs. Bates say in
19  response to that?
20      A.      She told me I might need to talk
21  with David, or I might want to talk with David
22  just to, you know.
23      Q.      Did she give you David's number?
24      A.      I believe she did.
25      Q.      Did you call David?

Page 79

1      A.      I did.
2      Q.      How soon after, did you call
3  David?
4      A.      I was at work, so maybe it was a
5  little while after, whenever I got a break or
6  something.  I don't remember exactly how long
7  it was.  Maybe an hour or two later.  I'm not
8  sure.  I'm not -- not sure.  I'm really not
9  sure.
10      Q.      And when you talked to David?
11      A.      Uh-huh.
12      Q.      How long did you speak with
13  David?
14      A.      I'm not sure about that either.
15  Maybe five minutes.  I'm not sure.
16      Q.      And what did you ask him in that
17  conversation?
18      A.      I just -- I reckon I asked him
19  what this is about, what I would have to do
20  and all like that.  And -- and he was just
21  telling me you'll just go answer some
22  questions and all for -- for this is
23  basically.
24      Q.      All right.  When you and
25  Ms. Bates were together, who handled the

Page 80

1  finances?
2      A.      Shawna.
3      Q.      Did Ms. Bates pay your bills as
4  well as her bills?
5      A.      I had a few of my own bills I
6  would pay, but basically she paid all the
7  bills.  We -- Yeah, she handled the payments.
8  She handled everything as far as, you know,
9  paying bills.
10      Q.      And when you filed tax returns,
11  either your own individual tax returns, did
12  you prepare those?
13      A.      I did not prepare them.
14      Q.      Who prepared the tax returns
15  when you were together?
16      A.      I don't remember exactly who --
17  the ladies name.  I don't know.
18      Q.      It was an outside, third party?
19      A.      Sure.  I'm sure.  Yes.  I don't
20  remember who it was.  Because Shawna -- Shawna
21  took care of all that.
22      Q.      Okay.
23      A.      Pretty much I done the work and
24  she took care of the paperwork, you know.
25      Q.      Do you know what Ms. Bates

Page 81

1  currently does for a living?
2      A.      I do not.  I'm assuming she's
3  still subbing or teaching, something to do in
4  that area, because that's what she loved to
5  do.  So . . .
6      Q.      What was the last position
7  Ms. Bates held that you were aware of?
8      A.      She was a sub teacher that I --
9  the last thing I remember, you know.  Sub --
10  Substituting.
11      Q.      When was that?
12      A.      Oh, gosh, I don't know when.
13  You mean what year?
14      Q.      What year approximately?
15      A.      I mean, she's done that for a
16  good while.  I mean, many years back.  I don't
17  remember what year it was.  I don't know.  I'm
18  sorry, I'm not good on -- on years.  I mean,
19  when -- time flies by so -- I don't know what
20  year to.
21      Q.      All right.  When you were
22  together?
23      A.      Okay.
24      Q.      What did Ms. Bates do for a
25  living?

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013                    Pages 82..85

Page 82

1       A.      Sub -- Substitute.  Substitute
2   teacher.
3       Q.      For what grades?
4       A.      First through fifth mostly, I
5   think.  First through fifth.
6       Q.      Has she ever been employed
7   outside of, to your recollection, outside of
8   being a -- the education field?
9       A.      No, sir.
10      Q.      What do you currently do for a
11  living?
12      A.      Underground utility work.
13  Pipeline work.  Pipeline-type work.
14  Construction.
15      Q.      How long have you been in this
16  line of work?
17      A.      All my life pretty much.  You
18  know, from the time I got out of school, my
19  dad had a business and I started with him and
20  I've been in -- been in it ever since.
21      Q.      What was the name of your
22  father's business?
23      A.      TC Smith, Inc.
24      Q.      And when, roughly, did you start
25  working for TC Smith?

Page 83

1       A.      That's when I was seventeen
2   years old.  I don't know what year that would
3   have been.
4       Q.      And how long did you work for TC
5   Smith?
6       A.      Probably -- Probably --
7   Initially, probably three or four years, then
8   I got, you know, in that time period, I got,
9   you know, me and him had a little fallout, no
10  major -- nothing major.
11          I went to work other places, and
12  then eventually come back to TC Smith.  You
13  got out and got a little learning done and
14  then come back to my dad, you know what I'm
15  saying.
16      Q.      So, how long was that period
17  where you were employed by a company other
18  than TC Smith?
19      A.      I may have these times mixed up,
20  but, you know, I worked for my dad a couple of
21  years probably after school, you know, after I
22  got out of high school.  Then I moved.
23  Probably three years I went to Columbus.  Went
24  to Columbus, Georgia and went to work with a
25  company, Gordy Construction.

Page 84

1           And I floated around a couple
2   other little jobs.  I don't remember.  And
3   then I finally went back to my dad.  And I
4   can't remember these years.  I -- I don't
5   remember.  Probably I worked him a couple
6   years.  We had a little problem.  I'm young,
7   you know how it is, and then I moved on.
8           And I'm still in the same line
9   of work, but, you know, I just moved to a
10  different company.  Probably three or four
11  years with a different company, three years,
12  maybe, and then back with my dad.
13      Q.      And then how -- And this was in
14  the same -- This period between when you
15  worked -- you first worked for TC Smith,
16  there's that three- or four-year period.
17  What -- what line of work was that?
18      A.      After working with my dad?
19      Q.      Uh-huh.
20      A.      It's the same type of work.
21  Construction, pipeline.
22      Q.      What is Bates & Smith
23  Contracting, Inc.?
24      A.      Who?
25      Q.      Bates & Smith Contracting, Inc.?

Page 85

1       A.      Uh-huh.
2       Q.      What is that?
3       A.      That is Bates & Smith
4   Contracting.  And it is pipeline.  Pipeline
5   work.
6       Q.      Is it a company?
7       A.      It was a company.
8       Q.      Is it a -- What kind of company?
9   Was it a corporation?
10      A.      It was incorporation.  Yeah,
11  corporation.
12      Q.      Do you remember what state it
13  was incorporated in?
14      A.      Georgia.
15      Q.      Okay.  When was this business in
16  operation?
17      A.      I don't remember what year we
18  went in business.  Here we go with them times
19  again.  I can't exactly tell you what year
20  it's from.
21      Q.      Okay.
22      A.      I'm trying to think back to
23  something that will remind -- you know, or
24  make me remember what year, and I -- it's
25  just --

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                    Pages 86..89

Page 86

1      Q.      Do you recall how old you were
2  when you --
3      A.      No, I can't.  No, I don't.  Let
4  me think here a minute.  Maybe 2003, maybe.
5  I'm not sure exactly.  But give or take.
6      Q.      Okay.  So, what specifically did
7  Bates & Smith Contracting, Inc. do?
8      A.      We installed pipe, sewer pipe,
9  water pipe and storm drain pipe.  Underground
10  utility work.
11      Q.      Who were your customers?  Who
12  were Bates & Smith, Inc -- Bates & Smith
13  Contracting, Inc.'s customers?
14      A.      Customers, we done worked for
15  counties.  Worked for different counties, you
16  know.  We was a sub under another -- under a
17  general contractor.
18      Q.      Who owned Bates & Smith
19  Contracting, Inc.?
20      A.      I reckon I did.
21      Q.      Were you the sole owner of Bates
22  & Smith Contracting, Inc.?
23      A.      I don't remember how that was
24  wrote up.  I don't -- I don't think I was the
25  sole owner.  I don't remember how that was

Page 87

1  written up.  I really don't.
2      Q.      Did Ms. Bates have an ownership
3  interest?
4      A.      Maybe.  I don't -- I don't -- I
5  really don't remember how we had it written
6  up.
7      Q.      What was your position with
8  Bates & Smith?
9      A.      I was a -- I was a foreman,
10  superintendent, foreman or whatever you may
11  call it.  I was over the jobs.  Over
12  installing the pipe.
13      Q.      How were you compensated through
14  Bates & Smith?  Did you draw a salary?
15      A.      I did.
16      Q.      Do you -- Were you compensated
17  in any other way?
18      A.      No, sir.
19      Q.      Did you earn a dividend from
20  Bates & Smith?
21      A.      Just draw a check.  Just a
22  check.
23      Q.      Was that check a payroll check?
24      A.      It was a payroll check.
25      Q.      So it was income that would have

Page 88

1  been reported on a W-2?
2      A.      Maybe.  I don't -- I don't
3  remember how we done that.  And like I say,
4  Shawna took care of all the -- all the
5  paperwork.
6      Q.      Did Shawna draw a salary from
7  Bates & Smith?
8      A.      You know at one time she may
9  have, you know, when we was doing -- when
10  everything was going good, maybe.  I don't --
11  I don't remember.  I don't remember.  I don't
12  know -- remember if we just worked off my
13  check or if she drawed a check, too.  I
14  don't -- I'm not sure.
15      Q.      Was Bates & Smith a profitable
16  enterprise?
17      A.      It -- It was doing -- It was
18  okay until the economy went bad, you know.
19      Q.      You said you started --
20      A.      We didn't get rich or nothing
21  like that.  But we was doing okay, I'm
22  assuming.
23      Q.      When you say you were assuming,
24  that means -- does that mean you don't know
25  whether or not Bates & Smith Contracting was

Page 89

1  earning a profit?
2      A.      We was earning a profit.
3      Q.      How do you know that it was
4  earning a profit?
5      A.      I mean, you know, we was -- we
6  was able to -- the money built up in the bank
7  a little bit, you know.  We was -- We was
8  doing -- It wasn't always so good.  When we
9  first started it was a little rough getting
10  going, but I'm sure -- I know we had a profit.
11  I can't tell you exactly how much profit, but
12  I know we profited.
13      Q.      Was there a separate bank
14  account for Bates & Smith Contracting?
15      A.      I'm assuming.  Yes, I'm sure.
16      Q.      When you say you're assuming?
17      A.      I'm sure.  I'm sure there was.
18      Q.      Was there any year where you
19  earned -- where Bates & Smith Contracting,
20  Inc. did not make a profit?
21      A.      Yes, I'm sure there was.  At the
22  beginning.
23      Q.      So that would have been in 2003?
24      A.      '4, '5, something like that.  In
25  that area.  I'm not -- I'm not telling you a

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013                    Pages 90..93

Page 90

1  definite year.
2        Q.    What year did -- did Bates &
3  Smith Contracting, Inc. start to earn a
4  profit?
5        A.    It was '06, maybe.  Again, I'm
6  not sure on these exact years.  I'm just --
7  Man, just time flies so bad.  I can't give you
8  an exact year.
9        Q.    How about in 2007?
10       A.    Maybe it was good.
11       Q.    2008?
12       A.    No.  No.  I mean, I don't -- I
13 don't remember.  Maybe 2008's when everything
14 started -- maybe when it starting doing -- you
15 know, the economy was dying, you know, so.
16 And that's probably about the right time for
17 the, you know, when that happened.
18       Q.    So the economy effected the
19 business of Bates & Smith Contracting, Inc.?
20       A.    Sure.  Sure, it did.
21       Q.    Is Bates & Smith Contracting,
22 Inc. still in --
23       A.    No.
24       Q.    -- operation?
25       A.    No, sir.

Page 91

1        Q.    When -- When did you shut down
2  that business, or when was Bates & Smith
3  Contracting, Inc. shut down?
4        A.    Maybe '08, '09.  Maybe.  Wait a
5  minute.  Yeah.  '09.  I'm not sure.
6        Q.    And why was it?
7        A.    No -- No work.  No work.
8        Q.    So, is it correct to say that
9  Ms. Bates handled all the finances for Bates &
10 Smith Contracting, Inc.?
11       A.    Yes.
12       Q.    And what -- What was your role,
13 specifically, with Bates & Smith Contracting,
14 Inc.?
15       A.    A superintendent as far as on
16 the job.  On-site work.  I was on the site
17 installing pipe, out in the field, you know
18 what I'm saying.
19       Q.    Was TC Smith, Inc. your -- your
20 father's business, was that the same kind of
21 business?
22       A.    The same.  Same work.
23       Q.    What was your position at TC
24 Smith?
25       A.    A foreman with him.  Because he

Page 92

1  was the -- you know, he was the owner, so he
2  was like superintendent and I was running a --
3  running a crew, running a crew for him.
4        Q.    Did you have the same
5  responsibilities with TC Smith?
6        A.    Exactly.
7        Q.    As you had with -- Was it the
8  same client base as TC Smith?
9        A.    Some of them.  Some same
10 clients, yes.  Because of, you know, working
11 with him all them years, yes, sir.  Then he
12 retired, and then we picked up some of his --
13 some of his old clients, yeah.
14       Q.    Did you have any other
15 responsibilities with TC Smith other than a
16 foreman, other than managing -- Let me -- Let
17 me -- Let me rephrase this.
18             Were you responsible for
19 managing the finances for TC Smith?
20       A.    Pretty much my dad took care
21 of -- you know, he wanted to handle it.  So,
22 like, toward the end of his career there, as
23 he was ready to retire, I kind of -- he tried
24 to get me to kind of handle paying some of the
25 bills and stuff for him, which is a big task

Page 93

1  and you try to do the work, too.  But, yeah, I
2  tried to do what I could to help him, you
3  know.
4        Q.    So paying bills.  And what other
5  responsibilities did you pick up as your
6  father was retiring from TC Smith?
7        A.    Just that's basically it, you
8  know.  And running a -- running a crew for
9  him, which is out installing pipe.  Whether it
10 may be in the street out here or something,
11 you know, or in the woods.  That's basically
12 it.  I mean, you know, you've got to order
13 your material, you've got to get it in the
14 ground, and then, you know, just the normal
15 stuff for installing pipe.
16       Q.    When you say you run a crew,
17 what does that mean?
18       A.    I had a crew of -- a pipeline
19 crew with maybe five, six men, according to
20 how many you need.  We'd be digging and
21 putting in pipe.
22       Q.    When you say digging, were they
23 digging with --
24       A.    Excavator.
25       Q.    -- with equipment?

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                    Pages 94..97

Page 94

```
 1      A.      Excavator.
 2      Q.      Machines?
 3      A.      Yes, sir.
 4      Q.      Okay.  So with Bates & Smith
 5 Contracting, Inc., did you ever pay any of the
 6 bills?
 7      A.      No, sir.
 8      Q.      Did you ever handle any of the
 9 filing taxes?
10      A.      No, sir.
11      Q.      Who handled filing the taxes?
12      A.      Shawna.
13      Q.      Who handled paying the bills?
14      A.      Shawna.
15      Q.      For Bates & Smith Contracting?
16      A.      Shawna.
17      Q.      Did you review the -- any of the
18 financial information for Bates & Smith
19 Contracting, Inc.?
20      A.      Not that I recall.  Not --
21 Not -- Not really have reviewed nothing, no.
22 I just trusted Shawna to do what she had to do
23 with her part, you know, and I done my part.
24 So . . .
25      Q.      So, when you previously
```

Page 95

```
 1 testified that Bates & Smith was either
 2 earning a loss or earning a profit, was that
 3 based?
 4      A.      Upon.
 5      Q.      Shawna's representation?
 6      A.      Shawna, right.
 7      Q.      Okay.  Okay.  What -- What were
 8 your sources of income in 2006, 2007?  Well,
 9 let's just start with -- We'll take it year by
10 year.  I'm sorry.
11              In 2006, what was your sources
12 of income?
13      A.      2006, I was drawing a check, I
14 mean.
15      Q.      From which company?
16      A.      Bates & Smith, I'm sure.
17      Q.      Bates & Smith?
18      A.      Yeah.
19      Q.      How much were you compensated?
20 What was your salary from Bates & Smith in
21 2006?
22      A.      I'm not sure what it was in them
23 years.  I'm not sure -- It's according to
24 what -- If -- If -- I don't remember exactly
25 when.  The economy started going bad on us,
```

Page 96

```
 1 you know, I had to take a cut, you know.  I
 2 don't remember.  I can't give you a -- a firm
 3 number, you know what I'm saying.
 4              Again, me and Shawna -- you
 5 know, me and Shawna were together.  I'd get a
 6 little money, you know, I wouldn't probably
 7 get my whole check, you know.  I mean, she
 8 would pay a bill -- our personal bills with
 9 my, you know what I'm saying, with what I
10 drawed.  And I'd get some money.  I -- I just
11 can't give you a firm right there without . .
12 .
13      Q.      So Shawna determined -- she
14 managed the payroll for Bates & Smith
15 Contracting, Inc.?
16      A.      Exactly.  Exactly.
17      Q.      Okay.  And she determined the
18 amount of salary that you would draw?
19      A.      Right.  I mean, we would discuss
20 things, but, you know.  I mean, when things
21 was good, may -- maybe it was like sixteen
22 hundred a week, you know.  And personally, you
23 know, that would come to me, and then that
24 would be from Shawna's and I personal, you
25 know.  And, you know, she would get what she
```

Page 97

```
 1 needed to pay the bills and I'd get some, you
 2 know, get some to have, you know, whatever I
 3 needed to pay or whatever I needed to do.
 4      Q.      So, did Bates & Smith -- Okay.
 5 Let me make sure I'm clear.  Okay.  The
 6 sixteen hundred dollars a week, approximately?
 7      A.      Okay.
 8      Q.      That you referred to previously,
 9 that was your salary?
10      A.      Well, some of that may have -- A
11 lot of times I worked out of town, so, see, I
12 can't give you a for-sure number.  Because
13 some of it would be for out-of-town expense.
14 I'd have something to eat, you know, to have
15 money from the company to eat on, plus some
16 money -- plus my check.
17      Q.      Okay.  And then addition to that
18 money, whatever money you received, that's
19 approximately sixteen hundred bucks?
20      A.      Uh-huh.
21      Q.      There was also Shawna received
22 some funds from Bates & Smith to pay other
23 bills; is that correct?
24      A.      Pay company bills -- No.  She
25 just -- She would pay company bills with --
```

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013                    Pages 98..101

Page 98

1   with -- from B & S.
2          Q.     Okay.  But from you paid your
3   personal expenses?
4          A.     Out of my check.
5          Q.     Out of your?
6          A.     Which come -- yes.
7          Q.     From the wages you earned from
8   Bates & Smith --
9          A.     That is correct.
10         Q.     -- Contracting, Inc.?
11         A.     That is correct.
12         Q.     Okay.  Okay.  So there was no
13  other sources of income?
14         A.     No, sir.
15         Q.     In 2006, other than the salary
16  you drew from Bates & Smith Contracting?
17         A.     That's correct.
18         Q.     And you -- you approximate that
19  the salary that you earned in 2006 was sixteen
20  hundred bucks a week, which included
21  reimbursement for personal expenses?
22         A.     Yes, that I recollect.
23         Q.     Through company funds?
24         A.     Yes, sir.
25         Q.     Okay.

Page 99

1          A.     All that's approximate.  It
2   ain't nothing definite.  I'm not telling you a
3   for-sure number on nothing.
4          Q.     And you never -- At the end of
5   the year at the end of the quarter you never
6   received any kind of bonus or dividend paid
7   directly to you from Bates & Smith?
8          A.     Not really.  No.  No.
9          Q.     Okay.  Do you recall whether or
10  not you were an officer of Bates & Smith?
11         A.     I believe I was an officer of
12  the corporation.
13         Q.     Were you the president of the
14  corporation?
15         A.     Maybe.
16         Q.     Was Shawna an officer of the
17  company?
18         A.     I believe.
19         Q.     What was her position?
20         A.     You know, it's been so long
21  since all that took place, I can't remember.
22  I don't remember.  Maybe she was secretary.
23  I'm not sure.
24         Q.     Okay.  And you testified
25  previously that your income or the wages that

Page 100

1   you earned from Bates & Smith would fluctuate;
2   is that correct?
3          A.     Sure, you know.  When the
4   economy got bad, you know, it had to go down,
5   you know.
6          Q.     Would it fluctuate on a regular
7   basis?
8          A.     No, not really.  No.
9          Q.     So month to month it was -- it
10  was steady?
11         A.     Yeah.
12         Q.     Correct?
13         A.     Yes, it was steady.
14         Q.     Okay.  Do you recall whether or
15  not in 2006 your salary went down at any
16  point?
17         A.     I don't remember what year.  I
18  don't -- I don't remember if it was 2006.  I
19  don't remember.
20         Q.     In 2007?
21         A.     '07.
22         Q.     Were you still employed by Bates
23  & Smith Contracting, Inc.?
24         A.     I believe so.
25         Q.     And you were earning a salary

Page 101

1   from Bates & Smith?
2          A.     I was, I'm sure, if I was
3   working.
4          Q.     Do you recall whether that
5   salary was more or less than what you earned
6   in 2006?
7          A.     I don't remember.
8          Q.     Do you recall if it was
9   approx -- if it was same as you earned in
10  2006?
11         A.     I don't remember that either.
12         Q.     Do you recall approximately how
13  much you were paid in 2007, from Bates &
14  Smith?
15         A.     I do not remember.
16         Q.     Do you recall if you have any
17  income other than --
18         A.     I did not.  No other income.
19         Q.     2007, did you earn any bonuses,
20  dividends from Bates & Smith Contracting,
21  Inc.?
22         A.     I don't -- I don't think so.
23         Q.     Did you ever earn any kind of
24  bonuses or dividends?
25         A.     Maybe -- Maybe here and there

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                    Pages 102..105

Page 102

1 maybe, I can't remember.  I don't remember
2 that.  I don't remember it.  I don't remember
3 getting any -- you know, any bonuses.
4        Q.    Outside --
5        A.    Outside my regular check.
6        Q.    Let me clarify, yeah.  Outside
7 of your regular check, were you ever paid --
8        A.    Not that I remember.
9        Q.    -- any extra compensation?
10       A.    I can't say that I have.
11       Q.    Okay.  In 2008, were you still
12 employed by Bates & Smith Contracting, Inc.?
13       A.    Yes, sir, maybe.  I'm trying to
14 remember the date of when -- I don't remember
15 when we actually was over.  You know, what I'm
16 saying.  I don't remember what year we --
17 2008, yes, maybe.
18       Q.    Okay.  Do you recall if in 2008
19 that you were earning less than you were
20 earning in either 2006 or 2007?
21       A.    I'm sure.  I'm sure I was
22 earning less, maybe.  That sounds like the
23 time of when the economy started dwindling,
24 dying down.
25       Q.    So it's your recollection in

Page 103

1 2008, you made less than you made in 2007?
2        A.    Maybe.
3        Q.    Okay.  How did your income that
4 you earned or your wages that you earned with
5 Bates & Smith, was it more or less than you
6 earned with TC Smith?
7        A.    About the same.
8        Q.    About the same.  Okay.  And
9 again, per year, do you recall what your
10 salary was?
11       A.    No, sir.
12       Q.    No.  Okay.  Did Bates & Smith
13 have -- ever have any issues with collecting
14 from its clients?
15       A.    Well, every now and then
16 people'd get slow.  They're going -- they're
17 going to get slow, you know what I'm saying,
18 about paying.  You know, it'd take a -- You'd
19 work a month and then sometime they would
20 get -- they would be slow getting paid from
21 the counties or cities, and -- and it'd be
22 slow, sure.
23       Q.    Do you recall any specific
24 instance with a client that you were unable to
25 collect on?

Page 104

1        A.    Not really, no.
2        Q.    Okay.  Do you recall -- Oh,
3 strike that.
4        A.    Uh-huh.
5        Q.    Did you apply for a loan?
6        A.    Loan?
7        Q.    With Ms. Bates to refinance the
8 property at 145 Culpepper?
9        A.    I did, I think.  Again, Shawna
10 always handled all the paperwork.
11             (Whereupon, Defendant's
12              Exhibit No. 4 was marked
13              for identification
14              purposes.)
15       Q.    Mrs. Bates (sic), do you
16 recognize the document that's before you
17 that's labeled Deposition Exhibit 4?
18       A.    Do I -- Do I recognize it?
19       Q.    Yes.
20       A.    No, I don't.  Maybe simply
21 because it's been, I don't know, been a while.
22       Q.    Can you turn to page, it would
23 be the third page?
24       A.    (Witness complies.)  Uh-huh.
25       Q.    Is that your signature?

Page 105

1        A.    It looks like my signature.  It
2 does.
3             (Whereupon, Defendant's
4              Exhibit No. 5 was marked
5              for identification
6              purposes.)
7        Q.    Okay.  Mr. Smith, you -- are you
8 familiar with the document that's been labeled
9 Deposition Exhibit 5?
10       A.    Am I familiar with it?  Not
11 really.
12       Q.    Do you recall signing this --
13 Well, let me back up.  Is this your signature
14 on it?
15       A.    Uh-huh.  It looks like my
16 signature.
17       Q.    Do you recall signing this
18 document?
19       A.    Not exactly.  But, again, it's
20 just been a while, maybe.
21       Q.    Okay.
22       A.    And I don't remember.
23       Q.    Turn back to Deposition Exhibit
24 4, which is the loan application?
25       A.    Uh-huh.

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                          Pages 106..109

Page 106

1      Q.      Do you recall reading this
2  document, now that you've had a chance to
3  review it?
4      A.      Well, I do remember the -- I do
5  remember the loan, I reckon.
6      Q.      Take your time, too, if you'd
7  like to review it.  I mean, we have time.
8      A.      Is this a refinance thing or
9  something?  I'm not sure.
10     Q.      Do you recall -- Well, let me
11 back up.  Let's strike that.
12         Did you submit an application to
13 refinance the loan -- the mortgage on the 145
14 Culpepper property?
15     A.      If this is -- I reckon we did.
16     Q.      Okay.
17     A.      And again, a lot of -- I mean,
18 if -- Shawna would handle the paperwork and a
19 lot of times I signed things, which I, you
20 know, I trusted her, you know what I'm saying.
21     Q.      Uh-huh.
22     A.      And sometimes, you know, I just
23 wouldn't read the whole -- and stuff would
24 slip your mind, you know.
25     Q.      Okay.

Page 107

1      A.      I just . . .
2      Q.      What did she tell you about the
3  refinancing of the mortgage?
4      A.      Maybe a cheaper interest rate
5  and everything, basically is what I remember.
6      Q.      Were you on the previous loan
7  that was refinanced?  Was your name on it, on
8  the loan?  Were you on that loan?
9      A.      I don't remember.  I don't
10 remember.  I really don't.
11     Q.      Do you recall receiving any
12 communications from -- well, Chase Bank or
13 WAMU regarding the refinancing and the
14 mortgage?
15     A.      I don't remember that.
16     Q.      Do you recall whether or not
17 Chase ever sent any correspondences to the 145
18 Culpepper address while you were living there?
19     A.      I don't -- I don't remember
20 nothing about nobody coming or nothing.  Ask
21 me that again now.  Do I remember?
22     Q.      Do you recall receiving any
23 correspondences and letters from Chase?
24     A.      No, I don't.
25     Q.      Okay.  Did you submit any

Page 108

1  information pursuant to this loan application?
2      A.      What do you mean?
3      Q.      Do you see where there's
4  information in these boxes?
5      A.      Right.
6      Q.      Regarding?
7      A.      I mean, it's Social Security
8  number and all.
9      Q.      Those addresses?
10     A.      Yes, exactly, I mean.
11     Q.      Did you fill out -- out this
12 form?
13     A.      I did not.  I probably signed
14 it.
15     Q.      To your recollection, who filled
16 out this form?
17     A.      I don't remember.  I don't know
18 who filled this out, I really don't.
19     Q.      You previously testified that
20 Ms. Bates would have handled that?
21     A.      All the paperwork.  But I don't
22 know -- I don't know if she filled this out
23 or -- or where this come from.  I'm not sure.
24 You know, I just don't know.
25     Q.      Did she consult you?

Page 109

1      A.      I'm sure, yes.
2      Q.      I'm sorry, strike that.
3          Did Mrs. Bates consult you
4  regarding the refinancing of the home?
5      A.      I do remember something about
6  the refinancing.
7      Q.      Did she consult you when she
8  filled out this?
9      A.      Apparently so.  Apparently so.
10     Q.      Why do you say that?
11     A.      Because that looks like my
12 signature.  I just don't remember this --
13 everything, you know, right here.  I don't
14 remember.  Everything about this, I don't
15 remember.  Everything -- You know, I just
16 remember talking about it, and -- and
17 apparently, you know, that's my signature.
18 So . . .
19     Q.      Okay.  Did you ever file joint
20 tax returns with Ms. Bates?
21     A.      I'm really not sure about that.
22 I'm not sure if we filed joint or separate.
23 I'm thinking -- I'm -- I'm not sure.  Again,
24 she took care of all the paperwork.  You know,
25 I'm sorry, I can't really answer them

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                                    Pages 110..113

Page 110

1  questions.  And I hate to just spit out
2  something that I don't know.  You know what
3  I'm saying.
4        Q.      Was it typical for Mrs. Bates to
5  prepare a document, and to have you sign it?
6              MR. ROHWEDDER:  Object to the
7  form of the question.  You can answer, if you
8  can answer it.
9        A.      Well, you know, I trusted Shawna
10  with everything, you know, as far as paperwork
11  and everything.  So, if she -- I would look
12  over something I'm sure, but I just don't
13  remember everything I look at, you know what
14  I'm saying.  But if it's legit, if it looked
15  legit when I signed it, yes, sir.  Because I
16  trusted her, you know.  You know, we -- we,
17  you know, I always trusted what her judgment
18  on paperwork.
19        Q.      Okay.  Just to clarify, you
20  do -- do you recall whether you ever filed a
21  joint tax return with Mrs. Bates?
22        A.      I don't know.  I'm not sure if
23  we did or not.
24              (Whereupon, Defendant's
25              Exhibit No. 6 was marked

Page 111

1              for identification
2              purposes.)
3              MR. ENGLERT:  Will you mark 6.
4              THE WITNESS:  Okay.
5        Q.      (MR. ENGLERT) Mr. Bates, do
6  you -- Or I'm sorry, Mr. Smith, do you
7  recognize or are you familiar with the
8  document that's been labeled Deposition
9  Exhibit Number 6?
10        A.      I am not familiar with it, but
11  I'm looking at it, so.  You know, I'm not
12  familiar with it.  That's all I can say.
13        Q.      Do you want to take a moment to
14  review it?  I have couple questions, follow-up
15  questions on it, if you want to take a minute
16  to look through it.
17        A.      Okay.  I don't -- you know.
18        Q.      Turn to page two of that
19  document, Mr. Smith.
20        A.      Page two.  Uh-huh.
21        Q.      Is that your signature?
22        A.      That is my signature.
23        Q.      Is this the 2006 tax returns
24  that was filed with the IRS?
25        A.      Yes, sir, I'm assuming it is.

Page 112

1  Yes, sir.  That's what it says on the top.
2        Q.      You say you're assuming that it
3  is.  You don't know for a fact?
4        A.      No, sir.  It -- It is.
5        Q.      How do you know that this is, in
6  fact, the 2006 tax return that was filed with
7  the IRS?
8        A.      I don't know in fact -- I don't
9  know for a fact.  I mean, I'm looking at this.
10  I mean, I'm assuming it is.  I mean, you know,
11  I've got my signature and all on it, and I'm
12  assuming.
13        Q.      So Ms. Bates would have been
14  responsible for at this time in 2006 for
15  filing -- or 2007 probably, but the 2006 tax
16  return?
17        A.      Yes.  She -- I mean, she handled
18  all that for us.
19        Q.      Okay.  If you'll look at the --
20  the top of the first page?
21        A.      Uh-huh.
22        Q.      And it says:  Shawna Smith,
23  Shawna M. Smith.  Do you see that section?
24        A.      Uh-huh, I do.
25        Q.      You previously testified that

Page 113

1  you were not aware that Shawna Bates had gone
2  by any other name?
3              MR. ROHWEDDER:  Than what?
4        A.      I'm sorry?
5        Q.      Any other name other than Shawna
6  Bates?
7        A.      Well, I mean, I see Shawna Smith
8  here.  I mean, I don't know.
9        Q.      Were you aware?
10        A.      I don't know what to say about
11  that, really.
12        Q.      You were aware that Shawna Bates
13  was using the name Shawna M. Smith?
14        A.      Really I didn't know -- I didn't
15  know it was Shawna M. Smith.  I real -- I
16  mean, I -- it's something I ain't really -- I
17  ain't paid attention too much to.
18        Q.      Did she consult you -- Did
19  Ms. Bates consult you regarding the use of
20  Shawna M. Smith, the name Shawna M. Smith in
21  connection with filing this tax return?
22        A.      I don't recall us talking about
23  it really.  I mean, you know.
24        Q.      Do you recall if Ms. Bates had
25  consulted with you before using the name

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013          Pages 114..117

Page 114

1  Shawna M. Smith in any other documents, tax
2  returns?
3          A.      Nothing we really discussed or
4  nothing about the name issue.  I mean, Smith,
5  I mean.
6                  MS. CASEY:  Do you mind if we
7  take a break?
8                  MR. ENGLERT:  No.  That's fine.
9                  THE WITNESS:  Okay.  That's
10  fine.
11                 VIDEOGRAPHER:  This is the end
12  of tape number two in the deposition of --
13  excuse me, Jeffrey G. Smith.  The time is
14  11:38 a.m.  We are now off the Record.
15                 (Recess taken.)
16                 VIDEOGRAPHER:  This is the
17  beginning of videotape number three in the
18  deposition of Jeffrey G. Smith.  The time is
19  11:50 a.m.  We are back on the Record.
20         Q.      (MR. ENGLERT) Mr. Smith, did
21  you -- did you ever jointly apply for credit,
22  a loan, other than the refinancing loan for
23  the 145 Culpepper Drive with Ms. Bates?
24         A.      Not that I know of.
25         Q.      Did Ms. Bates ever indicate why

Page 115

1  she wanted to refinance the house?
2          A.      Not really.  Just I'm assuming a
3  lower interest rate, I'm not sure.  I'm not
4  sure.
5          Q.      Did she indicate that she wanted
6  to refinance on her own?
7          A.      Not that I know of.  I don't --
8  I don't recall that.
9          Q.      Did she ask you to file a loan
10  application jointly with her?
11         A.      I reckon she did, probably.
12  Well, I don't remember.
13         Q.      Do you recall why she asked you?
14         A.      I don't -- I don't remember
15  that, no.
16         Q.      Did she ever indicate to you
17  that she was having problems qualifying for a
18  refinancing loan?
19         A.      I don't remember that.  I don't
20  remember a conversation about that.  I really
21  don't.
22         Q.      But at the time that that loan
23  application was submitted on -- in May 2008,
24  was Ms. Bates working?
25         A.      I don't remember.

Page 116

1          Q.      Were you working for Bates &
2  Smith, Contracting, Inc. at that time?
3          A.      I think I -- I think we were
4  still working.
5          Q.      And you were drawing a salary
6  from Bates & Smith?
7          A.      If I was working, I was probably
8  drawing a salary, yes, sir.
9          Q.      And at that time you submitted
10  the loan application, were you making more
11  than five thousand dollars a month from Bates
12  & Smith?
13         A.      I don't -- I don't remember.  I
14  don't remember what I was making.  I'm sure --
15  But I don't remember.
16         Q.      You previously testified that in
17  2006 and 2007 you were approximately making
18  sixteen hundred dollars a week?
19         A.      Give or take, yes, sir.
20         Q.      Okay.  And that in 2008?
21         A.      2008.
22         Q.      Your salary went down as a
23  result of the economy?
24         A.      I'm not sure.  I'm not sure if
25  it went down or not.  I might have -- I'm not

Page 117

1  sure what -- what year, when things started
2  turning real bad.  I can't remember exactly.
3          Q.      What's the most, the highest
4  salary, monthly salary that you've drawn from
5  Bates & Smith Contracting, Inc.?  Was it more
6  than -- more than five thousand?  Have you
7  ever earned more than five thousand per month?
8          A.      I'm sure at one time, yes, sir.
9          Q.      Have you ever earned more than
10  eight thousand per month with Bates & Smith?
11         A.      I -- I don't remember exactly.
12  I don't -- I don't remember.  I don't
13  remember.  And, again, I say Shawna took care
14  of all the paperwork and -- and we would pay
15  bills with my check, and -- and I'd get some
16  money.  And I don't -- I can't remember
17  exactly what I was making.
18         Q.      Did you ever make more than ten
19  thousand dollars a month?
20         A.      I wouldn't think so.  I mean, I
21  don't think so.
22         Q.      Okay.  Thank you.
23                 Just to clarify.  Have you ever
24  earned more than ten thousand dollars a month
25  with Bates & Smith Contracting, Inc.?

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                    Pages 118..121

1          MR. ROHWEDDER:  Object to the
2  form of the question.  Gross?  Net?
3          Q.      Have you ever earned more than
4  ten thousand dollars a month in wages from
5  Bates & Smith Contracting, Inc.?
6          A.      I don't -- I don't remember
7  what -- exactly what I made.  I mean, like I
8  say, she handled everything as far as
9  paperwork and I just done the work.
10         Q.      But to your recollection?
11         A.      And we was -- You know, I just
12  lived -- I mean, we was living and I know I
13  was happy with all that.  You know, we was
14  living, so, I mean, living comfortably,
15  whatever you want to say.
16         Q.      And is it your testimony that --
17  that Ms. Bates was the one who handled the
18  finances?
19         A.      Yes, sir.
20         Q.      For -- For you and for Bates &
21  Smith Contracting, Inc.?
22         A.      Yes, sir.
23         Q.      And now that you've reviewed
24  that, that Deposition Exhibit, that Tax Return
25  Exhibit, Number 6.

1          A.      Yes, sir.
2          Q.      Do you recall whether or not
3  you've ever filed a tax return as a married
4  couple?
5          A.      I -- I don't know.  I'm not
6  sure.
7          Q.      Okay.  Okay.  Mr. Smith --
8          A.      Uh-huh.
9          Q.      -- do you have a -- an
10  understanding of what the lawsuit -- the
11  underlying lawsuit?
12         A.      Do I have an understanding?
13         Q.      About what this lawsuit is
14  about.
15         A.      Not exactly.
16         Q.      What is your understanding of
17  the -- of the lawsuit, based on your
18  knowledge?
19         A.      The only thing I know is about
20  the -- the funds that we paid that at one time
21  that, again, I go back to that, is some
22  payments were lost.  That's basically all I
23  know.  And then -- And I don't really know.  I
24  really don't know what this is.  I really
25  don't.

1          Q.      Where did you get that
2  understanding about the nature of this
3  lawsuit?
4          A.      Huh?  I'm sorry?
5          Q.      Who -- Who have you spoken to
6  about this -- the lawsuit?
7          A.      I don't know nothing about the
8  lawsuit.  I mean, I don't even know -- I
9  really don't know what this is.  I know
10  there's -- I reckon there's something going on
11  here because I'm here.
12         A.      Uh-huh.
13         A.      But I don't know what's it's
14  about.  I don't -- I don't know the --
15         Q.      Okay.  You --
16         A.      I know it's about the house.
17         Q.      Okay.  So, you know it's about
18  the house?
19         A.      I do.
20         Q.      And how did you -- How do you
21  know it's about the house, and the house being
22  145 Culpepper?
23         A.      I mean, like I say, I remember
24  the payments getting lost, and I remember her
25  telling me at one time she was going to get

1  evicted and all that.  And that's basically
2  all I know.
3          Q.      So, you're then -- You're
4  assuming that -- this is -- that's what this
5  lawsuit is about, based on your previous
6  experiences?
7          A.      Right.
8          Q.      Nobody has -- You've never
9  spoken with Ms. Bates about the lawsuit?
10         A.      No, sir.
11         Q.      Never spoken with any of
12  Ms. Bates' attorneys, either David or another
13  attorney about the lawsuit?
14         A.      No.  No.
15         Q.      Okay.  Has anyone ever asked you
16  to be a party to the lawsuit?
17         A.      No.
18         Q.      Has anyone asked you whether or
19  not you'd be interested in bringing a lawsuit
20  against Chase?
21         A.      No.
22         Q.      Do you still own the property at
23  145 Culpepper?
24         A.      No.
25         Q.      Who owns the property?

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                    Pages 122..125

Page 122

1      A.      I mean -- At 145?
2      Q.      I'm sorry, 145 Culpepper?
3      A.      I mean, I'm on the -- I reckon
4  I'm on the loan, right, I'm -- I'm assuming?
5      Q.      I can't answer your questions.
6      A.      I -- I left town, I mean, you
7  know.  I didn't try to abandon nobody.  I just
8  tried to go to work and make money so I could
9  pay her, you know, pay child support and try
10 to help along.  That's all I -- I mean.
11     Q.      Is it your understanding that
12 you're still on the loan?
13     A.      My understanding, I am.
14     Q.      Is it your understanding that
15 you still own the property at Culpepper, at
16 145 Culpepper Drive?
17     A.      I'm assuming that, yes, sir, I
18 reckon.
19     Q.      Do -- Did you ever -- Did you
20 quitclaim your interest in the 145 Culpepper
21 property, your interest in the property?
22     A.      I don't -- I don't recall doing
23 nothing like that.
24     Q.      Okay.  Do you recall any time
25 having a conversation with Ms. Bates about

Page 123

1  conveying your interest in the property to
2  her, the property again being 145 Culpepper?
3      A.      No.  No.  I don't reckon so.  On
4  145, no.
5      Q.      What about any other properties?
6      A.      The 216, I signed over to
7  Shawna.
8      Q.      Do you recall when that was?
9      A.      No, I don't.
10     Q.      Was it around 2012?  2012?
11     A.      Maybe 2011, 2012.  I'm not sure.
12 I'm not sure.
13     Q.      Why did you quitclaim your
14 interest in the property?
15     A.      Just to -- Just to -- Because
16 I'm not there.  I mean, I felt like it's the
17 right thing to do.  I kind of felt like I had
18 abandoned, this -- you know, kind of felt like
19 I -- kind of felt a little bit bad about
20 pulling out on everybody, you know.
21             It was a bad time.  Everything
22 was, you know, having a little trouble with
23 the house and all.  So I figured, you know, I
24 could sign that over to her and maybe -- maybe
25 she could do better.

Page 124

1      Q.      So, was it your idea to convey
2  your interest in the 216 Culpepper property?
3      A.      Yeah.
4      Q.      Did Ms. Bates pay you for --
5      A.      No.
6      Q.      -- for that exchange -- transfer
7  of that interest in the property?
8      A.      No.  I didn't feel like she owed
9  me nothing.
10     Q.      Was there -- Did you receive any
11 form of compensation --
12     A.      No.
13     Q.      -- in exchange for that?
14     A.      No.
15     Q.      Do you recall speaking with an
16 attorney --
17     A.      No.
18     Q.      -- regarding the transfer of
19 your interest in either the 145 Culpepper
20 property or the 216 Culpepper property?
21     A.      No.  I haven't spoke with a
22 attorney, no.
23     Q.      Do you recall whether or not you
24 spoke with somebody from David's office, a man
25 named Charlie Gower?

Page 125

1      A.      I've not spoke with nobody.  I
2  mean, I don't remember speaking with nobody.
3      Q.      So let's back up.  At some
4  point, is it correct that you determined on
5  your own that you wanted to convey the 216
6  Culpepper property?
7      A.      Well, me and Shawna had talked
8  about it.  And like I say, I just -- I just --
9  she asked -- You know, we talked about signing
10 it over to her, and if she could do something
11 with it, and, you know, help her out and
12 make -- make ends meet, that would be good.
13 So I signed it over to her.
14     Q.      So, she raised this issue?
15     A.      Yes.
16     Q.      Brought up the issue of whether
17 or not you should convey the property?
18     A.      She brought it up and we talked
19 about it and all, and we -- and we decided to
20 do it.
21     Q.      Okay.
22     A.      I mean, she's got my boys and
23 all.  You know, I feel like I owe something
24 for all that.  You know what I'm saying?
25     Q.      Sure.  And were you represented

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013                                 Pages 126..129

Page 126

1  by an attorney?
2       A.    I was not represented by no
3  attorney.
4       Q.    Were you -- Did you know if
5  Ms. Bates was represented by an attorney?
6       A.    I don't know.  I don't know.
7  I'm not sure.
8       Q.    And you were never contacted by
9  an -- an attorney for Mrs. Bates with respect
10 to that transfer of the property?
11      A.    No.  Not that I know of.  Not
12 that I can remember.  I don't remember talking
13 to no attorney, I don't.  Me and Shawna just
14 talked, and then I signed a piece of paper,
15 you know.  Again, Shawna, you know, I trust
16 Shawna's judgment on things; and as far as a
17 piece of paper, I knowed it was 216 Culpepper
18 so I went ahead and signed it.
19      Q.    Do you recall how much that
20 property was worth at the time you transferred
21 it?
22      A.    I do not.  I don't have -- I
23 don't have a clue.
24      Q.    You -- No idea?
25      A.    No idea.

Page 127

1       Q.    Do you remember what you paid
2  for it?
3       A.    I do not.  I can't recall.
4       Q.    Do you recall, roughly, when you
5  obtained their -- the property?
6       A.    When we -- When we moved onto
7  it, are you saying?
8       Q.    When did you purchase the
9  property at 216 Culpepper?
10      A.    I don't remember what year it
11 was.
12      Q.    Did you and Ms. Bates purchase
13 it jointly?
14      A.    I don't remember if it was
15 jointly or just me.  I mean, I think it was
16 just my name on the property.
17      Q.    Okay.
18      A.    I think it was just my name, I
19 think.
20      Q.    Do you think the property was
21 worth more than a hundred thousand dollars?
22 Again, I don't -- I don't want you to
23 speculate or guess.
24      A.    Okay.  I don't know.  So I don't
25 know.

Page 128

1       Q.    If you have an estimate based on
2  your experience or --
3       A.    No, I don't.  The best I can do
4  is by thinking about the property, you know,
5  on my experience.  I don't -- I don't know.  I
6  don't know.  I really don't know.
7       Q.    Okay.  Okay.  So, you and
8  Ms. Bates applied for a refinancing loan in
9  May 2008; is that correct?
10      A.    Yes.  Yes.  I'm assuming.  I
11 mean, by looking at this.
12      Q.    Now, who -- Who was responsible
13 for paying the mortgage?
14      A.    Shawna.
15      Q.    Did she ever miss a payment?
16      A.    I'm not sure.  I can't tell you
17 that.
18      Q.    When you applied for the loan,
19 were you together?
20      A.    Maybe close in that time period.
21      Q.    Okay.
22      A.    I'm not sure exactly when we
23 separated.  I don't -- I don't remember.
24      Q.    Okay.  When did you -- Were you
25 aware that Mrs. Bates -- Oh, strike that.

Page 129

1            Were you aware of any instance
2  where Mrs. Bates failed to make her mortgage
3  payment on time?
4       A.    No, I'm not really sure.
5       Q.    Were you aware, generally, that
6  at any point she had fallen behind in her
7  mortgage?
8       A.    Not for sure.  I'm not for sure.
9  I'm not for sure, you know.  I'm sure she --
10 she got behind, we got behind, or she got --
11 We got behind, I'm sure, but I don't know how
12 much.  I don't know how far.
13      Q.    Now, let me back up.  When you
14 say we got behind --
15      A.    Well . . .
16      Q.    I just wanted to make sure I'm
17 clear.  You were responsible -- At any point,
18 you didn't -- you'd make payments on the
19 mortgage?
20      A.    Well, what I'm saying is, is I
21 feel responsible for them, you know, a lot of
22 times.  You know what I mean?
23      Q.    Yeah.
24      A.    My children and all, so I do
25 what could I to -- to pitch in.  You know, do

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                                      Pages 130..133

Page 130

1   what I could.
2        Q.     So, you have in the past made
3   payments on the mortgage?
4        A.     Not actually, myself, no.  No.
5        Q.     Okay.  Can you explain?
6        A.     I mean, Shawna would make the
7   payments, I mean.
8        Q.     Okay.
9        A.     You know, like I said, she took
10  care of all the paperwork.
11       Q.     Okay.  You testified previously
12  that Mrs. Bates approached you regarding
13  issues with the mortgage; is that correct?
14       A.     That is correct.
15       Q.     When was that?
16       A.     I don't -- I don't remember.
17       Q.     Was it after you moved out of
18  the 145 Culpepper.
19       A.     Yes.
20       Q.     And then before you moved out of
21  the 216 Culpepper.
22       A.     Right.
23       Q.     Okay.  So at that point, you
24  understood that the mortgage was in default?
25       A.     Was behind.  I don't know --

Page 131

1   Yes.
2        Q.     Okay.  Do you know if Ms. Bates
3   ever contacted Chase to discuss her issues
4   with the mortgage?
5        A.     I don't know.  I'm not sure.
6        Q.     Did Mrs. Bates ever discuss with
7   you her conver -- any conversations with
8   Chase?
9        A.     No.  Only besides the payments
10  that were lost or whatever, she tried to talk
11  to someone, somebody, I don't even know who.
12  But like I say, that's the only thing.  That's
13  what sticks in my head is them, you know, the
14  payments that was lost.
15       Q.     Let's go back to that --
16       A.     All right.
17       Q.     -- and decipher me a little bit
18  more specifically what -- how that
19  conversation went.  How long was that
20  conversation?
21       A.     Maybe twenty minutes.
22       Q.     Twenty minutes?
23       A.     Something like that.
24       Q.     What did she say?  What did
25  Ms. Bates say about the payments?

Page 132

1        A.     She just said they had -- the
2   payments weren't applied to the loan.  I don't
3   know exactly what all she told me, but . . .
4        Q.     Did she say how -- in what
5   amount?
6        A.     No.
7        Q.     She had made a payment to Chase?
8        A.     All I know is like -- like three
9   of the payments had not been applied to the
10  loan.
11       Q.     Okay.
12       A.     That's all I -- I don't know.
13  And -- And they said they hadn't received the
14  payments and such stuff as that.  And she said
15  she had made the payments, you know.  She was
16  upset, you know, about making the payments,
17  but -- but they hadn't been applied.
18       Q.     Did she ever tell you why the
19  payments had not been applied?
20       A.     I don't -- I don't know about
21  why they hadn't been applied.  I don't know.
22  I mean, she didn't really say why they hadn't
23  been applied.  She just told me, you know,
24  when we talked about, that they hadn't
25  received the payments or, you know, was what I

Page 133

1   understood.
2        Q.     So, she told you that she sent a
3   payment in to Chase, and that that payment was
4   not received by Chase?
5        A.     I think so, is what I understood
6   it to be.
7        Q.     Okay.
8        A.     You know, and I asked her, I
9   said:  What do you mean, they wasn't -- they
10  wasn't received?  And, you know, she just
11  said:  Well, they don't know what happened to
12  them, is what I understood.  You know, that's
13  the best I understood it.
14       Q.     Did she indicate that she had
15  tried to reach out to Chase?
16       A.     Yes.
17       Q.     And what did she tell you that
18  Chase told her?
19       A.     That they didn't -- They didn't
20  get the money.  They didn't -- Or apparently
21  they didn't get the payments.  I do remember
22  her saying something about going to the bank,
23  and the bank even had maybe done a letter to
24  Chase or something that they did receive, you
25  know, that the money did come out of the

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**          **Pages 134..137**

Page 134

1  account and all that to them.
2              I'm not sure.  That's all I
3  can -- You know, that's really all I can say.
4  And that's just me talking with her, you know,
5  that's not me -- I don't know nothing for
6  sure.  You know what I'm saying?  It's not
7  like I laid my eyes on nothing and saw it, you
8  know.  I'm just talking with Shawna about it.
9         Q.     Do you recall ever receiving a
10 check from Chase?
11        A.     I do not.
12        Q.     Do you recall if Ms. Bates
13 ever -- Did Ms. Bates ever mention to you the
14 receipt of a check from Chase?
15        A.     No.
16        Q.     Did Ms. Bates ever ask you to
17 sign a check from Chase?
18        A.     No.
19        Q.     Did she ever ask you to endorse
20 a check from Chase?
21        A.     Not that I -- No.
22        Q.     Did Chase ever reach out to you
23 to discuss the mortgage?
24        A.     I -- Not that I know of.  I
25 mean, I never talked with nobody.

Page 135

1         Q.     Chase never sent you a letter?
2         A.     Not that I know of.  I mean, if
3  a letter would have come, it might have come
4  to the house.  I don't know.  But Shawna took
5  care of all the paperwork, again.
6         Q.     So, if -- If there was a letter
7  that would have been addressed to you from
8  either Chase or another person or entity, it
9  would have been sent to 145 Culpepper?
10        A.     Yes.  Yes, sir.
11        Q.     If it was a letter from Chase,
12 it would have been opened by Ms. Bates?
13        A.     I'm sure.
14        Q.     Would she have shared that
15 letter -- Did she ever share the receipt of a
16 letter with --
17        A.     About a check?
18        Q.     A Chase letter to -- with you.
19        A.     No.
20        Q.     Okay.  Did you ever contact
21 Chase?
22        A.     I did not.
23        Q.     Do you know if there was a
24 foreclosure sale on the property on 145
25 Culpepper?

Page 136

1         A.     A foreclosure sale?  I -- I
2  don't know for sure.  I've never seen nothing,
3  you know what I'm saying.  I mean -- You know,
4  a matter -- I've talked to Shawna in the past
5  and she did tell me it run in the paper, but I
6  didn't see it.  So, you know, I'm just saying
7  what I've talked to people.  Until I put my
8  eyes on something sometimes, you know, you
9  just -- you just go by what people say, you
10 know what I'm saying.
11        Q.     So, Shawna contacted you and let
12 you know --
13        A.     She didn't -- Probably didn't
14 contact me.  Maybe between talking to my
15 children and all, she might have mentioned
16 that to me, and, you know.
17        Q.     What did she say about the
18 foreclosure sale?
19        A.     Maybe she had a date to be out
20 of the house, just worried about, you know,
21 what she's going to do and what she's going to
22 put -- got to get her stuff, maybe moved or
23 something.  Maybe basically that was it.
24             And we don't -- We just don't
25 talk a whole lot, you know.  I hate I ain't no

Page 137

1  more help than what I am, you know, if I'm
2  helping any.  But we just didn't communicate a
3  lot, which is sad, but it is -- that's the way
4  it was.
5         Q.     So, Ms. Bates, again, she was
6  responsible for handling paying the mortgage?
7         A.     Yes.
8         Q.     She's also responsible for
9  paying all the other bills?
10        A.     Yes.
11        Q.     For family?  Was Ms. Bates ever
12 been late on any -- paying any of those bills,
13 to your recollection?
14        A.     No.  Not that I remember.
15        Q.     Do you recall ever receiving a
16 letter in the mail or a phone call from a
17 creditor asking about payments?
18        A.     Are you saying from any
19 creditor?
20        Q.     Any creditor, Chase.
21        A.     Well, I'm sure we got a call
22 from a creditor in the business, you know what
23 I'm saying, because sometimes we would be late
24 getting paid, but I don't remember nothing
25 from Chase.

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                    Pages 138..141

Page 138

1       Q.      Why did Ms. Bates fall behind on
2   the mortgage?
3       A.      I don't -- I don't even know,
4   you know, it -- I don't know how -- if she
5   even fell behind.  I don't know.  I don't
6   really know nothing about that, really.  I
7   mean, I'm sure she probably got behind a
8   little bit, I'm not sure.  But I don't know.
9       Q.      Well, she told you that she had
10  missed some payments; correct?
11      A.      She told me that she had sent
12  some payments and they hadn't been applied to
13  the loan.
14      Q.      But she told you that she was
15  behind in her mortgage payments?  I mean,
16  previously --
17      A.      Oh, I'm sure -- I'm sure it was
18  probably a little bit behind, yeah.
19      Q.      Okay.
20      A.      I did say that.  I reckon I did,
21  yeah.
22      Q.      Okay.  After 2008, after the
23  Bates & Smith Contracting, Inc. was no longer,
24  where did you -- where did you work after
25  that?

Page 139

1       A.      I went to a company in Phenix
2   City.  I can't even think of the name of it
3   right now.  Give me a minute on that, and
4   I'll -- I'll come up with it, but . . .
5       Q.      Listen, we can circle back to
6   it.
7       A.      Yeah.  Let me think about that a
8   minute.
9       Q.      Do you recall where Shawna
10  worked after Bates & Smith?
11      A.      I'm sure she was probably still
12  in -- I'm sure she was in the teaching still,
13  sub -- subbing or teaching, one or the two.
14  Because she's pretty much done that ever since
15  our boys been in school, you know, when --
16  since they started school.
17      Q.      So, when she would substitute
18  teach, how often would she substitute teach?
19      A.      I mean, sometimes -- It would
20  vary.  Sometimes it would be a couple of days
21  a week.  Sometimes it would be all week.  You
22  know, it's just according.
23      Q.      And how much do you -- did she
24  earn?
25      A.      I don't have a clue.  I couldn't

Page 140

1   even attempt to answer that.  I don't know.
2       Q.      But it was not full-time
3   employment?
4       A.      No.  No.  I wouldn't say subbing
5   is.  You know, sometime it would be good,
6   sometime it would be slow.
7       Q.      Did Mrs. Bates ever approach you
8   about helping pay bills after that period
9   after Bates & Smith?
10      A.      Yes.  I mean, I was -- Like I
11  say, I would still do what I could do, you
12  know, with my check -- with whatever I draw
13  from the other company I went to work for.
14           And I, you know, even in child
15  support I try -- I try to pay heavy to try to
16  help them out.  I know it costs a lot for the
17  boys and all, you know, so I try to do all I
18  can do.
19      Q.      Did she -- Did Ms. Bates ever
20  ask you -- Well, strike that.
21           Did Ms. Bates ever -- Why -- Why
22  did Ms. Bates ask you for additional finances?
23      A.      I didn't say she asked -- Did I
24  say she asked me for additional finance?  No.
25  I -- I mean, I just feel like I'm obligated to

Page 141

1   give it to her, you know what I mean, what I
2   can, you know.
3       Q.      Was she -- Did you understand
4   that she was having financial difficulties
5   after you left -- after the -- the company,
6   Bates & Smith went -- was defunct?
7       A.      Well, I still feel, you know,
8   obligated to help.  I mean, like I say, you
9   know, help with, you know, try to do what I
10  could.  You know, I don't know the whole deal
11  with the house situation, but I still feel
12  like she's got to live, you know what I mean,
13  so I -- I give her what I can, you know.
14      Q.      Was it your understanding that
15  she was having financial difficulties after
16  Bates & Smith Constructing(sic) Company or
17  Consulting Company was -- was defunct?
18      A.      Was it my understanding she had?
19      Q.      Were you aware that she was
20  having financial difficulties?
21      A.      Well, I mean, everything got a
22  little tight right there when the -- when the
23  work went down, so we all had a little
24  financial difficulty a little bit.
25      Q.      And as a result of that?

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                    **Pages 142..145**

Page 142

1        A.        I'm not -- I'm not sure about
2 her financial difficulties.  I'm not sure.
3        Q.        Were you aware of any additional
4 sources of income that Ms. Bates may have had,
5 other than part-time substitute teaching?
6        A.        No, sir.
7        Q.        Okay.  Did Ms. Bates ever
8 express frustration with having to seek
9 employment after Bates & Smith went under?
10        A.        Not that I know of, no, sir.
11        Q.        So, your only information about
12 the foreclosure sale with respect to the 145
13 Culpepper property was pursuant to a
14 conversation with Ms. Bates; is that correct?
15        A.        Yes, sir.  Pretty much.
16        Q.        You never read about the
17 foreclosure in the newspaper?
18        A.        I never actually seen it with my
19 eyes.  You know, I can't say that I actually
20 seen it with my own eyes, no.
21        Q.        Did you ever discuss the
22 foreclosure sale with anyone, the pending
23 foreclosure sale of the 145 Culpepper
24 property?
25        A.        No.  no.

Page 143

1        Q.        You don't know if the
2 foreclosure sale was ever conducted; correct?
3        A.        Not that I know of.  I mean, I
4 don't know.
5        Q.        Okay.  Mr. Smith, have you ever
6 witnessed any purported trespasses on
7 Mrs. Bates' property at the 145 Culpepper
8 property?
9        A.        No.  I mean, have I ever
10 witnessed any trespassers?
11        Q.        Yes, that's the question.
12        A.        I mean, we -- We used to have
13 people come back there all the time driving
14 through, you know what I'm saying, and that's
15 the only trespassers I know of.  Which a lot
16 of people don't know -- A lot of them didn't
17 know better, you know.  Because there's a
18 Culpepper Drive Road, you know, so we had
19 trouble down in there with people coming there
20 at night.  And they've even done doughnuts out
21 in the big grass field and everything.  So,
22 you know, we've -- You know, that's the only
23 trespassers I know of.
24        Q.        Yeah.
25        A.        And I mean, yeah.  That's the

Page 144

1 only thing I know of, is stuff like that, you
2 know, being aggravating, I'm saying, you know.
3        Q.        Well, when that happened, what
4 would you or Ms. Bates do if there was
5 somebody who was cutting through your
6 property?
7        A.        We would let them know that this
8 is not a through road, you know, a open road,
9 just, you know -- It happened a bit.  You
10 know, it happened a good bit.  I reckon, you
11 know, you'd think it's Culpepper Drive, so you
12 think it's a road, but, you know, actually it
13 ends up at the property, you know.
14        Q.        Uh-huh.
15        A.        So . . .  A couple young boys
16 out there doing doughnuts out there in the
17 yard at night.  Tear up the grass.
18        Q.        Yeah.
19        A.        You just get aggravated with
20 stuff like that, you know.
21        Q.        So, just to clarify the time
22 frame, were you living on the property -- on
23 the property, being the 216 Culpepper property
24 in 2011, late 2011 and early 2012?
25        A.        Yes.  I think that's right.

Page 145

1 2011.  Yes, I think that's right.
2        Q.        Okay.  Did you ever see anyone
3 on the property with the exception of people
4 cutting through?
5        A.        No, sir.
6        Q.        Okay.  And the teen-age kids?
7        A.        No.
8        Q.        Doing doughnuts?
9        A.        No.
10        Q.        Okay.  Did you ever speak to
11 anyone about that?
12        A.        No.
13        Q.        Okay.  And while -- While you
14 were living on the 216 Culpepper property, do
15 you ever -- did you ever see anyone from Chase
16 at the house?
17        A.        Not that -- No.
18        Q.        Were there any no trespassing
19 signs?
20        A.        Yes.
21        Q.        On either the 216 property or
22 either -- Okay.  Let's just take it one by
23 one.
24                  Was there any no trespassing
25 signs at the 216 Culpepper property?

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                    Pages 146..149

1    A.    I don't think we had none.
2  Maybe a couple on a tree or two down in, you
3  know, down around.  But -- But, no.  I mean,
4  that's the only one, you know, just some old
5  signs we had up, but . . .
6    Q.    Okay.  Was there any no
7  trespassing signs at the 145 Culpepper
8  property?
9    A.    We did have them on the
10 driveway.
11   Q.    Okay.
12   A.    Trying to keep some of that
13 down, you know what I mean?
14   Q.    How many signs?
15   A.    I don't remember how many.
16 Maybe a couple.  I don't remember.
17   Q.    Two signs?
18   A.    There was one I remember right
19 by the driveway, you know, and it would be --
20 it would be on the left side.  I remember that
21 one, right near the end of the pavement.
22   Q.    Before you got to the house?
23   A.    Yeah.  Just to try to keep
24 people out from the, you know, coming back any
25 further.

1    Q.    And when were those signs put
2  up?
3    A.    Probably about the same time --
4  about the same time we put up a fence.  I
5  don't remember what -- I don't remember when
6  that was.  I can't tell you exactly when that
7  was.
8    Q.    How long have those no
9  trespassing signs been up, roughly?
10   A.    Oh, several years.
11   Q.    Several years.  Prior to 2008?
12   A.    I'm sure.
13   Q.    Okay.  Were they still there
14 when you moved out of the house and into the
15 216 Culpepper property?
16   A.    Yes, sir.  I do -- You know, the
17 one in particular I remember seeing is the one
18 that was just so close to the driveway.  I
19 mean, that's just -- You know, you'd see it
20 every time you come in, so I remember that
21 one.
22   Q.    Okay.
23   A.    I can't say about anymore, but
24 that one in particular.
25   Q.    Mr. Bates (sic), can you take a

1  look at Deposition Exhibit Number 2, if I
2  recall or 3?
3            MR. ROHWEDDER:  He wants you to
4  look at the map.
5            THE WITNESS:  Oh.  Oh, okay.
6    Q.    The map.  I'm sorry.  If you
7  wouldn't mind taking that silver pen that
8  seems to work pretty well, can you mark on
9  that map where the no trespassing signs were?
10   A.    The only one for sure I can tell
11 you is out here at the end of the driveway.
12 Do you want me to mark that one?
13   Q.    Yes, please, sir.
14   A.    At the end of the road, which is
15 right past that house, right in here
16 (indicating).  Somewhere in that area.  I'm --
17 You know, I'm -- I can't see it on here,
18 so . . .
19   Q.    Okay.  So, you only know that
20 there was one sign for sure; correct?
21   A.    The one sign behind is the one I
22 seen all the time, is the one sign.
23   Q.    And that was at the end of the
24 driveway?
25   A.    I'm sorry?

1    Q.    And that was at the end of the
2  driveway off Culpepper Drive; is that correct?
3    A.    That would be right past the
4  last house on the left right there
5  (indicating), just so -- you know, just to let
6  people know that this is like a private drive.
7    Q.    How big was the sign, roughly?
8    A.    Maybe yeah big (indicating).  A
9  regular no trespassing sign.
10   Q.    Yeah.  Could you just describe
11 about how big in terms of feet so that the
12 court reporter can record it?
13   A.    Maybe a 14 by, I don't know, 10.
14 I don't know what size.
15   Q.    Inches?  14-by-10 inches?
16   A.    Yeah.  Yeah, yeah, yeah.  I
17 don't remember.  I mean, I don't remember.
18 That's pretty close, I reckon.
19   Q.    Was it posted on a -- on a tree?
20   A.    No.  The one right here I think
21 was on a stake, maybe or something.  I don't
22 remember.
23   Q.    Okay.
24   A.    Maybe on a stake or maybe on a
25 tree.  You know, I can't remember that

Case 4:12-cv-00043-CDL   Document 67   Filed 06/11/13   Page 39 of 86

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**          Pages 150..153

**Page 150**

1 exactly.
2       Q.      Okay.
3       A.      Yeah.
4       Q.      Did you ever -- Were you aware
5 of any potential trespasses or purported
6 trespasses on the property by a representative
7 of Chase?
8       A.      I -- I'm not aware of them.
9       Q.      Okay.  Ms. Bates never spoke to
10 you about any trespasses?
11      A.      She mentioned to me, I don't
12 remember when, but some people had come taken
13 some pictures.  And my boys mentioned somebody
14 one time, and that's -- that's one thing I
15 remember that stuck in my head.  Because they
16 said they was out, you know, somebody had got
17 out and take some pictures up there at the --
18 at the end of the driveway, like before you
19 turn and come into here (indicating), you
20 know.  And I'm like, wow, you know:  What's
21 going on?  But I didn't want to get into that
22 with them too much, you know what I'm saying.
23 So . . .
24      Q.      Yeah.  Let's -- Let's back up.
25 You said there's two separate, it sounds like,

**Page 151**

1 and correct me if I'm wrong, there's two
2 separate times or incidences where you heard
3 about trespasses, one, was from Mrs. Bates; is
4 that correct?
5       A.      Yes.  In general talking with
6 her maybe while I was talking with the boys,
7 you know what I'm saying.
8       Q.      Okay.  And this is when you were
9 meeting with her in person?
10      A.      No.  Probably not.  I don't
11 remember -- I don't remember talking to her in
12 person about this, maybe just on the phone.
13      Q.      So it was a conversation on the
14 phone.  Do you recall when that was?
15      A.      No, I don't.
16      Q.      Okay.
17      A.      No, I don't.
18      Q.      And what did she -- What did she
19 say?
20      A.      It's been a -- It's been a while
21 back, but . . .
22      Q.      What did she say about
23 trespasses?
24      A.      Well, she said people had been
25 taking pictures.  And she said it had run in

**Page 152**

1 the paper.  About this same time is when she
2 was telling me about the paper.  You know,
3 like I told you, it's just from what I hear
4 her say I heard her say.  I didn't actually
5 see it in the paper myself, but . . .
6       Q.      And -- And --
7       A.      She said people were coming out
8 taking pictures of the prop -- of her -- of
9 the 145.
10      Q.      Okay.  Did you express that she
11 was -- How did she feel about that?  Did she
12 tell you how she felt about that?
13      A.      It bothered her.  I mean,
14 naturally it bothered her, you know what I
15 mean, because --
16      Q.      So, you said that she felt
17 annoyed by it?
18      A.      I mean, I don't know if it was
19 annoyed, but maybe, you know, I think more so
20 worried than annoyed, you know, about
21 everything happening like it was, you know.
22 so . . .
23      Q.      So it was your understanding
24 that she was more worried about the
25 foreclosure?

**Page 153**

1       A.      Maybe.  I mean, the way I feel
2 about it, maybe, you know, that's -- that's a
3 bad thing to go through, I mean.
4       Q.      Okay.  And this was the only
5 time that Ms. Bates mentioned to you about the
6 trespass was that one time that you -- that
7 you testified about earlier?
8       A.      About somebody taking pictures?
9       Q.      Yes.
10      A.      That's the only thing I know
11 about right there, and -- And that's the only
12 thing I know.
13      Q.      And she didn't describe
14 specifically how it was affecting her, the
15 fact that people were trespassing?
16      A.      Not really.  Not really.
17      Q.      Okay.  Has Mrs. Bates ever said
18 anything after that one time about the
19 trespass?
20      A.      No.
21      Q.      Okay.  The purported trespass, I
22 should say?
23      A.      No.
24      Q.      Did she ever cry about it, or
25 when --

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                    Pages 154..157

Page 154

1     A.     No.
2     Q.     Express any -- Okay.
3     A.     Her and I don't talk a lot
4  about -- about everything, you know.  We don't
5  hardly talk at all.  So . . .
6     Q.     Now, the second incident or
7  instance that you mentioned previously, or
8  testified previously, was with respect to your
9  boys.
10    A.     Yes, sir.
11    Q.     Correct?
12    A.     Yes, sir.
13    Q.     What did your boys tell you?
14    A.     Well, they had -- I had just
15 picked them up for the weekend and they were
16 just telling me about, you know, we was maybe
17 headed out the driveway or something and they
18 told me there was a man over there taking
19 pictures, you know, parked in a place where
20 there's some telephone pedestals and taking
21 some pictures over that way, you know.  And it
22 kind of scared them a little bit, but . . .
23         I said:  Darn.  And pretty much
24 I didn't talk to them no more about it because
25 I didn't know -- I didn't really know about

Page 155

1  the situation, so . . .
2     Q.     Do you recall when this
3  conversation or when this happened?
4     A.     No, I don't.
5     Q.     Okay.
6     A.     I mean, it's been a while back.
7     Q.     Did you follow up with Ms. --
8  Ms. Bates about it?
9     A.     I really didn't.
10    Q.     Okay.
11    A.     I mean, when I drop them off,
12 it's such a short time, you know.
13    Q.     Yeah.
14    A.     When I pick them up, I get them
15 and I go.  And sometimes they stay with me,
16 you know.  I'll get a motel or something and
17 they'll stay with me in Columbus overnight and
18 then I'll take them back the next day.  And
19 when I drop them, I normally drop them and go.
20 You know, make sure they get in.  You know,
21 their mom's right there and I -- I just leave.
22 So I didn't really discuss no more with her.
23    Q.     Did your boys tell you about why
24 they might be on the property?
25    A.     No.

Page 156

1     Q.     And you didn't follow up with
2  them about why they might -- that that person
3  might have been on the property taking
4  pictures?
5     A.     They didn't know.  They didn't
6  know.
7     Q.     Okay.  How do you know that they
8  didn't know?
9     A.     No.  I mean, I just assumed they
10 didn't know.  I mean, I don't know.  I mean.
11    Q.     Okay.
12    A.     I try to keep -- I'm sure she's
13 the same way, but I try to keep my problems
14 away from them, you know what I'm saying,
15 so . . .
16    Q.     Okay.
17    A.     Trying to make them feel as good
18 as possible, anyway, but . . .
19    Q.     So, is everything that you know
20 about a purported trespassing on the property
21 has to do with those two incidences?
22    A.     That's the only two I know
23 about.
24         MS. CASEY:  Is anyone going to
25 want to take a lunch break?

Page 157

1         MR. ENGLERT:  Yeah, I think I
2  was just going to suggest that as the
3  everybody's --
4         MR. ROHWEDDER:  How much time do
5  you guys have left do you think on there?
6         MR. ENGLERT:  I don't know if we
7  have too much more to go.  But I'll probably
8  have a few other follow-up questions, but it
9  shouldn't -- not that much more.
10         MR. ROHWEDDER:  I mean, if we're
11 getting close, I mean, I don't -- I mean, I
12 don't know.  I mean, I'd prefer to keep going.
13 If there's not too much longer, I'd hate to
14 burn an hour and then come back for twenty
15 minutes.  We can get --
16         MR. ENGLERT:  Maybe we can get
17 back to work, too.
18         MR. ROHWEDDER:  Yeah.  We can
19 get on back to work and.
20         MS. CASEY:  David, why can't we
21 take just like a twenty- or a thirty-minute
22 lunch break?
23         MR. ROHWEDDER:  I mean, yeah.
24 Twenty or thirty minutes is fine, but I mean,
25 like I said, you know, if you guys only

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013                     Pages 158..161

Page 158

1  have --
2              MS. CASEY:  Yeah.  Let's --
3  Let's plan to meet back at maybe, like one,
4  1:10, 1:15?
5              MR. ROHWEDDER:  Well, that's
6  pushing forty-five minutes by my book.  I
7  mean --
8              MS. CASEY:  Yeah.  Or do you
9  want to be exact and we can meet back at 1:06?
10 How's that?
11             MR. ROHWEDDER:  Well, I mean, at
12 the risk of sounding like a jerk, I mean,
13 is --
14             MS. CASEY:  Are we still on the
15 Record, or can we go off the Record to talk
16 about this?
17             MR. ROHWEDDER:  Yeah, we can go
18 off the Record and talk about this.  It's
19 really not up to me.  I mean, I think I'd
20 leave it to --
21             MR. ENGLERT:  Well, let's --
22 Hold on.
23             VIDEOGRAPHER:  This is the end
24 of tape number three in the deposition of
25 Jeffrey G. Smith.  The time is 12:36 p.m.  We

Page 159

1  are now off the Record.
2              (Recess taken.)
3              VIDEOGRAPHER:  This is the
4  beginning of tape number four in the
5  deposition of Jeffrey G. Smith.  The time is
6  1:06 p.m.  We are now on -- back on the
7  Record.
8         Q.     (MR. ENGLERT) All right.
9  Mr. Smith, you testified previously that prior
10 to this deposition, you had spoke with David
11 on the phone?
12        A.     Yes.
13        Q.     Have you spoken with David after
14 that conversation?  Let me rephrase that.  Did
15 you -- During the break did you have any
16 conversations with David?
17        A.     Oh, no.  Only about a -- a
18 bicycle.
19        Q.     Okay.  Any conversations -- Any
20 conversations related to your deposition
21 testimony?
22        A.     No.  No.
23        Q.     All right.  Before we took a
24 break, we were -- were talking about the
25 property.

Page 160

1         A.     Yes.
2         Q.     And some purported trespasses on
3  the property?
4         A.     Right.
5         Q.     Do you recall if you ever -- if
6  any -- Strike that.
7                Were you ever -- Did you ever
8  receive any messages or letters from Chase at
9  the -- at your trailer on the 216 Culpepper
10 address?
11        A.     No.
12        Q.     Did anybody slip anything under
13 your door at the -- at your trailer at the 216
14 Culpepper address?
15        A.     No.  No.
16        Q.     Was it possible?
17        A.     No.
18        Q.     To slip a document under the
19 door at the 216 Culpepper property?
20        A.     No.
21        Q.     Why is -- was it not possible to
22 slip?
23        A.     At my trailer you're saying?
24        Q.     At your trailer.
25        A.     No.  The -- You couldn't -- The

Page 161

1  door wouldn't allow you to slip it under
2  there.
3         Q.     Okay.
4         A.     The way the door is on the
5  trailer, it's just got such an overlay on the
6  outside.  It seals too tight, you know.
7         Q.     Is it -- You never received any?
8         A.     Never.
9         Q.     Now the 145 Culpepper address,
10 is there any other doors other than the front
11 door?
12        A.     There is a back door.
13        Q.     The back door?
14        A.     A back porch, a screened porch
15 with a -- and a wooden door to get into -- you
16 know, you'd have to come through the screened
17 porch and then into the back door, which is
18 like a metal door, like a metal, I think it's
19 metal.
20        Q.     Okay.  Was it possible or
21 have -- Let me start over.
22                Have you ever -- Was any mail
23 ever delivered to the back door?
24        A.     No.  No.
25        Q.     Did anybody -- Do you recall if

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                    **Pages 162..165**

Page 162

1  a package was ever slipped under the back
2  door?
3        A.      No.  No.
4        Q.      Was it possible to slip a
5  package under the back door?
6        A.      I don't think so.  I don't think
7  so.  But, you know, it may be possible, but I
8  don't think it could because of the way the
9  door shuts.  I mean, because of the tightness
10 of it and all.
11       Q.      Can you explain more?
12       A.      No.  I mean, what I'm -- you
13 know on the bottom of the door it's got like a
14 little seal that slides up to the threshold,
15 you know what I mean, and I don't -- I just
16 never -- we never received nothing there
17 through the back door.
18       Q.      Okay.
19       A.      And normally if anything come
20 like a package or anything, you know like when
21 we'd order something FedEx or whatever, it
22 would come to the front door.  They would
23 always go to the front door.  I mean, I say
24 that -- I say that because, you know, I'm just
25 saying a FedEx truck or something, they

Page 163

1  normally just stop at the front and deliver to
2  the front door.  So . . .
3        Q.      Now, the front door, was it --
4  is it just one door, or was there --
5        A.      One door.
6        Q.      -- a screen door?
7        A.      There's a -- there's, like, a
8  storm door, like a glass door in front of a
9  regular door, you know.
10       Q.      Okay.  Does that lock?
11       A.      Yes, sir.
12       Q.      That front door?
13       A.      That locks, too.
14       Q.      Okay.
15       A.      And normally it would all stay
16 locked, you know, the glass and the . . .
17       Q.      But occasionally, that might
18 have been left unlocked?
19       A.      Yeah, maybe.
20       Q.      Okay.
21       A.      And I got -- You know, it could
22 be unlocked, I'm not -- I'm not saying it was
23 for sure locked, but it could have been left
24 unlocked.
25       Q.      Okay.  And then was there space

Page 164

1  in between that --
2        A.      There is.
3        Q.      -- storm door and the main front
4  door?
5        A.      There is a space.  There is a
6  little space.
7        Q.      Okay.  Okay.  Now, when you
8  spoke with Ms. Bates about the subpoena?
9        A.      Uh-huh.
10       Q.      And she advised you to or
11 suggested that you contact David here?
12       A.      Uh-huh.
13       Q.      Did she say why?
14       A.      No.  I was just concerned -- I
15 mean, I was just maybe thinking I may need to
16 talk to somebody to see what was happening,
17 you know what I mean.  Basically just try to
18 find out what was going on, or what I had to
19 do, you know, whatever.
20       Q.      Do you currently have a bank
21 account?
22       A.      I do.
23       Q.      Which bank?
24       A.      Wells Fargo.
25       Q.      Wells Fargo.  Is that the -- How

Page 165

1  long have you had this account?
2        A.      A -- A good while.
3        Q.      Okay.
4        A.      I don't know how many years,
5  but --
6        Q.      Is it -- Is that in Andalusia,
7  that branch where you bank?
8        A.      That is not where I opened it
9  at.
10       Q.      Okay.
11       A.      But that's -- I do use the Wells
12 Fargo there in Andalusia.  Andalusia.
13       Q.      Did you have that -- Did you
14 have that account when you were with
15 Ms. Bates?
16       A.      I did, I think.  Yes, I did.  I
17 did.
18       Q.      And is that the account where
19 wages -- your paycheck from Bates & Smith
20 would have been deposited into?
21       A.      That is my personal account,
22 that Wells Fargo.
23       Q.      Okay.
24       A.      You know, that would be my
25 personal money there.  That wouldn't have been

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                     Pages 166..169

Page 166

1   no payments or nothing coming out of my
2   account, you know, towards the house or
3   nothing.
4        Q.      Okay.  Well, let me back up
5   then.
6        A.      Okay.
7        Q.      Bates & Smith, when you -- when
8   you received a paycheck from Bates & Smith?
9        A.      Uh-huh.
10        Q.      Was it -- Did you get it in the
11   form of an actual paycheck, or was it just,
12   like, in a, you know, sometimes people have
13   like a direct deposit?
14        A.      Shawna would make out a
15   paycheck.  Well, I think she'd make out a
16   paycheck pretty much, I think.
17        Q.      A physical check?
18        A.      I think so, yeah.
19        Q.      Okay.
20        A.      Just like everybody else would
21   get.
22        Q.      And then you would deposit it
23   into your personal account?
24        A.      She would, yes.  She would.
25        Q.      Shawna would deposit it in your

Page 167

1   personal account?
2        A.      A lot of times she'd take care
3   of that for me, yeah.
4        Q.      Was it a joint account?
5        A.      This is not a joint account.
6   This is my own account.  She has an account at
7   Wells Fargo but, or whatever, or did or
8   whatever.
9        Q.      Okay.
10        A.      Wait a minute.  There is a joint
11   account.  Okay.  There is some type of joint
12   account.  See, I don't know exactly how that
13   works, but I use my personal account.
14        Q.      Okay.
15        A.      And a, you know, that's . . .
16        Q.      And the joint account's at Wells
17   Fargo, also?
18        A.      I think so.
19        Q.      Okay.
20        A.      I mean, I know it is.  But I
21   don't -- I don't know if it's even used
22   anymore or whatever.  You know, I don't know
23   if it's --
24        Q.      Sure.  You don't know if it's
25   still open or not, the joint account?

Page 168

1        A.      It is still open.
2        Q.      The joint account's still open?
3        A.      I'm pretty sure.
4        Q.      Do you -- do you still use that
5   joint account?
6        A.      The only reason -- It's where I
7   transfer money into her account for child
8   support.  That's exactly right.
9        Q.      Okay.
10        A.      And that's the only thing that
11   that's used for, you know.
12        Q.      Okay.  Got you.  So, when your
13   paychecks --
14        A.      Uh-huh.
15        Q.      -- from Bates & Smith, were
16   those deposited in your personal Wells Fargo
17   Bank account?
18        A.      You know, I don't know how that
19   was -- I've got to think about that, because
20   I'm not sure.  Because she would pay bills,
21   you know, our personal bills, and then I'd get
22   money, too.  I don't know if she would -- I
23   don't remember how she did that.  I really
24   don't.  I don't know if she'd cash the check
25   and put me some and use the rest for bills,

Page 169

1   I'm not sure.  I'm -- I'm not exactly sure
2   exactly how that went.  As long as I got my
3   money, I was happy.
4        Q.      So, when she -- Let's just walk
5   through this process, and I know we've been
6   here for a while, and some of this is covering
7   some ground that we've already covered, but I
8   just want to make sure we have everything
9   straight.
10             So you earned a weekly paycheck
11   from --
12        A.      Yes, sir.
13        Q.      -- Bates & Smith?
14        A.      That is correct.
15        Q.      And you took that -- And there
16   was at most or it was usually -- in 2006, 2007
17   you believe it was about sixteen hundred
18   dollars a month?
19        A.      About that.
20        Q.      Okay.  And then in 2008 it would
21   have been less?
22        A.      I'm not sure.  We said that, but
23   I'm not sure what it was in 2008.  I'm not
24   sure.  I'm not sure.
25        Q.      Okay.  So you have -- you get

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013                     Pages 170..173

Page 170

1  these paychecks and they're made out from
2  Bates & Smith?
3        A.    Uh-huh.
4        Q.    To you personally?
5        A.    To me, and, you know, like I
6  said, I'm not sure -- The way that worked is,
7  I didn't actually get a -- get the check a lot
8  of times, she would take care of that for me.
9  She would either -- I don't know if she cashed
10 the check and turned around and put me some
11 or, you know.  I don't remember -- I don't
12 remember actually getting the checks, you know
13 what I'm saying.
14       Q.    So Shawna would, as part of her
15 role as Bates & Smith helping manage the
16 finances --
17       A.    Right.
18       Q.    -- she would cut a check to you
19 personally?
20       A.    Uh-huh.
21       Q.    And then deposit it into your
22 joint account; is that correct?
23       A.    No, I'm not saying that.  I'm
24 just saying I'm not sure if she would actually
25 cash the -- Maybe it did go into our joint

Page 171

1  account, and then I got some of it afterwards.
2  I don't -- I don't remember.  I can't tell you
3  exactly.  I really don't know.
4              I don't -- You know, I know I
5  just didn't get a check every week to where I
6  had to cash or nothing like that or either
7  deposit it or something like that, you know, I
8  know she would take care of that for me.
9        Q.    So you -- But you paid your own
10 bills?
11       A.    Not really.  I had a few of my
12 own bills, as far as credit cards, but we had
13 them together, you know what I mean.  We
14 would -- The monies would go there and take
15 care of all the bills, you know what I'm
16 saying, all mine and her bills.
17       Q.    So, what account -- what account
18 was your bills, your personal bills paid out
19 of?
20       A.    Out of my account, my personal
21 account, with what money I got.  My personal
22 stuff was paid out of my -- my account.
23       Q.    And did you physically write the
24 checks for those accounts or would Shawna?
25       A.    I would -- I would do my own

Page 172

1  checks or my own bills.  It just what I -- I
2  didn't have but a couple of bills, I'm just
3  saying.
4        Q.    Yeah.
5        A.    Just doing credit cards when I'm
6  out, you know, if I needed a little something
7  extra out of town or something like that for
8  my personal.  Which, you know, I also, you
9  know what I'm saying, just my personal credit.
10       Q.    All right.  So you were aware
11 then, you know, as you -- when you paid these
12 bills how much was in your account?
13       A.    Oh, sure.  Yeah.
14       Q.    All right.
15       A.    In my personal account, yes,
16 sir.
17       Q.    Your personal account?
18       A.    Yes, sir.  And -- And I mean,
19 I'm the only one that used out of my personal
20 account.
21       Q.    And how does that money get into
22 the personal account?
23       A.    That's what I was saying.  I
24 don't know how that -- I don't know actually
25 how she swapped that around to get it, you

Page 173

1  know, to pay our bills, you know I'm saying,
2  anything we had together I'm saying anything
3  we had, you know.
4        Q.    But you never were -- you never
5  actually had a check that you deposited into
6  your personal account?
7        A.    Not -- Not really.  Maybe a
8  couple times.  Maybe some.  But if so, she
9  would handle that.  She'd take care of that
10 for me.
11       Q.    So Shawna would cut the check
12 from Bates & Smith?
13       A.    Uh-huh, uh-huh.  That's correct.
14       Q.    And then she would deposit that
15 check?
16       A.    For me.
17       Q.    For you into what -- which
18 account?
19       A.    I mean, whatever was -- For
20 bills, she would use for bills.  And like I
21 say, I can't remember how that was exchanged.
22 I really can't.  I don't remember.
23       Q.    So you don't -- Do you recall --
24 When you checked your personal account, do you
25 recall whether based on that, did you see

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                     Pages 174..177

Page 174

1  whether or not your -- your weekly paycheck
2  was deposited into that account?
3         A.    You know, a lot of times I
4  reckon sometimes it was different.  I don't
5  really know.  I really don't know what to tell
6  you.  I ain't trying to beat around the bush
7  here.  I just don't remember how that was
8  done.  I really don't.
9         Q.    Uh-huh.  Okay.
10        A.    I mean, you know, I'm trying to
11 think back right now and racking my brain and
12 I just can't remember how we done that, you
13 know.  But any bills we had together, I wanted
14 to make sure they was paid first, you know
15 what I mean.  And then whatever -- whatever
16 I'd get in my personal, that would be mine,
17 you know what I'm saying.
18        Q.    But you personally had one
19 account, and that was with the Wells Fargo?
20        A.    I do have my own account.
21        Q.    And you were aware of another
22 joint account that you had with?
23        A.    I'm sorry.
24        Q.    And you were aware of another
25 joint account you had with Ms. Bates?

Page 175

1         A.    Her.  Yes.  Her and I, we had a
2  joint account.
3         Q.    And you believe that was with
4  Wells Fargo Bank?
5         A.    I think so.
6         Q.    Okay.
7         A.    Well, I know so, yeah.
8         Q.    Okay.  Okay.  Do you recall when
9  you and Mrs. Bates submitted your loan
10 application, whether or not you received any
11 cash back as part of that transaction?
12        A.    I do not.  I do not know.  Cash
13 back, I don't -- I don't -- I wouldn't think
14 so, but, hey, I don't -- I'm not sure.
15        Q.    Did you or Mrs. Bates ever take
16 out a second loan on the mortgage?
17        A.    Not that I know of.
18        Q.    To your knowledge, everything in
19 that loan application is -- was accurate?
20        A.    Yes, sir.
21        Q.    Okay.
22        A.    You know, from -- you know, I
23 reckon it's accurate.
24        Q.    And who -- and again, that
25 information was provided by Ms. Bates for that

Page 176

1  loan application; is that your recollection?
2         A.    I'm sure.
3         Q.    Okay.
4         A.    I mean, like I say, she took
5  care of all the -- all the paperwork.
6         Q.    Okay.
7         A.    Anything like this, I wouldn't
8  do it, you know, she would take care of that,
9  and I signed it.
10        Q.    Now, what about tax returns?  Is
11 it the same as tax returns?
12        A.    Yes.  She took care of it, had
13 somebody do them or whatever, and I'd sign
14 them, you know.
15        Q.    So she would give all the -- the
16 relevant information needed to prepare the tax
17 return, she would handle giving that to the
18 tax preparer?
19        A.    Right.
20        Q.    Okay.  That personal Wells Fargo
21 Bank account?
22        A.    Uh-huh.
23        Q.    Did you have that personal
24 account in 2005?
25        A.    I don't know.  I don't know what

Page 177

1  year I opened it.  Maybe not.  Not in 2005,
2  maybe not.
3         Q.    Do you recall what year you
4  opened that account?
5         A.    No, I don't.  I do not.
6         Q.    Did you have a checking account
7  before -- personal checking account before you
8  opened the Wells Fargo account?
9         A.    Regions.  I did have a Regions
10 account.
11        Q.    Regions account?
12        A.    Yeah.
13        Q.    How long did you have the
14 Regions account?
15        A.    Several years.
16        Q.    Several years?
17        A.    Yeah.
18        Q.    Between the Regions and the
19 Wells Fargo Bank account, that was --
20        A.    Once I got my Wells Fargo, I
21 kind of got away from the Regions, and they
22 just seemed to be more Wells Fargo everywhere
23 than there was -- you know, it's just hard.
24 Like when you're working out of town, you know
25 what I'm saying?

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013          Pages 178..181

Page 178

1      Q.      Yeah.
2      A.      It was just hard to find a
3  Regions everywhere compared to Wells Fargo.
4  So . . .
5      Q.      And the joint account, was that
6  open in 2005?
7      A.      I don't -- I don't -- I don't --
8  don't know.
9      Q.      Okay.
10     A.      I mean, I'm not sure.
11     Q.      Okay.
12     A.      I'm not sure what year we opened
13  that.
14     Q.      Was that -- Was there another
15  joint account that -- that you had with
16  Ms. Bates before that?
17     A.      No.  That's -- I think that's
18  the only one.
19     Q.      Okay.  Any other bank accounts,
20  either joint or personal, that you can -- that
21  you had since like the early mid 2000s?
22     A.      Just Regions and -- I mean,
23  Regions and Wells Fargo, that's basically it.
24     Q.      Okay.  When you say basically
25  it, I just want that to make sure.

Page 179

1      A.      That's all I know of.  Regions.
2  I mean, as far as my personal, it's got --
3  it's Regions and Wells Fargo.  Yeah.
4              There was another personal
5  before that, which was CB&T, you know.  But,
6  gosh, that's been way, way, way back.
7      Q.      CB&T?
8      A.      Yeah, CB&T out of Columbus.  And
9  see that's kind of a local thing.  And when
10  you go to veering out of town, you never --
11  you know, it just -- it's just not a big -- I
12  was just after that big bank, you know, that's
13  everywhere.  So . . .
14     Q.      Just to be absolutely clear,
15  you -- you have never contacted Chase about
16  the mortgage?
17     A.      No.
18     Q.      And Chase has never contacted
19  you about the mortgage?
20     A.      No.  No.
21     Q.      And if Chase records reflected
22  anything different, you would have no way to
23  dispute it; right?
24     A.      I mean, they ain't contacted me
25  is all I can say.

Page 180

1      Q.      Chase has never sent you a -- a
2  letter, or at least that you've never --
3      A.      Not that I received.
4      Q.      Okay.  And again, if Chase
5  records reflected differently, you'd have no
6  way to dispute it?
7      A.      I'm sorry, I'd have what?
8      Q.      No way to dispute that?  Would
9  you have any records that would contradict if
10  Chase had a record that said we sent a letter
11  at such-and-such a date, you wouldn't have any
12  documents that would disprove that?
13     A.      I reckon not.
14     Q.      Okay.
15     A.      I just know I haven't received
16  nothing.
17     Q.      Okay.  Okay.
18         MR. ENGLERT:  Okay.  I'm going
19  to ask you to just take a real quick
20  two-minute break.  I have to use the bathroom
21  and review my notes real quick, and I think
22  we'll be about done.
23         VIDEOGRAPHER:  The time is 1:27
24  p.m.  We are now off the Record.
25             (Recess taken.)

Page 181

1         VIDEOGRAPHER:  The time is 1:31
2  p.m.  We are now on Record.
3      Q.      (MR. ENGLERT)  Mr. Smith, that
4  Regions account, is that still open?
5      A.      No.  No, it's closed.
6      Q.      You closed it?
7      A.      Yes.
8      Q.      Do you recall when you opened
9  the Regions account?
10     A.      Oh, Lord.  No, I don't.  Been
11  years back.  I don't -- I don't remember what
12  year.
13     Q.      Is it prior to 2000, the year
14  2000?
15     A.      Probably after 2000.
16  Probably -- Let me see.  Maybe -- Maybe around
17  2001, 2002.  I'm not sure.
18     Q.      Okay.  And did you close that
19  account -- When did you close that account?
20     A.      Probably '08 or something like
21  that, maybe.
22     Q.      Did you close it around the same
23  time that you opened the Wells Fargo account?
24     A.      No.  I had the Wells Fargo also.
25  But I just kind of veered away from the

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                    Pages 182..185

Page 182

1  Regions, you know what I'm saying, so I just
2  started using the Wells Fargo.
3          Q.      Okay.  We're just about done.  I
4  just wanted to circle back with you again on
5  the subpoena.
6          A.      Okay.
7          Q.      As we discussed, the subpoena
8  power extends that requires you to produce
9  those documents that are in your possession?
10         A.      Right.
11         Q.      Or control?
12         A.      Right.
13         Q.      You've testified that you do not
14 have any documents responsive to that
15 subpoena; is that correct?
16         A.      I do not.
17         Q.      Do you have the ability to
18 access any of those documents -- And let me
19 rephrase that.
20                 Do you have the ability to
21 access a bank -- your bank statements?
22         A.      What do you mean?
23         Q.      You -- You can call your bank?
24         A.      I reckon I could, yes, sir.
25         Q.      And ask them to provide you with

Page 183

1  the bank statements; is that correct?
2          A.      Yes, you can.  I'm assuming.
3  I've never did it, but . . .
4                  MR. ENGLERT:  At this time,
5  we're going to keep the deposition open for
6  the purposes of -- until we can get the
7  documents that we requested in the subpoena.
8                  MR. ROHWEDDER:  What specific
9  documents?
10                 MR. ENGLERT:  Well, the tax
11 returns from 2006 and 2007.
12         Q.      And I will, as I advised
13 Mr. Smith previously, if you sign that
14 document that we've provided to you, which you
15 are required to do under the subpoena, you
16 will be -- we'll be able to access those
17 records.  Otherwise, you will be required to
18 go and obtain those documents on your own and
19 provide them to us pursuant to the subpoena.
20 So I'll ask you again if you would like to
21 sign that document?
22         A.      No, sir.
23         Q.      Okay.  And I will, as I advised
24 you previously, we will -- we do have the
25 powers to seek -- to compel you to provide

Page 184

1  those documents pursuant to a Court Order.  We
2  also have the right to seek our fees, our
3  attorney's fees incurred in collecting or
4  seeking a Motion to Compel you to provide
5  those documents.
6          A.      All right.
7          Q.      Do you understand?
8          A.      I do understand.
9          Q.      And, again, you're -- you're
10 refusing for the -- on the Record to provide
11 those documents?
12         A.      Yes, sir.
13         Q.      To sign those, the tax form?
14         A.      Yep.
15                 MR. ENGLERT:  Okay.  That's all
16 we have.  Thank you, Mr. Smith.
17                 THE WITNESS:  You're welcome.
18                 EXAMINATION
19 BY MR. ROHWEDDER:
20         Q.      Mr. Smith, have you ever been
21 stressed out, yourself?
22         A.      Everybody gets a little
23 stressed, I reckon.
24         Q.      Do you ever feel depressed?
25         A.      No.

Page 185

1          Q.      Have you ever been anxious?
2          A.      Anxious, I reckon everybody gets
3  a little anxious sometimes.
4          Q.      Do you ever feel tired or sick?
5          A.      Yeah, I do.
6          Q.      Have you ever been emotionally
7  upset?
8          A.      We all get a little bit like
9  that.
10         Q.      Have you been happy?
11         A.      Oh, heck yeah.
12         Q.      Have you ever been sad?
13         A.      Yes, I have.
14         Q.      How do you know those things?
15         A.      Just by the feeling of them.
16         Q.      Do you think that you need a --
17 a training in the field of medicine or in the
18 field of mental health to know those things
19 about yourself?
20         A.      No.  Not at all, no.
21         Q.      Do you think that you need
22 training in the field of medicine or mental
23 health to know those things about those with
24 whom you have a personal and close
25 relationship?

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                Pages 186..189

Page 186

1       A.      Not at all.  That is exactly
2  right.
3       Q.      Earlier, you had talked about
4  Shawna having gained some weight?
5       A.      Yes, sir.
6       Q.      Was she gaining -- Did you
7  notice that starting sometime towards the end
8  of 2011?
9       A.      Yea -- While I was still on the
10 properties, yes, sir.
11      Q.      And was that around the same
12 time that she had briefly talked to you about
13 a payment issue?
14      A.      Yes, sir.
15      Q.      And then that -- you noticed
16 that she continued, did you -- Let me back up.
17              Did you continue to notice that
18 she was having or experiencing that weight
19 gain into 2012 and up to the time that you
20 left?
21      A.      She did -- She did swell on up
22 pretty good, yeah.  She'd gotten -- Yeah, she
23 gained weight.
24      Q.      Do you know how much weight she
25 gained?

Page 187

1       A.      No, I don't.  I really don't.
2  It's hard for me to look and tell.
3       MR. ROHWEDDER:  That's all I
4  have.  Thank you, Mr. Smith.
5       THE WITNESS:  All right.  Am I
6  free?
7       MR. ROHWEDDER:  Yeah.  You are
8  free to go.
9       MS. CASEY:  Is somebody -- Is
10 somebody going to explain read and sign?
11      MR. ROHWEDDER:  Yeah.  You have
12 the -- You can -- You have the ability to read
13 and sign your deposition, which means the
14 court reporter will send you a copy of the
15 deposition transcript to the address that you
16 provided today.
17      THE WITNESS:  Okay.
18      MR. ROHWEDDER:  You can look at
19 it and read for errors, you can change your
20 deposition testimony subject to Counsel's
21 request that they can come back and talk to
22 you about any major changes that you make to
23 it.  Or you can waive that right and trust
24 that what the court reporter took down is an
25 accurate reflection of what you testified to.

Page 188

1       THE WITNESS:  Okay.  Well, I'm
2  assuming -- I think it would be accurate
3  from -- I mean, I don't know.
4       MR. ROHWEDDER:  I mean, it's up
5  to you.  There's no right or wrong answers.
6       THE WITNESS:  Yeah.  I don't
7  feel like I need it, I mean, no copy of it or
8  nothing.  I'm okay.
9       MR. ROHWEDDER:  So, you'll waive
10 your -- you'll waive that?
11      THE WITNESS:  Yeah.  I think I
12 give all the best answers I could give y'all
13 today, you know what I'm saying.
14      MR. ROHWEDDER:  You understand
15 what we're telling you, though?  I just want
16 that your -- that we're all on the same page.
17 Because if you want to read it and check for
18 errors, you can, if not, you don't have to.
19      THE WITNESS:  I'm good.
20      MR. ROHWEDDER:  Okay.
21      THE WITNESS:  I'm good.
22      MR. ROHWEDDER:  And I think my
23 last little stick on the Record would be that
24 we would object to y'all's reservation of
25 keeping the deposition open.  So, otherwise, I

Page 189

1  think we're good.
2       THE WITNESS:  Okay.  Where
3  does -- All this goes back to you, or . . .
4       MR. ROHWEDDER:  Yeah.
5       VIDEOGRAPHER:  This is the end
6  of tape number four in the deposition of
7  Jeffrey G. Smith.  The time is 1:40 p.m.  We
8  are now off the Record.  This concludes the
9  deposition for June 6th, 2013.
10
11
12 (The deposition was concluded at 1:40 p.m.,
13 June 6th, 2013.)
14
15
16
17
18
19
20
21
22
23
24
25

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**                     Page 190

Page 190

```
 1              REPORTER'S CERTIFICATE
 2  STATE OF ALABAMA,
 3  MONTGOMERY COUNTY,
 4          I, Sara Nunnelly, Certified Court
 5  Reporter and Commissioner for the State of
 6  Alabama at Large, do hereby certify that the
 7  above and foregoing proceeding was taken down
 8  by me by stenographic means, and that the
 9  content herein was produced in transcript form
10  by computer aid under my supervision, and that
11  the foregoing represents, to the best of my
12  ability, a true and correct transcript of the
13  proceedings occurring on said date and at said
14  time.
15          I further certify that I am neither of
16  kin nor of counsel to the parties to the
17  action nor in any manner interested in the
18  result of said case.
19
20
21
22
                    /s/Sara Nunnelly
23          _____
                    Sara Nunnelly, CCR
24          ACCR #420 Expires 9/30/13
                    Commissioner for the
25          State of Alabama at Large
```

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                    Index: --I..2012

**-**

**--I**   55:12

**0**

**06**   90:5

**07**   100:21

**08**   91:4
  181:20

**09**   91:4,5

**1**

**1**   22:4,6,15
  71:18

**10**   149:13

**106**   5:8

**10:34**   70:18

**10:48**   70:21

**11:38**   114:14

**11:50**   114:19

**12:36**   158:25

**14**   149:13

**14-by-10**
  149:15

**145**   25:16
  34:14
  35:7,12,15
  36:16,23
  38:1,5,11
  39:7
  40:12,16

41:6,13
57:19
58:7,
63:13,21
64:8,14
104:8
106:13
107:17
114:23
120:22
121:23
122:1,2,
16,20
123:2,4
124:19
130:18
135:9,24
142:12,23
146:7
161:9

**188**   5:7

**1989**   42:12

**1996**   46:4
  60:25

**1:06**   158:9
  159:6

**1:10**   158:4

**1:15**   158:4

**1:27**   180:23

**1:31**   181:1

**1:40**   189:7,
  12

**2**

**2**   29:3,5,10
  70:24
  71:16
  148:1

**2000**   57:2
  181:13,14,
  15

**2000s**   178:21

**2001**   181:17

**2002**   39:13
  181:17

**2003**   86:4
  89:23

**2004**   56:2,
  8,11,16

**2005**   176:24
  177:1
  178:6

**2006**   30:17,
  23 31:5
  71:10
  95:8,11,
  13,21
  98:15,19
  100:15,18
  101:6,10
  102:20
  111:23
  112:6,14,
  15 116:17
  169:16
  183:11

**2007**   71:11
  90:9 95:8
  100:20
  101:13,19
  102:20
  103:1
  112:15
  116:17
  169:16
  183:11

**2008**   39:1
  46:22 57:6
  61:5
  102:11,17,
  18 103:1
  115:23
  116:20,21
  128:9
  138:22
  147:11
  169:20,23

**2008's**   90:13

**2009**   38:20,
  23 46:20
  57:6

**2010**   30:17,
  23 31:5

**2011**   123:11
  144:24
  145:1
  186:8

**2012**
  123:10,11
  144:24
  186:19

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013                    Index: 2013..address

**2013**  5:20
  70:25
  189:9,13

**207**  32:5

**20770**  32:5

**215(sic)**
  39:17

**216**  34:16
  35:4,11,
  14,19 36:2
  37:3,21
  40:4,13
  47:4 48:21
  63:16,22
  64:9,14
  123:6
  124:2,20
  125:5
  126:17
  127:9
  130:21
  144:23
  145:14,21,
  25 147:15
  160:9,13,
  19

**23rd**  70:25

————————————

**3**

**3**  36:9
  148:2

**36303**  5:8

————————————

**4**

**4**  89:24
  104:12,17
  105:24

**412CV-43-CDL**
  5:17

**4506-T**  71:21

————————————

**5**

**5**  89:24
  105:4,9

————————————

**6**

**6**  110:25
  111:3,9
  118:25

**6th**  5:20
  189:9,13

————————————

**7**

**770-318-1551**
  18:15

————————————

**8**

**8/21/65**
  31:21

————————————

**9**

**96**  45:17

**9:23**  5:9,19

————————————

**A**

**a.m.**  5:9,20
  70:18,21
  114:14,19

**abandon**
  122:7

**abandoned**
  123:18

**ability**
  182:17,20
  187:12

**absolutely**
  179:14

**access**
  182:18,21
  183:16

**accommodate**
  8:2

**account**  53:7
  89:14
  134:1
  164:21
  165:1,14,
  18,21
  166:2,23
  167:1,4,5,
  6,11,12,
  13,25
  168:5,7,17
  170:22
  171:1,17,
  20,21,22
  172:12,15,
  17,20,22

  173:6,18,
  24 174:2,
  19,20,22,
  25 175:2
  176:21,24
  177:4,6,7,
  8,10,11,
  14,19
  178:5,15
  181:4,9,
  19,23

**account's**
  167:16
  168:2

**accounts**
  171:24
  178:19

**accurate**
  175:19,23
  187:25
  188:2

**acting**  5:2

**actions**  52:2
  74:5,7
  77:8

**active**  20:13

**actual**  44:18
  166:11

**addition**
  97:17

**additional**
  140:22,24
  142:3

**address**  32:3

34:14 38:4
39:7,18
40:4,6,11,
12,13,16
41:3,7,14
47:4
63:14,17,
23 107:18
160:10,14
161:9
187:15

addressed
135:7

addresses
108:9

adjacent
35:9,12

advice   20:19

advise   13:6
14:24 15:5
72:11

advised
164:10
183:12,23

advisement
13:10

affecting
153:14

affirmative
72:21

age   44:2,4

aggravated
144:19

aggravating
144:2

ahead   7:12
8:9 10:3,
14 13:24
126:18

ahold   17:23

Alabama   5:2,
4,8,21
32:6,11
34:10

alcohol   11:1

allegation
26:16

aloud   71:20

amount   19:7
96:18
132:5

Andalusia
18:5,7
32:6,11,13
33:4,17,
18,21,23
34:3 39:21
165:6,12

angle   35:16

annoyed
152:17,19,
20

answering
8:8

answers   8:21
188:5,12

anxiety   57:9

anxious
57:12
76:13
185:1,2,3

anymore
147:23
167:22

apparently
109:9,17
133:20

application
105:24
106:12
108:1
115:10,23
175:10,19
176:1

applied
128:8,18
132:2,9,
17,19,21,
23 138:12

apply   104:5
114:21

approach
140:7

approached
130:12

approx   101:9

approximate
14:13
42:10,14
44:7 45:15

98:18 99:1

approximately
14:2 19:12
33:8 39:9,
12 46:4
48:6,22
81:14
97:6,19
101:12
116:17

area   61:6
81:4 89:25
148:16

arguments
50:20,21
62:4,6,7

arrangement
44:16

assess   77:17

associates
21:17

assume   10:4

assumed
156:9

assuming
73:22,23
81:2
88:22,23
89:15,16
111:25
112:2,10,
12 115:2
122:4,17
128:10
188:2

attempt
  140:1

attention
  113:17

attitude
  52:1

attorney
  121:13
  124:16,22
  126:1,3,5,
  9,13

attorney's
  184:3

attorneys
  31:13
  121:12

aunt   67:22

aware   11:4
  47:15
  52:7,12
  55:8 56:10
  72:25 75:6
  81:7
  113:1,9,12
  128:25
  129:1,5
  141:19
  142:3
  150:4,8
  172:10
  174:21,24

―――――――――
        B
―――――――――

back   9:20
  20:6 29:19

30:8,12
31:4 33:3,
20 34:3,
19, 35:22
37:9 38:18
46:14
54:22 66:5
70:20
71:15
72:22
81:16
83:12,14
84:3,12
85:22
105:13,23
106:11
114:19
119:21
125:3
129:13
131:15
139:5
143:13
150:24
151:21
155:6,18
157:14,17,
19 158:3,9
159:6
161:12,13,
14,17,23
162:1,5,17
166:4
175:11,13
179:6
181:11
182:4
186:16

187:21
189:3

backtrack
  11:24

bad   13:18
  33:11
  38:13
  73:25
  88:18 90:7
  95:25
  100:4
  117:2
  123:19,21
  153:3

bank   5:16
  6:5,9,24
  27:6,9
  28:3,16
  30:24 49:8
  89:6,13
  107:12
  133:22,23
  164:20,23
  165:7
  168:17
  175:4
  176:21
  178:19
  179:12
  182:21,23
  183:1

base   92:8

based   9:10
  95:3
  119:17
  121:5

128:1
173:25

basically
  7:17 13:5
  14:16,19
  17:16
  18:4,7
  51:20 52:3
  53:16 65:6
  67:20
  73:13 76:5
  79:23 80:6
  93:7,11
  107:5
  119:22
  121:1
  136:23
  164:17
  178:23,24

basis   100:7

Bates   5:15
  6:3 7:1,3
  15:14
  16:3,8
  19:1
  20:14,18
  27:4 28:1,
  9 30:16
  34:25
  43:20 44:9
  45:3,8,12,
  18,19,23
  46:3 47:7,
  9,20 48:23
  49:3,11,24
  50:2,12,17
  51:2 52:7

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013          Index: Bates'..borrow

54:8,15
55:5 56:6,
20 57:11,
16 58:4,8,
13,14,20
59:22
60:2,6,24
62:8,14,21
65:16
66:10,21
67:9 68:19
69:8,20
70:1 72:19
73:1 75:6,
24 78:6,18
79:25
80:3,25
81:7,24
84:22,25
85:3 86:7,
12,18,21
87:2,8,14,
20 88:7,
15,25
89:14,19
90:2,19,21
91:2,9,13
94:4,15,18
95:1,16,
17,20
96:14
97:4,22
98:8,16
99:7,10
100:1,22
101:1,13,
20 102:12
103:5,12

104:7,15
108:20
109:3,20
110:4,21
111:5
112:13
113:1,6,
12,19,24
114:23,25
115:24
116:1,6,11
117:5,10,
25 118:5,
17,20
121:9
122:25
124:4
126:5,9
127:12
128:8,25
129:2
130:12
131:2,6,25
134:12,13,
16 135:12
137:5,11
138:1,23
139:10
140:7,9,
19,21,22
141:6,16
142:4,7,9,
14 144:4
147:25
150:9
151:3
153:5,17
164:8

165:15,19
166:7,8
168:15
169:13
170:2,15
173:12
174:25
175:9,15,
25 178:16

Bates'  28:4
67:18
121:12
143:7

bathroom
7:24 70:14
180:20

beat  174:6

began  62:12

beginning
5:9 89:22
114:17
159:4

begins  5:13

bicycle
159:18

big  35:24
41:20
92:25
143:21
149:7,8,
179:11,12

bill  96:8

bills  65:8,
66:22

67:1,2,6
80:3,4,5,
7,9 92:25
93:4 94:6,
13 96:8
97:1,23,
24,25
117:15
137:9,12
140:8
168:20,21,
25 171:10,
12,15,16,
18 172:1,
2,12
173:1,20
174:13

birth  31:20

bit  17:15
23:16 24:9
46:16
55:24
68:16 89:7
123:19
131:17
138:8,18
141:24
144:9,10
154:22
185:8

bonus  99:6

bonuses
101:19,24
102:3

book  158:6

borrow  48:16

bothered
  152:13,14

bottom
  162:13

boxes   108:4

boys   16:5,
  16  17:17
  26:18
  47:24  48:1
  49:14,21
  50:8  58:25
  125:22
  139:15
  140:17
  144:15
  150:13
  151:6
  154:9,13
  155:23

brain   174:11

branch   165:7

break   7:23
  8:5,10
  70:14
  72:17  79:5
  114:7
  156:25
  157:22
  159:15,24
  180:20

briefly
  186:12

bring   21:4
  24:12

bringing

  121:19

broke   27:17

brought
  125:16,18

bucks   97:19
  98:20

built   89:6

burn   157:14

bush   174:6

business
  70:7
  82:19,22
  85:15,18
  90:19
  91:2,20,21
  137:22

———————————
       C
———————————

call   16:15
  40:24
  78:16,25
  79:2  87:11
  137:16,21
  182:23

called   12:16
  15:18

calls   17:14,
  19

camper   32:8,
  13, 33:21
  34:6  36:5
  37:4,22

card   70:9

cards   171:12
  172:5

care   74:1
  80:21,24
  88:4  92:20
  109:24
  117:13
  130:10
  135:5
  167:2
  171:8,15
  173:9
  176:5,8,12

career   92:22

case   5:16
  72:6

Casey   6:8
  114:6
  156:24
  157:20
  158:2,8,14
  187:9

cash   168:24
  170:25
  171:6
  175:11,12

cashed   170:9

Cataula
  34:13

CB&T   179:5,
  7,8

CCR   5:1

cell   18:12,
  14,19,25

  19:11

certify   5:3

Chad   44:1,
  8,12,17

Chad's   44:2

chance   106:2

Chandler
  44:1,5,8,
  12,17

Chandler's
  44:4

change   40:6,
  10,11  41:3
  47:10
  187:19

Charlie
  21:21
  124:25

Chase   5:16
  6:5,9,24
  27:5,6,9
  28:3,16
  31:8  41:2
  49:8  70:5
  71:10
  74:5,7,25
  76:1,11
  77:1
  107:12,17,
  23  121:20
  131:3,8
  132:7
  133:3,4,
  15,18,24
  134:10,14,

17,20,22
135:1,8,
11,18,21
137:20,25
145:15
150:7
160:8
179:15,18,
21 180:1,
4,10

**cheaper**
107:4

**check** 87:21,
22,23,24
95:13 96:7
97:16 98:4
102:5,7
117:15
134:10,14,
17,20
135:17
140:12
166:17
168:24
170:7,10,
18 173:5,
11,15
188:17

**checked**
173:24

**checking**
177:6,7

**checkmark**
22:25

**checks**
170:12

**child** 15:19
16:13
17:9,15
28:12,14
45:2,6,9
50:3,6,23
122:9
140:14
168:7

**children**
15:20
43:10,22
44:20,24
53:15
59:11 63:2
66:14
69:19
129:24
136:15

**Christmas**
49:14

**circle** 139:5
182:4

**cities**
103:21

**city** 32:24
139:2

**Civil** 5:4

**clarify**
21:14
102:6
110:19
117:23

144:21

**clean** 8:24
9:12

**clear** 97:5
129:17
179:14

**client** 92:8
103:24

**clients**
92:10,13
103:14

**close** 20:8
128:20
149:18
157:11
181:18,19,
22 185:24

**closed**
181:5,6

**clothes**
48:17

**clue** 126:23
139:25

**collect**
103:25

**collecting**
103:13
184:3

**Columbus**
33:13
83:23,24
155:17
179:8

**comfortably**
118:14

**comm** 52:17

**Commissioner**
5:3

**communicate**
28:10
52:18
76:12
137:2

**communicated**
73:7,9
75:6

**communicating**
56:6

**communication**
28:6 50:9
55:18,22
56:1

**communications**
27:25 73:1
107:12

**company**
83:17,25
84:10,11
85:6,7,8
97:15,24,
25 98:23
99:17
139:1
140:13
141:5,16,
17

**compared**
178:3

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013**          Index: compel..copy

compel
 183:25
 184:4

compensated
 87:13,16
 95:19

compensation
 102:9
 124:11

competent
 77:17

competently
 11:7

completed
 7:20

completely
 12:8

complies
 22:23
 23:4,23
 25:6 30:9
 104:24

comprehend
 10:2

computer
 24:16,23
 27:11,16

concerned
 73:10
 164:14

concerns
 53:13

concluded
 189:12

concludes
 189:8

conditions
 52:9 55:6
 58:22,24

conduct   77:5

conducted
 143:2

confirm
 36:21
 37:20

connection
 6:25 7:10
 22:19
 113:21

consent   72:8

Constructing(
sic)   141:16

construction
 32:7 36:4
 82:14
 83:25
 84:21

consult
 108:25
 109:3,7
 113:18,19

consulted
 113:25

Consulting
 141:17

contact
 17:21 18:9
 20:14 41:2

135:20
136:14
164:11

contacted
 13:11
 18:17
 126:8
 131:3
 136:11
 179:15,18,
24

contacts
 18:16

content   13:1
 14:15

context   76:7

continue
 186:17

continued
 186:16

Contracting
 84:23,25
 85:4 86:7,
13,19,22
 88:25
 89:14,19
 90:3,19,21
 91:3,10,13
 94:5,15,19
 96:15
 98:10,16
 100:23
 101:20
 102:12
 116:2

117:5,25
118:5,21
138:23

contractor
 86:17

contradict
 180:9

control   72:3
 182:11

conver   131:7

conversation
 8:20 13:2
 14:15
 72:25
 74:16
 78:5,8,13
 79:17
 115:20
 122:25
 131:19,20
 142:14
 151:13
 155:3
 159:14

conversations
 50:17
 76:8,10
 78:2 131:7
 159:16,19,
20

convey   124:1
 125:5,17

conveying
 123:1

copy   30:15

187:14
188:7

corporation
85:9,11
99:12,14

correct
16:10
43:18
44:10
47:7,8
56:3 60:18
69:21
73:4,5
75:17 77:4
78:3,4,6,7
91:8 97:23
98:9,11,17
100:2,12
125:4
128:9
130:13,14
138:10
142:14
143:2
148:20
149:2
151:1,4
154:11
169:14
170:22
173:13
182:15
183:1

correctly
33:24

correspondence
s  107:17,23

costs  140:16

counsel  5:6,
25 21:12

Counsel's
187:20

counties
86:15
103:21

couple  17:10
20:6
29:18,19
34:18
42:17
45:25 54:7
69:3 83:20
84:1,5
111:14
119:4
139:20
144:15
146:2,16
172:2
173:8

couples
62:18

court  5:1,7,
18,23 6:15
7:6 12:7
45:6,9
72:1,8
149:12
184:1
187:14,24

Courts  71:25

covered

169:7

covering
169:6

creates
61:13

credit  70:9
114:21
171:12
172:5,9

credited
53:7

creditor
137:17,19,
20,22

creditors
70:4

crew  92:3
93:8,16,
18,19

cry  153:24

crying
73:17,20
74:17
75:10,18

Culpepper
25:16
26:13 28:3
34:15,17
35:4,7,11,
12,15
36:2,16,23
37:3,21
38:1,4,5,
11 39:7,17

40:4,12,
13,16
41:7,13
47:4 48:22
57:19
58:7,
63:14,17,
21,22
64:8,9
104:8
106:14
107:18
114:23
120:22
121:23
122:2,15,
16,20
124:2,19,
20 125:6
126:17
127:9
130:18,21
135:9,25
142:13,23
143:7,18
144:11,23
145:14,25
146:7
147:15
149:2
160:9,14,
19 161:9

current  32:3

custody
44:11,13,
16,20 45:9

customers

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013                Index: cut..difficulty

86:11,13,
14

**cut** 9:18
96:1
170:18
173:11

**cutting**
144:5
145:4

———————
**D**
———————

**dad** 67:19
68:3,8,23
82:19
83:14,20
84:3,12,18
92:20

**Darn** 154:23

**date** 5:3
14:8 31:19
39:8 42:11
46:15
49:16
102:14
136:19
180:11

**dated** 70:24

**dates** 12:22
13:19 46:6

**dating** 31:4

**David** 6:2
7:20 10:8
12:4,20
13:9,14

14:15,24
20:17
21:16,24
78:21,25
79:3,10,13
121:12
157:20
159:10,13,
16 164:11

**David's**
78:23
124:24

**day** 13:17,
155:18

**days** 29:18,
19 139:20

**deal** 141:10

**deaths** 67:16

**decade** 45:16

**December**
47:25
59:14

**decided**
125:19

**decipher**
131:17

**deem** 10:16

**default**
130:24

**Defendant's**
22:5 29:4
36:8
104:11
105:3

110:24

**definite**
90:1 99:2

**defunct**
141:6,17

**deliver**
163:1

**delivered**
12:17
161:23

**deposed**
8:13,15
11:11

**deposit**
166:13,22,
25 170:21
171:7
173:14

**deposited**
165:20
168:16
173:5
174:2

**deposition**
5:14,21
7:9 12:13
15:16,24
17:3 20:22
21:9,18
22:15
24:13
31:10 43:7
70:23
78:16
104:17

105:9,23
111:8
114:12,18
118:24
148:1
158:24
159:5,10,
20 183:5
187:13,15,
20 188:25
189:6,9,12

**depressed**
51:4
53:18,19
184:24

**depression**
56:13,
57:17

**describe**
149:10
153:13

**determined**
96:13,17
125:4

**Diagnosis**
77:12

**diarrhea**
58:15

**differently**
180:5

**difficulties**
141:4,15,
20 142:2

**difficulty**
67:10

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013          Index: digging..dwindling

141:24

**digging**
93:20,22,
23

**direct**
166:13

**directly**
99:7

**disagreement**
50:25

**disagreements**
50:16,19

**disconnected**
19:11

**discuss**
49:4,7
78:12
96:19
131:3,6
134:23
142:21
155:22

**discussed**
15:23,
16:25 53:8
54:18
64:12,15
76:2 114:3
182:7

**disprove**
180:12

**dispute**
179:23
180:6,8

**distance**
20:1

**distinct**
35:5

**District**
5:17,18
7:6,7 72:1

**dividend**
87:19 99:6

**dividends**
101:20,24

**divorced**
60:13

**document**
22:14
29:9,16
71:8, 72:9
104:16
105:8,18
106:2
110:5
111:8,19
160:18
183:14,21

**documents**
21:1,5
24:12,21
25:7,12,
13,19
26:4,11,15
27:24
28:7,8
29:22,25
30:4,22,25
31:1,3
72:4 114:1

180:12
182:9,14,
18 183:7,
9,18
184:1,5,11

**dollars** 97:6
116:11,18
117:19,24
118:4
127:21
169:18

**door** 41:6,
9,13,18,
20,21,23
160:13,19
161:1,4,
11,12,13,
15,17,18,
23 162:2,
5,9,13,17,
22,23
163:2,3,4,
5,6,8,9,12
164:3,4

**doors** 161:10

**Dothan** 5:8,
21

**doubt** 10:7

**doughnuts**
143:20
144:16
145:8

**drain** 86:9

**draw** 87:14,
21 88:6

96:18
140:12

**drawed** 88:13
96:10

**drawing**
95:13
116:5,8

**drawn** 117:4

**drew** 98:16

**drive** 25:16
34:17
114:23
122:16
143:18
144:11
149:2,6

**driver's**
47:16

**driveway**
146:10,19
147:18
148:11,24
149:2
150:18
154:17

**driving**
143:13

**drop**
155:11,19

**duly** 6:13

**duplexes**
45:20

**dwindling**
102:23

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013          Index: dying..excessive

dying  68:3
  90:15
  102:24

―――――――――
        E
―――――――――

earlier
  153:7
  186:3

early  144:24
  178:21

earn  87:19
  90:3
  101:19,23
  139:24

earned  89:19
  98:7,19
  100:1
  101:5,9
  103:4,6
  117:7,9,24
  118:3
  169:10

earning
  89:1,2,4
  95:2
  100:25
  102:19,20,
  22

eat  97:14,
  15

economy  65:1
  88:18
  90:15,18
  95:25
  100:4

116:23

education
  82:8

effected
  90:18

efforts
  24:19

eleven  44:5

email  27:14

emails  24:24
  27:2 28:1

emotional
  28:4,21
  51:4,17
  53:20

emotionally
  51:14
  185:6

employed
  65:21 82:6
  83:17
  100:22
  102:12

employment
  67:11
  140:3
  142:9

enclosed
  71:22

end  56:23
  69:2 92:22
  99:4,5
  114:11
  146:21

148:11,14,
  23 149:1
  150:18
  158:23
  186:7
  189:5

endorse
  134:19

ends  65:5
  125:12
  144:13

Englert  6:4,
  17,20,22
  22:10,13
  29:2,8
  36:12
  37:15,18,
  19 54:21
  58:1
  70:15,22
  111:3,5
  114:8,20
  157:1,6,16
  158:21
  159:8
  180:18
  181:3
  183:4,10
  184:15

enterprise
  88:16

entity  135:8

equipment
  93:25

errors

187:19
  188:18

estimate
  14:3 128:1

estimating
  49:20

eventually
  83:12

everybody's
  157:3

evicted
  121:1

evidence
  27:24

evidencing
  26:11
  30:22

exact  14:7
  31:19 33:5
  42:11
  46:6,24
  90:6,8
  158:9

examination
  5:11 6:19
  184:18

examined
  6:13

Excavator
  93:24 94:1

exception
  145:3

excessive

56:21

**exchange**
 124:6,13

**exchanged**
 173:21

**excuse**  46:3
 114:13

**Exhibit**
 22:3,6,15
 29:3,5,10
 36:9 70:23
 104:12,17
 105:4,9,23
 110:25
 111:9
 118:24,25
 148:1

**expect**  14:23

**expense**
 97:13

**expenses**
 98:3,21

**experience**
 128:2,5

**experiences**
 121:6

**experiencing**
 56:20 61:8
 186:18

**explain**  7:13
 11:25
 130:5
 162:11
 187:10

**explanation**
 59:6

**express**
 64:16
 74:20,23
 75:24,25
 76:11,20,
 25 142:8
 152:10
 154:2

**expressed**
 56:16 67:9
 74:17
 75:9,17

**extends**
 182:8

**extra**  102:9
 172:7

**eyes**  134:7
 136:8
 142:19,20

————————————

**F**

————————————

**Facebook**
 24:6,16,24
 28:1

**fact**  75:19
 112:3,6,8,
 9 153:15

**failed**  129:2

**fair**  17:20
 18:24 48:9
 75:16
 77:14

**fall**  138:1

**fallen**  68:20
 129:6

**fallout**  83:9

**familiar**
 29:9 36:19
 105:8,10
 111:7,10,
 12

**family**  40:1
 67:16,18,
 21 68:2,20
 137:11

**Fargo**
 164:24,25
 165:12,22
 167:7,17
 168:16
 174:19
 175:4
 176:20
 177:8,19,
 20,22
 178:3,23
 179:3
 181:23,24
 182:2

**father**
 68:13,24
 69:12 93:6

**father's**
 82:22
 91:20

**Fedex**
 162:21,25

**feel**  124:8
 125:23
 129:21
 140:25
 141:7,
 152:11
 153:1
 156:17
 184:24
 185:4
 188:7

**feeling**
 76:12
 185:15

**feelings**
 56:16

**fees**  184:2,
 3

**feet**  149:11

**fell**  138:5

**felt**
 123:16,17,
 18,19
 152:12,16

**fence**  147:4

**field**  82:8
 91:17
 143:21
 185:17,18,
 22

**Fifteen**  44:3

**figured**
 123:23

**file**  109:19

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013                    Index: filed..general

115:9

**filed** 7:1
  30:15
  80:10
  109:22
  110:20
  111:24
  112:6
  119:3

**filing** 94:9,
  11 112:15
  113:21

**fill** 108:11

**filled**
  108:15,18,
  22 109:8

**finally** 84:3

**finance**
  140:24

**finances**
  64:12,17,
  20 80:1
  91:9 92:19
  118:18
  140:22
  170:16

**financial**
  94:18
  141:4,15,
  20,24
  142:2

**financially**
  64:23

**find** 164:18

178:2

**fine** 6:17
  14:4 70:16
  114:8,10
  157:24

**finish** 8:5
  9:12,14
  10:13

**firm** 96:2,
  11

**flies** 68:10
  69:17
  81:19 90:7

**floated** 84:1

**fluctuate**
  100:1,6

**follow** 72:22
  155:7
  156:1

**follow-up**
  111:14
  157:8

**for-sure**
  97:12 99:3

**foreclosure**
  26:5
  135:24
  136:1,18
  142:12,17,
  22,23
  143:2
  152:25

**foregoing**
  5:5

**foreman**
  87:9,10
  91:25
  92:16

**form** 57:25
  65:11
  71:21
  75:2,22
  76:23
  108:12,16
  110:7
  118:2
  166:11
  184:13

**forty-five**
  158:6

**Foster** 5:7

**found** 76:5

**four-year**
  84:16

**frame** 33:5
  56:24
  63:20
  144:22

**frames** 13:19
  33:11
  38:14,16

**free** 187:6,
  8

**Freedom** 5:7

**French** 31:14

**friends**
  39:24
  67:16,18

68:20

**front** 41:9
  53:24
  161:10
  162:22,23
  163:1,2,3,
  8,12 164:3

**frustration**
  67:9,10
  142:8

**full** 31:22

**full-time**
  140:2

**funds** 97:22
  98:23
  119:20

**funeral** 68:1

**fussing**
  62:17

**fussings**
  62:10

_____

        **G**

_____

**gain** 56:21
  186:19

**gained**
  186:4,23,
  25

**gaining**
  186:6

**general** 7:13
  58:15
  86:17

151:5

**generally**
20:10
75:19
129:5

**Georgia** 5:18
7:7 33:10
34:13 72:2
83:24
85:14

**give** 12:14
32:23,24
37:1 40:22
45:15
46:14
78:23 86:5
90:7 96:2,
11 97:12
116:19
139:3
141:1,13
176:15
188:12

**giving**
176:17

**glass** 41:21
163:8,16

**Glenn** 31:24

**glimpsed**
23:9,16,18
24:1,3,8
29:17

**good** 12:22
14:14
38:15,16

39:3 52:4
81:16,18
88:10 89:8
90:10
96:21
125:12
140:5
144:10
156:17
165:2
186:22
188:19,21
189:1

**Gordy** 83:25

**gosh** 38:14
42:7,24
47:21
50:13 57:1
69:17
81:12
179:6

**Gower** 21:21
124:25

**grades** 82:3

**grandmas**
49:23

**grass** 143:21
144:17

**grew** 61:14

**Gross** 118:2

**ground** 7:13
11:24
93:14
169:7

**guess** 14:9
127:23

**guys** 157:5,
25

—————————
H
—————————

**half** 19:19
33:14

**handle**
92:21,24
94:8
106:18
173:9
176:17

**handled**
79:25
80:7,8
91:9
94:11,13
104:10
108:20
112:17
118:8,17

**handling**
137:6

**happen** 14:17

**happened**
19:24 53:9
90:17
133:11
144:3,9,10
155:3

**happening**
53:3,
152:21

164:16

**happy** 118:13
169:3
185:10

**hard** 38:18
47:22
53:12
177:23
187:2

**hate** 110:1
136:25
157:13

**head** 9:2
72:20
131:13
150:15

**headed**
154:17

**health** 52:8
54:10
55:6,9
58:21
59:24 60:4
77:10,
185:18,23

**health-wise**
51:13

**hear** 152:3

**heard** 151:2
152:4

**heavy** 140:15

**heck** 185:11

**held** 81:7

helping
  137:2
  140:8
  170:15

hey  175:14

high  83:22

high-tech
  23:17

highest
  117:3

Hold  158:22

home  38:8,
  11 40:19
  109:4

hospice  69:7

hospital
  69:23

hour  79:7
  157:14

house  35:15
  38:8 48:17
  51:18
  52:21,23
  53:3,6
  63:21
  73:13,22
  74:3,21
  115:1,6
  120:16,18,
  21 123:23
  135:4
  136:20
  141:11
  145:16

146:22
147:14
148:15
149:4
166:2

How's  158:10

huh-uhs  9:8

hundred
  96:22
  97:6,19
  98:20
  116:18
  127:21
  169:17

Huseby  5:23

_____

            I
_____

I'd(sic)
  52:15

idea  124:1
  126:24,25

identification
  22:7 29:6
  36:10
  104:13
  105:5
  111:1

identify
  5:25 24:20
  36:25

ill  68:20,
  23,24
  69:3,12

implied  77:5

important
  8:23 12:7

Inc.'s  86:13

inches
  149:15

incidences
  151:2
  156:21

incident
  154:6

included
  98:20

including
  28:1 30:24

income
  30:23,
  87:25
  95:8,12
  98:13
  99:25
  101:17,18
  103:3
  142:4

incorporated
  5:23 85:13

incorporation
  85:10

incurred
  184:3

indicating
  37:9
  148:16
  149:5,8
  150:19

indication
  51:3

individual
  20:20
  77:18
  80:11

individually
  30:16

info  60:15

information
  18:10
  72:2,5
  94:18
  108:1,4
  142:11
  175:25
  176:16

informed
  69:19

Initially
  83:7

insomnia
  57:21,22
  58:9

installed
  86:8

installing
  87:12
  91:17
  93:9,15

instance
  69:25
  103:24
  129:1

154:7

**instances**
70:4

**instruct**
13:22

**interaction**
27:5 73:1

**interactions**
49:8

**interest**
87:3 107:4
115:3
122:20,21
123:1,14
124:2,7,19

**interested**
121:19

**interject**
10:8

**interrupted**
19:13

**interruption**
19:6,8

**introduce**
22:3

**involved**
11:12
45:23

**IRS** 111:24
112:7

**issue** 114:4
125:14,16
186:13

**issues** 11:3
49:5 51:4
53:25
54:18 55:9
58:8,9
70:4,9
75:7
130:13
131:3

——————

**J**

——————

**Jeff** 43:14,
23

**Jeffrey** 5:9,
15 6:12
31:24
114:13,18
158:25
159:5
189:7

**jerk** 158:12

**Jessica** 6:8

**job** 91:16

**jobs** 36:6
84:2 87:11

**Joe** 6:4,21

**joint**
109:19,22
110:21
167:4,5,
10,11,16,
25 168:2,5
170:22,25
174:22,25
175:2

**178:5,15,**
20

**jointly**
30:16
34:25
114:21
115:10
127:13,15

**JPMORGAN**
5:16 6:5,
9,24 27:5

**judgment**
110:17
126:16

**June** 5:20
70:24
189:9,13

**Junior**
43:13,14,
23

——————

**K**

——————

**keeping**
188:25

**kids** 145:6

**kind** 7:14
14:25 15:8
23:17
35:18,25
37:10
58:23
61:14 85:8
91:20
92:23,24
99:6

101:23
123:17,18,
19 154:22
177:21
179:9
181:25

**knew** 52:22

**knowed**
126:17

**knowledge**
36:23 60:6
67:15
175:18

——————

**L**

——————

**labeled**
22:14 29:9
104:17
111:8

**ladies** 80:17

**laid** 134:7

**Lane** 32:5

**late**
137:12,23
144:24

**laundry**
48:19

**lawsuit** 7:1,
10 11:12,
13,16,21
15:11,25
22:19
119:10,11,
13,17

120:3,6,8
121:5,9,
13,16,19

**leading**
30:23

**learning**
83:13

**leave**  155:21
158:20

**left**  33:9
51:15 53:4
54:6 57:4,
7 64:14
122:6
141:5
146:20
149:4
157:5
163:18,23
186:20

**legal**  31:22
74:8

**legally**
47:10 74:9

**legit**
110:14,15

**letter**  70:24
133:23
135:1,3,6,
11,15,16,
18 137:16
180:2,10

**letters**  24:6
27:8 28:1
107:23

160:8

**letting**  13:3

**license**
47:16

**life**  82:17

**Listen**  139:5

**live**  32:8,
17 34:9
53:22
73:11
141:12

**lived**  32:12
38:7
118:12

**living**  34:5
48:12 52:6
81:1,25
82:11
107:18
118:12,14
144:22
145:14

**loan**  25:14,
21 28:19
104:5,6
105:24
106:5,13
107:6,8
108:1
114:22
115:9,18,
22 116:10
122:4,12
128:8,18
132:2,10

138:13
175:9,16,
19 176:1

**local**  179:9

**located**
32:10 37:4
38:8

**lock**  41:23
163:10

**locked**
163:16,23

**locks**  163:13

**long**  18:19
19:18
32:12 36:1
42:13,16,
24 43:3
50:7
68:24,25
78:8 79:6,
12 82:15
83:4,16
99:20
131:19
147:8
165:1
169:2
177:13

**longer**  68:16
138:23
157:13

**looked**  35:21
110:14

**Lord**  48:24
181:10

**lose**  74:21

**loss**  95:2

**lost**  74:12
76:3
119:22
120:24
131:10,14

**lot**  36:4
60:15
61:11 65:2
97:11
106:17,19
129:21
136:25
137:3
140:16
143:15,16
154:3
167:2
170:7
174:3

**loved**  81:4

**lower**  115:3

**lunch**  156:25
157:22

---

**M**

---

**Machines**
94:2

**Macon**  67:24

**made**  53:6
71:23
74:25
103:1

118:7
130:2
132:7,15
170:1

maiden  42:23

mail  40:16,
  21,24
  41:12
  48:15
  137:16
  161:22

main  164:3

major  50:15,
  19 66:25
  83:10
  187:22

make  10:19
  65:4,5
  67:1 85:24
  89:20 97:5
  117:18
  122:8
  125:12
  129:2,16,
  18 130:6
  155:20
  156:17
  166:14,15
  169:8
  174:14
  178:25
  187:22

making  8:19
  116:10,14,
  117:17
  132:16

man  18:22
  90:7
  124:24
  154:18

manage
  170:15

managed
  96:14

managing
  92:16,19

map  36:14,
  22 37:2
  148:4,6,9

mark  22:3
  29:2 36:12
  37:1,5
  111:3
  148:8,12

marked  22:6
  29:5 36:9
  104:12
  105:4
  110:25

marriage
  60:10

married
  42:2,4,11,
  16,19
  43:17,19,
  21 60:7,9,
  19,20,21,
  23 119:3

material
  93:13

matter  5:15
  136:4

means  88:24
  187:13

meant  60:17

media  24:6
  28:2

medication
  56:12,14

medications
  10:20,24

medicine
  185:17,22

meet  40:25
  45:11,18
  49:4 65:5
  125:12
  158:3,9

meeting
  151:9

Melody  42:20
  43:16

members  40:1
  67:21 68:3

men  93:19

mental  52:8
  58:21
  59:24 60:4
  77:10,
  185:18,22

mention
  55:13,16
  134:13

mentioned
  13:14
  26:18
  51:11
  136:15
  150:11,13
  153:5
  154:7

mentioning
  55:11

message
  28:11,16,
  23

messages
  24:7,24
  28:2 160:8

met  45:21
  46:1,3,9

metal
  161:18,19

mid  178:21

Middle  5:18
  7:6 72:1

mind  22:4
  106:24
  114:6
  148:7

mine  27:17
  174:16

minute  68:10
  86:4 91:5
  111:15
  139:3,8
  167:10

minutes
  78:9,10,11
  79:15
  131:21,22
  157:15,24
  158:6

missed  76:21
  138:10

Mississippi
  32:19
  33:18

mixed  83:19

mom  45:20

mom's  45:20
  155:21

moment
  111:13

Monday
  15:17,18
  16:11,17,
  18

money  50:24
  53:9 64:15
  65:24,25
  96:6,10
  97:15,16,
  18 117:16
  122:8
  133:20,
  165:25
  168:7,22
  169:3
  172:21

monies  65:24
  171:14

month  19:25
  20:5 100:9
  103:19
  116:11
  117:7,10,
  19,24
  118:4
  169:18

monthly
  117:4

months  20:6
  32:15,20
  33:1,4,7,
  15,19,20
  34:1,2
  46:1 69:3

mortgage
  49:5 51:24
  53:25
  54:18 73:2
  74:18
  75:20
  106:13
  107:3,14
  128:13
  129:2,7,19
  130:3,13,
  24 131:4
  134:23
  137:6
  138:2,15
  179:16,19

motel  155:16

mother  44:9

Motion  184:4

move  38:11

moved  34:10
  39:7,17
  40:3,12,18
  47:4 48:21
  63:13,16,
  21,22
  64:7,8,14
  83:22
  84:7,9
  127:6
  130:17,20
  136:22
  147:14

moving
  57:10,16,
  18 58:5,13

Mutual  31:9

_____

N

_____

named  124:25

names  31:25
  35:2
  43:12,25

naturally
  64:18 74:3
  152:14

nature  120:2

nausea  58:15

needed  97:1,
  3 172:6
  176:16

Net  118:2

networks
  24:7

newspaper
  142:17

night  143:20
  144:17

nods  9:2
  72:20

nonresponsive
  9:17

normal  62:9,
  10 93:14

North  5:7

notes  180:21

notice
  186:7,17

noticed  57:4
  186:15

notified
  31:9

November
  49:17,25

number  5:14,
  16 18:10,
  11,14,17,
  20,25 19:4
  20:10,15
  25:4,5,6,
  24 26:1,7,
  10,22
  27:19
  30:6,14,21
  70:23
  71:16,18

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
**Jeffrey G. Smith on 06/06/2013      Index: Nunnelly..paperwork**

78:23 96:3
97:12 99:3
108:8
111:9
114:12,17
118:25
148:1
158:24
159:4
189:6

**Nunnelly**
5:1,24
8:19 12:2

———————
**O**
———————

**oath** 12:1,
3,6

**object** 57:24
65:10
75:1,2,21
76:22
110:6
118:1
188:24

**objection**
10:9,11,13

**obligated**
140:25
141:8

**observe**
62:13

**obtain** 24:20
183:18

**obtained**
127:5

**obtaining**
67:10

**occasion**
15:15

**occasionally**
163:17

**occur** 19:23

**October**
49:17,24

**office** 31:13
124:24

**officer**
99:10,11,
16

**offices** 5:6
31:13

**On-site**
91:16

**online** 27:18

**open** 144:8
167:25
168:1,2
178:6
181:4
183:5
188:25

**opened**
135:12
165:8
177:1,4,8
178:12
181:8,23

**operation**
59:13

85:16
90:24

**oral** 5:10

**order** 8:24
44:11,13
72:9 93:12
162:21
184:1

**ordered** 45:5

**original**
9:17 22:10

**out-of-town**
97:13

**overlay**
161:5

**overnight**
155:17

**overview**
36:22

**owe** 125:23

**owed** 124:8

**owned** 86:18

**owner** 86:21,
25 92:1

**ownership**
87:2

**owns** 121:25

———————
**P**
———————

**p.m.** 158:25
159:6
180:24

181:2
189:7,12

**package**
162:1,5,20

**packages**
41:12

**paid** 50:7
80:6 98:2
99:6
101:13
102:7
103:20
113:17
119:20
127:1
137:24
171:9,18,
22 172:11
174:14

**paper** 12:17
41:18
78:15
126:14,17
136:5
152:1,2,5

**papers** 41:12

**paperwork**
80:24 88:5
104:10
106:18
108:21
109:24
110:10,18
117:14
118:9
130:10

176:5

paragraph
  23:2

parked
  154:19

part  94:23
  170:14
  175:11

part-time
  142:5

partners
  21:17

party  11:15
  80:18
  121:16

Pascagoula
  32:25
  33:1,23,25
  39:22

passed  67:19
  68:4,8,13,
  25 69:12

past  15:18
  21:17,21
  32:1 34:2
  47:23
  59:14
  62:20
  67:14
  68:19,21
  130:2
  136:4
  148:15
  149:3

pavement
  146:21

pay  28:14
  45:2, 50:6
  65:8 67:1
  80:3,6
  94:5 96:8
  97:1,3,22,
  24,25
  117:14
  122:9
  124:4
  140:8,15
  168:20
  173:1

paycheck
  165:19
  166:8,11,
  15,16
  169:10
  174:1

paychecks
  30:24 31:4
  168:13
  170:1

paying  65:22
  66:21 67:6
  80:9 92:24
  93:4 94:13
  103:18
  128:13
  137:6,9,12

payment
  128:15
  129:3
  132:7

133:3
186:13

payments
  53:6
  74:12,24
  75:7,13
  76:1,3,11,
  13,21
  77:1,6
  80:7
  119:22
  120:24
  129:18
  130:3,7
  131:9,14,
  25 132:2,
  9,14,15,
  16,19,25
  133:21
  137:17
  138:10,12,
  15 166:1

payroll
  87:23,24
  96:14

pedestals
  154:20

Peek  32:5

pen  37:1,16
  148:7

pending
  142:22

people  67:25
  136:7,9
  143:13,16,
  19 145:3

146:24
149:6
150:12
151:24
152:7
153:15
166:12

people'd
  103:16

period  30:19
  63:13 65:9
  66:11,17
  68:25
  83:8,16
  84:14,16
  128:20
  140:8

periods
  65:7,15
  66:16,17
  67:3

permission
  71:9

person  42:19
  47:20
  49:11
  135:8
  151:9,12
  156:2

personal
  70:11
  96:8,24
  98:3,
  165:21,25
  166:23
  167:1,13

168:16,21
171:18,20,
21 172:8,
9,15,17,
19,22
173:6,24
174:16
176:20,23
177:7
178:20
179:2,4
185:24

**personally**
96:22
170:4,19
174:18

**Phenix**  139:1

**phone**  18:10,
11,12,14,
20,25
19:11 50:2
137:16
151:12,14
159:11

**physical**
41:6,8
54:10,16
166:17

**physically**
171:23

**pick**  93:5
155:14

**picked**
49:21,22
92:12

154:15

**picture**
36:22

**pictures**
150:13,17
151:25
153:8
154:19,21
156:4

**piece**  41:17
126:14,17

**Pike**  5:2

**pipe**  86:8,9
87:12
91:17
93:9,15,21

**pipeline**
82:13
84:21 85:4
93:18

**Pipeline-type**
82:13

**pitch**  129:25

**place**  5:21
44:12
99:21
154:19

**places**  83:11

**Plaintiff**
45:12

**plan**  158:3

**point**  7:22
15:14

39:16
47:12 49:5
52:13
100:16
125:4
129:6,17
130:23

**porch**
161:14,17

**portion**
54:25

**position**
81:6 87:7
91:23
99:19

**possession**
25:18
27:1,23
30:3 182:9

**posted**
149:19

**potential**
150:5

**pounds**  56:22
57:5

**power**  71:25
182:8

**powers**
183:25

**prefer**
157:12

**premises**
58:5

**preparation**
21:2

**prepare**  21:9
80:12,13
110:5
176:16

**prepared**
80:14

**preparer**
176:18

**president**
99:13

**pretty**  32:7
33:9 35:22
52:4 56:8
60:21
80:23
82:17
92:20
139:14
142:15
148:8
149:18
154:23
166:16
168:3
186:22

**prev**  52:11

**previous**
16:20,24
19:25
29:20
33:22 34:8
107:6
121:5

**previously**
46:2 52:11
65:14
69:18
72:24
77:23
94:25 97:8
99:25
108:19
112:25
116:16
130:11
138:16
154:7,8
159:9
183:13,24

**prior**  32:16
33:2,3
37:24 38:3
46:20,22
57:2,10,
16,18
58:4,13
60:17
61:20,24
70:2
147:11
159:9
181:13

**private**
149:6

**problem**  43:8
73:22 84:6

**problems**
28:18
51:13,17,
23 54:10,

16 59:8,21
61:8,12,
13,16,23
62:12
115:17
156:13

**Procedure**
5:5

**proceedings**
5:12

**process**
169:5

**produce**
29:22
182:8

**professional**
59:24 60:4

**profit**  89:1,
2,4,10,11,
20 90:4
95:2

**profitable**
88:15

**profited**
89:12

**pronouncing**
33:24

**prop**  152:8

**properties**
34:18,20
51:16,19
52:16 53:5
57:8 74:11
123:5

186:10

**property**
26:5,13,
17,20 28:3
34:11,21,
22,24
35:4,5,11,
12,19,23,
25 36:17
37:3,4,21
38:8 40:23
41:1
48:12,22
54:6 57:4
104:8
106:14
121:22,25
122:15,21
123:1,2,14
124:2,7,20
125:6,17
126:10,20
127:5,9,
16,20
128:4
135:24
142:13,24
143:7,8
144:6,13,
22,23
145:3,14,
21,25
146:8
147:15
150:6
155:24
156:3,20
159:25

160:3,19

**provide**
15:10 59:5
182:25
183:19,25
184:4,10

**provided**  5:4
175:25
183:14
187:16

**pull**  71:10

**pulling**
123:20

**purchase**
127:8,12

**purported**
26:12
143:6
150:5
153:21
156:20
160:2

**purports**
36:13

**purposes**
22:8 29:7
36:11
104:14
105:6
111:2
183:6

**pursuant**
71:24 72:6
108:1
142:13

183:19
184:1

pushing
  158:6

put  33:16
  56:22
  73:12
  136:7,22
  147:1,4
  168:25
  170:10

putting  57:5
  93:21

———————————

Q

———————————

qualifying
  115:17

quarter  99:5

question
  8:4,6,8
  9:10,13,
  18,19,23
  10:4,12
  13:23 14:3
  54:14
  57:25
  65:11 66:3
  75:2,22
  76:23
  110:7
  118:2
  143:11

questions
  7:15,18,
  19,20,21,

22 8:20,24
  10:9 12:4,
  8 13:7
  14:19,25
  15:3,6,8
  79:22
  110:1
  111:14,15
  122:5
  157:8

quick  11:25
  180:19,21

quitclaim
  122:20
  123:13

———————————

R

———————————

racking
  174:11

raised
  125:14

rate  107:4
  115:3

reach  19:4
  133:15
  134:22

read  23:2,
  7,15 24:3,
  8,10 54:21
  55:1
  71:18,20
  106:23
  142:16
  187:10,12,
  19 188:17

reading  24:5
  25:8 29:15
  106:1

ready  92:23

real  113:15
  117:2
  180:19,21

reason  168:6

reasons  59:1

recall  17:6
  29:15
  39:6,11
  41:5,11,16
  42:21,22
  47:1 50:16
  54:12 55:3
  56:5,14,15
  57:9,11
  58:3,8,11,
  18 60:10
  61:11
  62:25
  63:4,23
  64:1,11
  65:18,19
  66:9 68:18
  69:24 70:3
  86:1 94:20
  99:9
  100:14
  101:4,8,
  12,16
  102:18
  103:9,23
  104:2
  105:12,17

106:1,10
  107:11,16,
  22 110:20
  113:22,24
  115:8,13
  119:2
  122:22,24
  123:8
  124:15,23
  126:19
  127:3,4
  134:9,12
  137:15
  139:9
  148:2
  151:14
  155:2
  160:5
  161:25
  173:23,25
  175:8
  177:3
  181:8

receipt
  134:14
  135:15

receive
  124:10
  133:24
  160:8

received
  12:13 21:6
  22:19
  97:18,21
  99:6
  132:13,25
  133:4,10

161:7
162:16
166:8
175:10
180:3,15

receiving
40:16
107:11,22
134:9
137:15

recently
15:14

recess  70:19
114:15
159:2
180:25

reckon  56:8,
9 59:2
77:19
79:18
86:20
106:5,15
115:11
120:10
122:3,18
123:3
138:20
144:10
149:18
174:4
175:23
180:13
182:24
184:23
185:2

recognize

22:14
104:16,18
111:7

recollect
98:22

recollection
68:14 82:7
102:25
108:15
118:10
137:13
176:1

record  5:19
8:20,24
9:12 31:23
55:1
70:18,21
114:14,19
149:12
158:15,18
159:1,7
180:10,24
181:2
184:10
188:23
189:8

recorded  9:3

records
30:18
179:21
180:5,9
183:17

red  37:16

referred
27:24 97:8

referring
26:11

refinance
104:7
106:8,13
115:1,6

refinanced
107:7

refinancing
107:3,13
109:4,6
114:22
115:18
128:8

reflected
179:21
180:5

reflection
187:25

refusing
184:10

Regions
177:9,11,
14,18,21
178:3,22,
23 179:1,3
181:4,9
182:1

regular
100:6
102:5,7
163:9

regularly
56:7

reimbursement
98:21

related
25:14,21
26:5,16
27:25
64:17
74:24
75:19
159:20

relates
28:16

relating
25:7 26:12

relationship
46:8 58:4
61:9 62:13
72:18
185:25

release  72:4

relevant
176:16

relied  20:25

remarried
60:14

remember
19:10
33:5,10
35:1,3
38:13
39:2,4,5
42:25
43:1,5
46:13,15,
17,19

49:12
55:11
61:15
63:9,10
65:21
67:20,23
68:1,2,4,
17 69:6,16
73:8 74:11
79:6
80:16,20
81:9,17
84:2,4,5
85:12,17,
24 86:23,
25 87:5
88:3,11,12
90:13
95:24 96:2
99:21,22
100:17,18,
19 101:7,
11,15
102:1,2,8,
14,16
105:22
106:4,
107:5,9,
10,15,19,
21 108:17
109:5,12,
14,15,16
110:13
115:12,14,
19,20,25
116:13,14,
15 117:2,
11,12,13,

16 118:6
120:23,24
125:2
126:12
127:1,10,
14 128:23
130:16
133:21
137:14,24
146:15,16,
18,20
147:5,17,
20 149:17,
22,25
150:12,15
151:11
168:23
170:11,12
171:2
173:21,22
174:7,12
181:11

**remind** 85:23

**reminds**
13:21

**rephrase**
9:19 10:1
41:11
44:14 58:2
75:3,23
92:17
159:14
182:19

**replacement**
55:17

**reported**

88:1

**reporter**
5:2,24
6:7,10,15
55:2
149:12
187:14,24

**Reporting**
5:7

**represent**
6:1,24

**representation**
95:5

**representative**
150:6

**represented**
21:12
125:25
126:2,5

**representing**
5:23 6:25

**request**
25:5,8,13,
23 30:14,
21 31:2
71:3,18,23
187:21

**requested**
54:25
183:7

**requesting**
30:22,25
71:9

**requests**

23:22,23
30:3

**required**
24:11
29:22
183:15,17

**requires**
182:8

**reservation**
188:24

**reside** 18:2
34:9 36:1

**resided**
34:11
37:25
38:1,5

**residing**
37:20,21
38:4

**respect** 27:4
44:12
126:9
142:12
154:8

**respond** 7:19
8:25 9:6,9
10:14
13:7,10
15:6

**responding**
9:13

**response**
14:5 78:19

responsibiliti
es  92:5,15
  93:5

responsible
  92:18
  112:14
  128:12
  129:17,21
  137:6,8

responsive
  31:2
  182:14

rest  168:25

result
  116:23
  141:25

retire  92:23

retired
  92:12

retiring
  93:6

return
  110:21
  112:6,16
  113:21
  118:24
  119:3
  176:17

returns
  30:15,18
  71:4,10
  72:5
  80:10,11,
  14 109:20
  111:23

114:2
  176:10,
  183:11

review  94:17
  106:3,7
  111:14
  180:21

reviewed
  21:1 23:25
  94:21
  118:23

rich  88:20

risk  158:12

road  5:2
  32:7,18
  36:4
  143:18
  144:8,12
  148:14

Rohwedder
  6:2,18
  22:9,12
  30:10,13
  37:17
  57:24
  65:10,17
  75:1,21
  76:22
  110:6
  113:3
  118:1
  148:3
  157:4,10,
  18,23
  158:5,11,
  17 183:8

184:19
  187:3,7,
  11,18
  188:4,9,
  14,20,22
  189:4

role  91:12
  170:15

romantic
  46:8

romantically
  45:22

rough  89:9

roughly
  32:14 46:5
  82:24
  127:4
  147:9
  149:7

rule  11:24

rules  5:4
  7:13

run  93:16
  136:5
  151:25

running
  92:2,3
  93:8

_____

S

_____

sad  137:3
  185:12

salary  87:14
  88:6 95:20

96:18 97:9
  98:15,19
  100:15,25
  101:5
  103:10
  116:5,8,22
  117:4

sale  135:24
  136:1,18
  142:12,22,
  23 143:2

Sara  5:1,24

scared
  154:22

school  82:18
  83:21,22
  139:15,16

screen  163:6

screened
  161:14,16

seal  162:14

seals  161:6

second-to-the-
last  23:20

secretary
  99:22

section
  112:23

Security
  108:7

seek  72:7,
  142:8
  183:25

**SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.**
Jeffrey G. Smith on 06/06/2013          Index: seeking..simply

184:2

**seeking**
 25:13
 30:21
 59:23
 72:2,5,9
 184:4

**send** 187:14

**separate**
 35:5 89:13
 109:22
 150:25
 151:2

**separated**
 38:15
 46:18 48:5
 53:13
 128:23

**served** 15:15
 21:18 26:4
 29:13
 77:24

**service**
 19:7,9

**services**
 59:23 60:3

**set** 35:3

**setting**
 35:24

**seventeen**
 83:1

**severely**
 68:20

**sewer** 86:8

**shakes** 9:2

**share** 135:15

**shared**
 135:14

**Shawna** 5:15
 6:3 12:16,
 24,25
 13:11
 30:16
 40:22
 47:10,13,
 16 52:4
 80:2,20
 88:4,6
 94:12,14,
 16,22 95:6
 96:4,5,13
 97:21
 99:16
 104:9
 106:18
 110:9
 112:22,23
 113:1,5,7,
 12,13,15,
 20 114:1
 117:13
 125:7
 126:13,15
 128:14
 130:6
 134:8
 136:4,11
 139:9
 166:14,25
 170:14

171:24
 173:11
 186:4

**Shawna's**
 95:5 96:24
 126:16

**she'd** 48:18
 50:22,23
 67:1
 166:15
 167:2
 168:24
 173:9
 186:22

**shoot** 18:21
 27:16

**shop** 35:18,
 19,21,23,
 24

**short** 155:12

**shut** 91:1,3

**shuts** 162:9

**sic** 104:15
 147:25

**sick** 185:4

**sickly** 58:25
 59:3

**side** 35:21
 146:20

**sign** 71:8,
 14 72:8,16
 110:5
 123:24
 134:17

148:20,21,
 22 149:7,9
 183:13,21
 184:13
 187:10,13

**signature**
 72:9
 104:25
 105:1,13,
 16 109:12,
 17 111:21,
 22 112:11

**signed** 71:21
 106:19
 108:13
 110:15
 123:6
 125:13
 126:14,18
 176:9

**significant**
 19:7 67:15

**signing**
 105:12,17
 125:9

**signs**
 145:19,25
 146:5,7,
 14,17
 147:1,
 148:9

**silver** 148:7

**similar**
 22:16

**simply** 10:10

77:5
104:20

sir  7:2
11:6,9,14,
17,20,22
15:12 16:1
17:25
18:3,11,13
19:2,5,9
20:16
22:20 24:5
26:6 29:14
31:3,6
32:2,22
33:25
34:4,7,23
35:10,13
38:6,9
39:23,25
40:2,14,
17,20
41:4,15
42:3,5
43:21
44:13
45:1,7,10
49:6,9
54:11 55:3
56:18
57:13
58:10,16,
18 59:4
60:12
66:23
68:7,9
71:5 73:3
77:7,8,13
78:1,17

82:9 87:18
90:25
92:11
94:3,7,10
98:14,24
102:13
103:11
110:15
111:25
112:1,4
116:8,19
117:8
118:19,22
119:1
121:10
122:17
135:10
142:6,10,
15 145:5
147:16
148:13
154:10,12
163:11
169:12
172:16,18
175:20
182:24
183:22
184:12
186:5,10,
14

site  91:16

situation
73:18 74:1
141:11
155:1

sixteen

96:21
97:6,
98:19
116:18
169:17

size  149:14

sleeping
57:23 58:9

slides
162:14

slip  41:17
106:24
160:12,18,
22 161:1
162:4

slipped
162:1

slipping
41:12
55:25

slow
103:16,17,
20,22
140:6

Smith  5:9,15
6:12,21
10:23
22:13
28:25 29:8
31:7,17,24
43:13,14,
23 44:1,8,
9 47:10,
13,16
70:22

82:23,25
83:5,12,18
84:15,22,
25 85:3
86:7,12,
18,22
87:8,14,20
88:7,15,25
89:14,19
90:3,19,21
91:2,10,
13,19,24
92:5,8,15,
19 93:6
94:4,15,18
95:1,16,
17,20
96:14
97:4,22
98:8,16
99:7,10
100:1,23
101:1,14,
20 102:12
103:5,6,12
105:7
111:6,19
112:22,23
113:7,13,
15,20
114:1,4,
13,18,20
116:2,6,12
117:5,10,
25 118:5,
21 119:7
138:23
139:10

140:9
141:6,16
142:9
143:5
158:25
159:5,9
165:19
166:7,8
168:15
169:13
170:2,15
173:12
181:3
183:13
184:16,20
187:4
189:7

social  24:6
 28:2 108:7

sole  86:21,
 25

sought  20:19
 60:3

sounding
 158:12

sounds
 102:22
 150:25

source  52:18

sources
 95:8,11
 98:13
 142:4

space  163:25
 164:5,6

speak  16:3,5
 31:12 50:2
 79:12
 145:10

speaking
 62:17
 76:16
 124:15
 125:2

specific
 103:23
 183:8

specifically
 51:23
 59:11
 64:22
 73:7,19
 74:4,23
 75:25
 76:20,24
 77:2 86:6
 91:13
 131:18
 153:14

speculate
 14:9
 127:23

spit  110:1

split  46:11,
 25 47:3
 52:14,15
 55:20,23,
 24 61:21
 63:8

spoke  12:23

13:14
15:17,19
16:8,11,
15,24
17:8,14
21:16 51:2
124:21,24
125:1
150:9
159:10
164:8

spoken  12:12
 15:13
 20:19
 21:21 31:8
 50:11
 120:5
 121:9,11
 159:13

spot  37:5

stake
 149:21,24

start  7:14
 9:16 47:12
 54:14 61:8
 66:2 82:24
 90:3 95:9
 161:21

started  12:2
 46:7
 61:16,22
 74:16
 75:10,18
 88:19 89:9
 90:14
 95:25

102:23
117:1
139:16
182:2

starting
 23:21
 90:14
 186:7

state  6:1
 10:13
 28:4,21
 85:12

stated  10:11
 17:19

statements
 30:24
 182:21
 183:1

States  5:17
 7:6 71:25

status  15:11

stay
 155:15,17
 163:15

steady
 100:10,13

stepped
 35:20

stick  188:23

sticks
 131:13

stipulation
 5:5

**stipulations**
  6:16

**stomach**
  58:17

**stop**  9:15
  163:1

**storm**  41:23
  86:9 163:8
  164:3

**straight**
  169:9

**street**  5:8
  93:10

**stress**  52:19
  64:16,19,
  20 74:17,
  20,24
  75:10,18
  76:14

**stressed**
  52:2,13,25
  53:23
  62:14
  64:23
  73:2,15,
  18,24
  76:13,21,
  25 77:3,6
  184:21,23

**strike**  104:3
  106:11
  109:2
  128:25
  140:20
  160:6

**structure**
  41:6,8

**stuck**  150:15

**stuff**  23:17
  53:10
  73:12
  92:25
  93:15
  106:23
  132:14
  136:22
  144:1,20
  171:22

**subbing**  81:3
  139:13
  140:4

**subject**
  187:20

**submit**
  106:12
  107:25

**submitted**
  115:23
  175:9

**subpoena**
  12:13 13:4
  15:16 17:3
  21:7
  22:11,18
  23:8
  29:12,20
  71:24
  77:25
  78:3,15
  164:8

182:5,7,15
183:7,15,
19

**substitute**
  82:1
  139:17,18
  142:5

**Substituting**
  81:10

**such-and-such**
  180:11

**suffered**
  55:6 58:14

**suffering**
  54:9,16
  57:12,17
  58:21
  62:14

**suggest**
  157:2

**suggested**
  164:11

**Suite**  5:8

**superintendent**
  87:10
  91:15 92:2

**support**
  15:19
  16:14
  17:10,15
  28:13,14
  45:2,6,9
  50:4,6,23
  122:9

140:15
168:8

**surgery**
  69:21 70:1

**swapped**
  172:25

**swear**  6:11
  12:6

**swell**  186:21

**swore**  12:1

**sworn**  6:13
  12:3

---

**T**

---

**taking**  5:21
  56:12
  148:7
  151:25
  153:8
  154:18,20
  156:3

**talk**  17:17,
  18 50:5
  51:8,9
  78:20,21
  131:10
  136:25
  154:3,5,24
  158:15,18
  164:16
  187:21

**talked**
  12:16,20
  13:8,9

15:2 51:9
54:7 79:10
125:7,9,18
126:14
132:24
134:25
136:4,7
186:3,12

**talking**
72:18
73:10,21
109:16
113:22
126:12
134:4,8
136:14
151:5,6,11
159:24

**tape** 114:12
158:24
159:4
189:6

**task** 92:25

**tax** 30:15,
18 71:4,
10,21 72:4
80:10,11,
14 109:20
110:21
111:23
112:6,15
113:21
114:1
118:24
119:3
176:10,11,
16,18

183:10
184:13

**taxes** 94:9,
11

**TC** 82:23,25
83:4,12,18
84:15
91:19,23
92:5,8,15,
19 103:6

**teach** 139:18

**teacher** 81:8
82:2

**teaching**
81:3
139:12,13
142:5

**Tear** 144:17

**Ted** 5:22

**teen-age**
145:6

**telephone**
154:20

**telling**
59:20
79:21
89:25 99:2
120:25
152:2
154:16
188:15

**ten** 18:23,
24 62:20
65:15 66:7

67:8,14
68:5,19,21
117:18,24
118:4

**tenant**
45:20,21

**terms** 18:10
149:11

**terrible**
48:2

**testified**
6:14 46:2
52:12
65:14
69:18
72:24 75:5
77:24 95:1
99:24
108:19
112:25
116:16
130:11
153:7
154:8
159:9
182:13
187:25

**testify**
11:7,18
23:7

**testimony**
12:14
20:18
21:15
22:24 26:3
27:1,22

29:24
30:17 31:1
37:25 47:6
57:14
65:18
118:16
159:21
187:20

**text** 24:7,
24 28:2,
10,15,22

**therapist**
59:23 60:3

**therapy**
55:17

**thing** 8:3
10:6 11:23
24:17 81:9
106:8
119:19
123:17
131:12
144:1
150:14
153:3,10,
12 168:10
179:9

**things** 10:19
52:22
96:20
106:19
117:1
126:16
185:14,18,
23

**thinking**

60:22
109:23
128:4
164:15

third-to-the-last  23:21
71:3

thirty
157:24

thirty-minute
157:21

Thirty-seven
31:18

thought  43:4
60:16

thousand
116:11
117:6,7,
10,19,24
118:4
127:21

three-  84:16

threshold
162:14

Thursday
5:20 12:21
13:20

thyroid
55:9,17

thyroidectomy
55:14

thyroids
55:11

tight  141:22
161:6

tightness
162:9

time  9:15
10:6,7
13:19
15:20,21,
24 19:7,
10,13,25
21:15,20
22:1,2
23:12
26:20
32:16
33:5,11,16
34:23
37:24
38:13,16
42:5,8,9
43:17
46:24
47:22 48:2
49:10,15,
22 50:4
51:19
53:12,18
54:13,17,
20 56:5,
10,15,24
57:10,15
58:12
59:13
61:20
62:22
63:4,7,10,
20,24

64:3,4,5,
13,17,25
66:11
68:10
69:1,5,9,
11,17
70:16
75:9,14
81:19
82:18 88:8
90:7,16
102:23
106:6,7
112:14
114:13,18
115:22
116:2,9
117:8
119:20
120:25
122:24
123:21
128:20
129:3
143:13
144:21
147:3,4,20
148:22
150:14
152:1
153:5,6,18
155:12
157:4
158:25
159:5
180:23
181:1,23
183:4

186:12,19
189:7

times  17:7
34:5 48:4,
5,19,25
49:21
51:12
54:5,7
63:1,3
65:21
66:13
83:19
85:18
97:11
106:19
129:22
167:2
173:8
174:3

tired  185:4

today  7:9
9:5 10:21
11:1,8
12:5,9,15
13:7 15:24
17:4 20:23
21:5 23:7
24:12
31:10 72:8
187:16
188:13

told  17:2
53:5
78:14,20
132:3,23
133:2,18
138:9,11,

14 152:3
154:18

**top** 112:1,
20

**Total** 49:1

**tough** 62:3

**town** 18:4
36:7
61:10,13
62:1 97:11
122:6
172:7
177:24
179:10

**track** 9:20

**trailer**
160:9,13,
23,24
161:5

**training**
77:9
185:17,22

**transaction**
175:11

**transcript**
71:4
187:15

**transfer**
124:6,18
126:10
168:7

**transferred**
126:20

**treated** 54:9

**treatment**
52:8

**tree** 146:2
149:19,25

**trees** 37:9

**trespass**
26:12,16
153:6,19,
21

**trespassers**
143:10,15,
23

**trespasses**
143:6
150:5,6,10
151:3,23
160:2

**trespassing**
145:18,24
146:7
149:9
153:15
156:20

**trial** 11:19

**trouble**
57:23 58:9
61:25
66:21,24
123:22
143:19

**truck** 162:25

**trust** 126:15
187:23

**trusted**
94:22
106:20
110:9,16,
17

**truth** 59:20

**truthfully**
12:4,8

**turn** 22:21
23:19 30:5
71:2
104:22
105:23
111:18
150:19

**turned**
170:10

**turning**
117:2

**twenty**
131:21,22
157:14,24

**twenty-**
157:21

**twenty-two**
43:15

**two-minute**
180:20

**type** 84:20
167:11

**typical**
110:4

**U**

**uh-huh** 6:23
18:18
22:23
23:1,4
29:1
36:15,18
39:19 40:5
44:15
48:14 58:6
64:10
66:8,18,20
67:5 68:22
71:1,17,
74:19
75:12 76:9
79:11
84:19 85:1
97:20
104:4,24
105:15,25
106:21
111:20
112:21,24
119:8
120:12
144:14
164:9,12
166:9
168:14
170:3,20
173:13
174:9
176:22

**uh-huhs** 9:8

SHAWNA BATES vs. JP MORGAN CHASE BANK, N.A.
Jeffrey G. Smith on 06/06/2013                    Index: unable..Wells

unable   11:7
  103:24

undergone
  69:20,21

Underground
  82:12 86:9

underlying
  119:11

underneath
  41:13,18

understand
  9:22 10:4
  24:2,10
  26:9 52:21
  73:25
  141:3
  184:7,8
  188:14

understanding
  53:2
  119:10,12,
  16 120:2
  122:11,13,
  141:14,18
  152:23

understood
  130:24
  133:1,5,
  12,13

undertook
  52:8

unemployed
  62:22,23
  63:5,7,10,
  12,19,24

64:2 65:8,
  16 66:10,
  12,15,19
  67:4

United   5:17
  7:6 71:25

unlocked
  163:18,22,
  24

upset   53:10
  58:17
  62:8,10
  69:8 75:25
  132:16
  185:7

Usual   6:15

utility
  82:12
  86:10

_____

_____
          V
_____

vary   139:20

veered
  181:25

veering   9:16
  179:10

verbally
  8:25 9:5,6

versus   5:16

videotape
  5:14
  114:17

view   35:15

visit   39:20,
  24 44:20,
  22,25

visited
  49:15

vomiting
  58:15

_____

_____
          W
_____

W-2   88:1

wages   98:7
  99:25
  118:4
  165:19

Wait   91:4
  167:10

waive   187:23
  188:9,10

walk   40:25
  169:4

WAMU   107:13

wanted   11:25
  72:22
  92:21
  115:1,
  125:5
  129:16
  174:13
  182:4

wanting
  14:22
  50:24

Wargo   31:14

wash   48:17

Washington
  31:9

water   7:23
  86:9

Wednesday
  12:22
  15:23
  16:7,21,
  22,23

week   12:21
  13:20
  15:22
  16:18,19,
  24 19:19
  21:17,25
  96:22 97:6
  98:20
  116:18
  139:21
  171:5

weekend
  154:15

weekly
  169:10
  174:1

weeks   17:11
  19:14,16,
  17

weight   56:21
  186:4,18,
  23,24

Wells
  164:24,25
  165:11,22

167:7,
168:16
174:19
175:4
176:20
177:8,19,
20,22
178:3,23
179:3
181:23,24
182:2

**Withdrawn**
58:1

**witnessed**
143:6,10

**wooden**
161:15

**woods**  93:11

**work**  32:7,8
61:10 79:4
80:23
82:12,13,
16 83:4,
11,24
84:9,17,20
85:5 86:10
91:7,16,22
93:1
103:19
118:9
122:8
138:24
140:13
141:23
148:8
157:17,19

**worked**  64:1
83:20
84:5,15
86:14,15
88:12
97:11
139:10
170:6

**working**
36:4,7
61:13 63:3
82:25
84:18
92:10
101:3
115:24
116:1,4,7
177:24

**works**  7:17
167:13

**worried**
52:23
53:21
76:17
152:20,24

**worry**  53:14

**worst**  69:5

**worth**  126:20
127:21

**wow**  46:12
150:20

**write**  171:23

**writing**
44:19

**written**
87:1,5

**wrong**  59:19
69:6 151:1
188:5

**wrote**  86:24

———————

——— Y ———

**y'all**  14:18
188:12

**y'all's**
188:24

**yard**  144:17

**Yea**  186:9

**year**  27:16
33:12,14
39:11
45:13,25
46:17,19
48:8
49:13,17
57:8 59:14
61:17
67:20 68:4
69:16
81:13,14,
17,20 83:2
85:17,19,
24 89:18
90:1,2,8
95:9,10
99:5
100:17
102:16
103:9

117:1
127:10
177:1,3
181:12,13

**years**  18:21,
23 42:17
46:14
47:19,21
50:10,18
61:3,4,20,
23 62:2,20
65:15 66:7
67:8,14
68:6,13,
16,19,21
81:16,18
83:2,7,21,
23 84:4,6,
11 90:6
92:11
95:23
147:10,11
165:4
177:15,16
181:11

**Yost**  5:22

**young**  84:6
144:15